### In the Matter Of:

BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

2:16-cv-0296

---

## THOMAS FOWLKES, M.D.

*September 29, 2017*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                      COLUMBUS

4                    -   -   -

5    TERESA BERRY,          :   CIVIL ACTION
     ADMINISTRATOR OF THE   :
6    ESTATE OF RHIANNA      :
     FILICHIA               :
7          Plaintiff,       :
                            :
8          V.               :
                            :
9    DELAWARE COUNTY        :
     SHERIFF'S OFFICE,      :
10   et al.,                :   CASE NO.
            Defendants.     :   2:16-cv-0296
11                   -   -   -

12             September 29, 2017

13                   -   -   -

14         Oral deposition of THOMAS FOWLKES,
     M.D., held in the offices of Esquire
15   Deposition Solutions, 1835 Market Street,
     Philadelphia, Pennsylvania 19103, commencing
16   at 10:58 a.m. on the above date, before
     Teresa M. Beaver, a Federally-Approved
17   Professional Court Reporter and a Notary
     Public in the Commonwealth of Pennsylvania.

18

19                   -   -   -

20

21

22         ESQUIRE DEPOSITION SOLUTIONS
              1835 Market Street
23                26th Floor
         Philadelphia, Pennsylvania 19103
24              (215) 988-9191



```
 1    A P P E A R A N C E S  :

 2

 3           KEMP, SCHAEFFER & ROWE
             BY:  ERICA A. PROBST, ESQUIRE
 4           88 West Mound Street
             Columbus, Ohio  43215
 5           (614)  232-8692
             erica@ksrlegal.com
 6           Counsel for the Plaintiff

 7           FISHEL HASS KIM ALBRECHT DOWNEY LLP
             BY:  DANIEL T. DOWNEY, ESQUIRE
 8           7775 Walton Parkway
             Suite 200
 9           New Albany, Ohio  43054
             (614)  453-7301
10           ddowney@fishelhass.com
             Counsel for the Defendant,
11           Delaware County Sheriff's Office

12
             FREUND, FREEZE & ARNOLD
13           BY:  MARK L. SCHUMACHER, ESQUIRE
             Capitol Square Office Building
14           65 E. State Street
             Suite 800
15           Columbus, Ohio  43215
             (614)  827-7300
16           mschumacher@ffalaw.com
             Counsel for the Defendant,
17           Correct Care Solutions

18                        -  -  -

19

20

21

22

23

24
```



```
1                      I  N  D  E  X

2    WITNESS                                    PAGE

3     THOMAS FOWLKES, M.D.

4          BY MS. PROBST                          5

5

6

7             E  X  H  I  B  I  T  S

8    MARKED            DESCRIPTION              PAGE

9     1                Expert Report             30

10    2                Curriculum Vitae          31

11    3                Handwritten Record        39

12    4                Handwritten Record        47

13    5                Handwritten record        47

14    6                Handwritten Record        48

15

16

17

18

19

20

21

22

23

24
```



```
 1              DEPOSITION SUPPORT INDEX

 2

 3

 4    Direction to Witness Not to Answer

 5    Page      Line              Page        Line

 6    None

 7

 8

 9    Request For Production of Documents

10    Page      Line              Page        Line

11    None

12

13

14    Stipulations

15    Page      Line              Page        Line

16    None

17

18

19    Questions Marked

20    Page      Line              Page        Line

21    None

22

23

24
```



```
 1                      -    -    -
 2              THOMAS FOWLKES, M.D., after
 3   having been duly sworn, was examined and
 4   testified as follows:
 5                      -    -    -
 6                  EXAMINATION
 7                      -    -    -
 8   BY MS. PROBST:
 9       Q.     Can you state your name for the
10   record?
11       A.     Thomas Fowlkes.
12       Q.     Are you a doctor?
13       A.     I am.
14       Q.     Can I call you Dr. Fowlkes or
15   Fowlkes?
16       A.     You can.  You can call me
17   Dr. Fowlkes, Tom or whatever you would like
18   or just doctor.  Just doctor.
19       Q.     My father-in-law is a doctor and
20   I went ten years calling him doctor and one
21   day he asked me to call him Steve.  It's a
22   habit of mine.
23              Prior to starting your
24   deposition I want to hand you a document that
```



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                      6

```
 1   I've previously or just now marked as Exhibit
 2   1, which I believe to be a report you
 3   prepared.  If you could review it and let me
 4   know what it is.
 5       A.    This is a copy of my Rule 26
 6   report in this case along with my CV, case
 7   list and fee schedule.
 8       Q.    Can you give me your current
 9   business address that you use?
10       A.    Post Office Box 1955, Oxford,
11   Mississippi.
12       Q.    I did you come here from
13   Mississippi today?
14       A.    Not today.  Yesterday.
15       Q.    Okay.  Who is your current
16   employer?
17       A.    I have -- I am a self-employed
18   physician.  I have three jobs.  I'm a
19   self-employed physician.  I'm an employee of
20   Fayette County, Mississippi and employee of
21   American Addiction Centers.
22       Q.    You indicate yourself employed
23   as a physician.  Do you have a company that
24   you've created to employ yourself as a
```



```
 1   physician or are you a sole --

 2        A.      Thomas Fowlkes, M.D., PA.

 3        Q.      Where is that incorporated?

 4        A.      Mississippi.

 5        Q.      You indicate you're an employee

 6   of Lafayette County.  What's your job title?

 7        A.      Medical director of the

 8   detention center.

 9        Q.      The detention center in

10   Lafayette County?

11        A.      That is correct.

12        Q.      And as an employee of American

13   Addiction Center, what is your job there?

14        A.       I'm an addiction physician and

15   director of professional and medical

16   relations for the Oxford Treatment Center

17   location.  That's a nationwide company.

18        Q.      With respect to your employment

19   for Thomas Fowlkes, M.D. PA, what type of

20   work do you do?

21        A.      Number one, I'm board certified

22   in emergency medicine.  So, on occasion,

23   emergency physicians may work sporadically or

24   locum tenens kind of work.  Do I -- if I do
```



1    that, I do it through my professional

2    association.

3              In addition to that, I do expert

4    witness and litigation support practice.  And

5    until earlier this year, I had a medical

6    clinic operating through that professional

7    association.

8         Q.     Who was?

9         A.     Thomas Fowlkes Medical Clinic.

10   Very creative marketing.

11        Q.     Was that located in Mississippi?

12        A.     Yes.  Oxford, Mississippi.

13        Q.     Why did you stop doing that?

14        A.     I have two -- I had two nurse

15   practitioners that worked with me.  It was a

16   cash-based practice for uninsured patients.

17   I was the $40 doctor of town.  So, the two --

18   I turned it over to the two nurse

19   practitioners.  They were doing the bulk of

20   the provision of services for the last year

21   or so.  So, I turned it over to them, because

22   they wanted to accept Medicaid, et cetera.

23        Q.     With respect to your job as an

24   employee of Lafayette County, that being the



```
 1    medical director of the detention center for

 2    Lafayette County, how long have you held that

 3    position?

 4         A.    I've been the medical director

 5    of the jail for 20 years.

 6         Q.    Is it a jail or is it a prison?

 7         A.    It is a jail and detention

 8    center.  Those are synonymous terms.

 9         Q.    How many prisoners does it have?

10         A.    We have approximately 160 beds.

11    That's our normal census.  Right now probably

12    more like 140.

13         Q.    How many hours a week do you

14    spend working there?

15         A.    It depends how you calculate it.

16    I'm on call 24 hours a day, seven days a

17    week.  So, I guess 168.

18         Q.    How many hours do you spend

19    actually at the facility?

20         A.    It varies from week to week.

21         Q.    Are there any other doctors on

22    staff?

23         A.    Physicians, no.

24         Q.    Is there only one location for
```



1    which you're responsible?  Are there any

2    nurses on staff?

3         A.      There are.

4         Q.      What type?

5         A.      I have a nurse practitioner.

6    So, mid level provider.

7                 I have a registered nurse and I

8    have an L.P.N.

9         Q.      Do you know the difference

10   between the scopes of practice for those

11   three particular nurses?

12        A.      I do.

13        Q.      And do you know if the scopes of

14   practice for those three particular nurses,

15   do you know what their scopes of practice are

16   in the State of Ohio?

17        A.      I'm generally familiar with

18   other states.  Certainly not -- every state

19   has a different nursing practice act with

20   slightly different language.

21        Q.      As you know the differences in

22   their scopes of practice, what do you believe

23   the differences to be?  Nurse practitioner,

24   begin with her.



```
 1        A.      So, a nurse practitioner has an
 2   advanced level of training.  They had to have
 3   been a registered nurse before.  They have to
 4   go to nurse practitioner school, which is at
 5   least a masters program.  Many of them are
 6   now doctorate level programs.  And they learn
 7   diagnosis and more about pharmacology so they
 8   are able to diagnose conditions, prescribe
 9   medications and order testing, independently
10   of -- not necessarily independently.  Depends
11   on the state.  Some states they are operating
12   under the collaboration of a physician.  Some
13   states actually they can practice completely
14   independently now.  But they can order
15   medications in and diagnostic testing.
16        Q.      What about an RN, scope of
17   practice?
18        A.      Okay.  An RN is a registered
19   nurse.  So, they have completed a program
20   specific for registered nurses.  They are not
21   able to practice independently.  So, in other
22   words they cannot prescribe medications or
23   order testing independently.
24                They can follow protocols and
```



```
 1   orders of doctors, carry out nursing, DD's

 2   nursing plans.

 3              One of things that they are

 4   usually able to do in most states that

 5   L.P.N.s are not is administer IVs or IV

 6   medications.  Quite often L.P.N.s cannot.

 7              And there are often nursing

 8   and/or insurance requirements that only a

 9   registered nurse provide a written nursing

10   plan of care.

11              That varies from state to state,

12   but often an insurance company or hospital

13   will say that the nursing plan of care has to

14   be written by a registered nurse.  And there

15   was one more that I was about to tell you.

16   Just a moment.

17       Q.     That's fine.  We started early.

18   Take your time.

19       A.     I can't think of it right now.

20   Maybe it will come to me in a minute.  They

21   can usually supervise other nurses including

22   L.P.N.s.

23              An L.P.N. has been to a program

24   specifically for a licensed practical or in
```



1    some states it's called licensed vocational

2    nursing and that is more a vocational program

3    or associates program.  And they are, in

4    general, allowed to perform the same

5    activities, I told you they couldn't usually

6    do IV medications unless they are

7    specifically trained.

8              The nursing practice acts of

9    most states say they cannot supervise a

10   registered nurse.

11        Q.    Do you know if the nurses --

12   nursing -- do you know if -- I'm getting your

13   language and mine confused.

14             Do you know if the State of

15   Ohio's statutes prevents or prohibits an

16   L.P.N. from creating a nursing plan of care?

17        A.    You reference some particular

18   nursing plan of care.  That may well be what

19   my reference before that a written plan of

20   care may well be required in the Ohio nursing

21   practice.  That could be written by a nurse.

22             A plan of care -- but a -- a

23   nonwritten plan of care or planning and

24   delivering doctors' orders, et cetera, they



THOMAS FOWLKES, M.D.                            September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                     14

1    certainly can do.

2         Q.     Do you know if the State of Ohio

3    prohibits an L.P.N. from making an initial

4    assessment?

5         A.     I believe it does not prohibit

6    them from making an initial assessment.

7                Are you talking about

8    specifically in a correctional setting?

9         Q.     I'm talking about anywhere.

10        A.     No, I don't believe they are

11   prohibited from making an initial assessment.

12        Q.     Do you know if an L.P.N. is

13   prohibited from diagnosing a patient?

14        A.     Nurses in general are not able

15   to diagnose patients.  Neither L.P.N.s nor

16   RNs are trained to diagnose but rather only

17   to assess, independently of other providers.

18        Q.     Would you agree that an L.P.N.

19   cannot prescribe medication?

20        A.     Yes.

21        Q.     Would you agree that an L.P.N.

22   cannot make a determination as to whether or

23   not certain already prescribed medications

24   should not be given?



1      A.      I would not agree with that.  I
2   would not agree with that.
3      Q.      On that particular point, is it
4   your position then that an L.P.N. is able to
5   determine whether or not an individual, who
6   they are assessing, should continue the
7   prescription that they have been given by a
8   physician?
9      A.      So, as -- in this case
10  specifically, if an L.P.N. were acting upon
11  the direction of a physician, not to
12  prescribe narcotic -- not to dispense
13  narcotic medications, or if there is a policy
14  of the medical director that says we do not
15  prescribe or dispense chronic narcotics here,
16  the L.P.N. would be expected to follow that
17  directive of the physician.
18     Q.      And do you know -- we're getting
19  into the facts a little bit, which I didn't
20  want to do yet, but I'm going to ask you.
21             Do you know if the specific
22  medical policy at the Delaware County jail
23  prohibited the dispensation of all narcotic
24  medications?



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                   16

1          A.      Well, the written policies and

2    procedures of the Delaware County jail don't

3    contain the practice and the general practice

4    or the medical decision-making of the

5    responsible physician.

6                  So, you would not expect a set

7    of policies and procedures to outline all of

8    the specific practice patterns of and

9    requests of the medical director.

10                 So, no.  So the answer to your

11   question is no, I don't believe it prohibited

12   that.

13         Q.      Do you know if the policies and

14   procedures of correctional healthcare,

15   incorporated, prohibited the dispensation of

16   all narcotic medications in the particular

17   Delaware County jail facility?

18         A.      It is my understanding that that

19   was a position or site specific thing, not a

20   company-wide policy.

21         Q.      Other than narcotic

22   medications -- I want to ask my question

23   again.

24                 Does -- can an L.P.N. determine



1    whether or not an individual should --

2    withdrawn.

3              Can an L.P.N. determine whether

4    or not an individual should not continue

5    certain prescriptions given by a physician?

6         A.    Yes.

7         Q.    Do you know what prescriptions

8    Miss Filichia was taking at the time she was

9    admitted to the Delaware County jail on

10   February 20th, 2016?

11        A.    Yes.

12        Q.    What were those?

13        A.    Before I answer that, when I

14   answered yes to, can a licensed practical

15   nurse decide to not essentially you asked me

16   a question of does a licensed practical nurse

17   have the ability to decide not to give a

18   medicine prescribed by a physician.

19        Q.    Yes.

20        A.    I answered yes.  I was expecting

21   a follow-up from you about why is that so.

22   You didn't give that to me.

23        Q.    No, I didn't.

24        A.    May I explain my answer?



```
1          Q.      Sure.
2          A.      An L.P.N. can look at a
3    medication and can make a determination that
4    the medication that they have wasn't
5    prescribed to them, was prescribed five years
6    ago and is not a valid prescription.
7                  They can also look at the
8    medication and discuss it with the physician
9    and decide in conjunction with the physician
10   whether it's going to be given or not.
11                 So, certainly it happens many
12   times that nurses, in conjunction with the
13   physician, decide whether or not medications
14   are going to be continued.  And sometimes the
15   nurse herself can decide I don't even need to
16   ask the physician about this ten-year-old
17   prescription.
18                 Certainly there are times when
19   an L.P.N. can decide that this is not a valid
20   prescription or, you know, that this is
21   not -- there's something not valid about it.
22   There's a different medication in the bottle,
23   et cetera, or if they have any doubts, they
24   can discuss it with the physician.
```



1    Q.    Okay.  Let's limit the question

2    then.  I'm going to reask it.  I appreciate

3    your answer.

4    A.    Okay.

5    Q.    So, can an L.P.N. determine that

6    a patient should not be given a valid

7    prescription from a doctor on her own?

8    A.    What's your definition of valid?

9    Q.    Not expired.

10    A.    Okay.

11    Q.    One that they've been taking up

12    to the minute they see the L.P.N.?

13    A.    So, the L.P.N. can discuss that

14    with the physician and in conjunction with

15    the physician can decide whether or not that

16    medication will be continued in the jail.

17    Q.    But it's accurate to say that

18    the L.P.N. on her own, without talking to a

19    physician, cannot determine that a valid or

20    current, if you will, prescription being

21    taken by an inmate should be discontinued?

22    A.    Would you read the question

23    back, please?

24                    -  -  -



```
 1              (Whereupon, the following
 2     portion of the record was read by the court
 3     reporter:
 4              "QUESTION:  But it's accurate to
 5     say that the L.P.N. on her own, without
 6     talking to a physician, cannot determine that
 7     a valid or current, if you will, prescription
 8     being taken by an inmate should be
 9     discontinued?")
10                      -  -  -
11              THE WITNESS:  It would depend on
12     a number of factors, including directions
13     that they have from the physician.  So,
14     orders that they've gotten from their
15     supervising physician.  And it may well be
16     that many medications are not started, the
17     L.P.N. makes a determination not to start
18     them at the time of admission, but to have
19     the physician review them when they come in
20     later.
21              It is quite routine for nurses
22     to decide not to continue a medication that
23     could -- that could be against the
24     physician's wishes or either is not an urgent
```



1    medication.

2              As an example, in my jail, I

3    don't allow the prescribing of Tylenol

4    because I don't want to have a concern about

5    Tylenol being in my jail and there being

6    Tylenol doses.  My nurses know that it's my

7    wishes for them not to continue Tylenol.

8              If they believe there's a reason

9    why they need to, they'll put the medication

10   up and ask me about it.

11             There's many circumstances when

12   nurses decide I should not continue this

13   medication.

14        Q.    What is an urgent medication?

15   What would qualify as an urgent medication?

16        A.    One that needs to be -- one that

17   shouldn't be discontinued for a few days.

18        Q.    Would antibiotics qualify as

19   urgent medications?

20        A.    It would entirely depend on

21   whether the antibiotics were -- what the

22   circumstances were, what they were given for,

23   what length of time, et cetera.

24             Such as -- do you want me to



THOMAS FOWLKES, M.D.                              September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                      22

1    talk about the specifics of this case?

2         Q.    No.  We'll get to it.  I'm just

3    kind of doing some general right now.

4         A.    Okay.  It depends on a time

5    frame.  Antibiotics are given for a

6    particular time frame.  So, often for

7    instance a dentist will give you antibiotics

8    for five days, after you had a tooth

9    extracted.

10               We often have inmates that come

11   in three months later with a sack of

12   medications that includes the five days still

13   in the bottle because they never took them

14   and my nurses should not start them because

15   it's not -- even though the prescription is

16   not expired for a year, they had their tooth

17   removed three months ago.

18               It would be inappropriate for

19   the nurse to just give them antibiotics that

20   a dentist had given them three months ago and

21   told them to take over five days.  That's

22   inappropriate and the nurses ought to know

23   that.

24        Q.    So the timing of the



1    prescription is a factor in determine whether

2    a medication is urgent?

3         A.      Certainly.

4         Q.      Is the type of infection --

5    withdrawn.

6                 If the medication is an

7    antibiotic, is the type of infection a

8    consideration in determining whether the

9    medication is urgent?

10        A.      Whether urgent or not, that's

11   not up to the nurse to decide.

12                So, about the urgency of the

13   condition or -- the appropriateness of the

14   prescription.  So, in other words, the time

15   frame, whether it's the right medication,

16   that's something that the nurse should be

17   able to decide.

18                But I wouldn't expect a nurse to

19   decide about the diagnosis for which it was

20   prescribed, necessarily.

21                I should add I wouldn't expect

22   her to decide that without getting additional

23   information so she could do things other than

24   talk to the physician.  She could look at the



 1    medical records that she had or request

 2    medical records or request pharmacy

 3    verifications, which often happen.

 4         Q.    Or that an inmate may bring with

 5    them?

 6         A.    Yes.

 7         Q.    Is your educational background

 8    contained in your expert report complete?

 9         A.    Is my educational background

10    complete and contained in my CV?

11         Q.    Yes.

12         A.    Yes.

13         Q.    During your education at the

14    University of Pittsburgh in emergency

15    medicine, did you undertake any courses in or

16    did you have any education in forensic

17    science?

18         A.    You'll have to tell me what you

19    mean by that.

20         Q.    Did you ever act as a coroner

21    during your residency at the University of

22    Pittsburgh?

23         A.    Not during my residency.

24         Q.    Did you ever act as a coroner at



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                25

1    any time?

2        A.     Not as the coroner; the

3    assistant medical examiner.

4        Q.     Assistant medical examiner?

5        A.     Yes.

6        Q.     When was that?

7        A.     From approximately 2000, 2007 in

8    Fayette County, Mississippi.

9        Q.     What are the duties of an

10   assistant medical examiner?

11       A.     To rule on the cause and manner

12   of death to cases which one is assigned.

13       Q.     Approximately annually as an

14   assistant medical examiner, how many causes

15   of death did you opine upon?

16       A.     I would say in the several

17   dozens.

18       Q.     Regular dozens or baker's

19   dozens?  I'm just kidding.

20              All right.  During your time as

21   an assistant medical examiner, did ever have

22   another physician disagree with your ruling

23   on the cause or manner of death?

24       A.     Not that I'm aware of.



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                   26

1          Q.      Did you ever offer testimony

2     regarding your cause of death -- withdrawn.

3                  Did you ever offer testimony as

4     an assistant medical examiner in a court of

5     law regarding the cause of death?

6          A.      Yes.

7          Q.      Was this in criminal

8     proceedings?

9          A.      Both.

10         Q.      Criminally and civil?

11         A.      Yes.

12         Q.      And in any of those proceedings,

13    was the determination of the cause of death

14    made by you as an assistant medical examiner

15    found to be inaccurate?

16         A.      Not that I'm aware of.

17         Q.      What types of things does a

18    medical examiner review in order to determine

19    a cause of death?

20         A.      Okay.  So, the medical -- the

21    circumstances surrounding the death.  So,

22    there would be police reports, there would be

23    investigative summaries, there would be the

24    investigation of the scene itself, and



1    examination of the body itself, the medical

2    records.  Then quite often some type of

3    testing would be ordered; such as

4    toxicological testing and/or an autopsy.

5              Those findings, if ordered, you

6    would have the results back before one ruled

7    on the cause and manner of death.

8         Q.    With respect to medical records,

9    do you mean historical medical records of the

10   decedent?

11        A.    That is correct.

12        Q.    And why are those important?

13   Withdrawn.  You didn't say important.

14              Why are those used?

15        A.    They are important to tell about

16   the person's past medical history and that

17   gives one's clues as to medications they are

18   taking, medications they are not taking,

19   surgeries that they've had, conditions that

20   they've had and the like.

21        Q.    I know you've indicated in your

22   CV and during your testimony already that you

23   are the director, medical director for a

24   detention center in Lafayette County.



```
 1              So, prior to becoming the
 2   medical director of the detention center of
 3   Lafayette County, did you take any courses
 4   provided by the National Commission on
 5   Correctional Healthcare?
 6         A.      Prior to my -- no.  The answer
 7   is no.
 8         Q.      Did you take any after you
 9   became the director?
10         A.      Your question, if I understood
11   it, was did I take courses offered by the --
12   ask your question again.
13         Q.      Did you take any courses offered
14   by the National Commission on Correctional
15   Healthcare?
16         A.      I don't believe the National
17   Commission -- I don't believe the National
18   Commission on Correctional Healthcare offers
19   courses.
20         Q.      Did you attend any seminars?
21         A.      Yes.
22         Q.      Thank you.  I kind of meant
23   both, but I appreciate the difference.
24              With respect to seminars given
```



THOMAS FOWLKES, M.D.                      September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                29

1   by the National Commission on Correctional

2   healthcare, do you recall the last one you

3   attended?

4          A.     Yes.

5          Q.     When was that?

6          A.     In April of this year.  If I may

7   also expand, they offer not only seminars,

8   but they also offer certifications.  They

9   offer seminars on accreditation standards and

10  they offer certifications for professionals

11  who are working in a correctional healthcare

12  environment.

13         Q.     Do you have any of those

14  certifications?

15         A.     I do.

16         Q.     And those are listed in your --

17  in Exhibit A under your CV?  Is that correct?

18         A.     Actually, that is the -- I have

19  my updated CV.

20         Q.     Thank you.

21         A.     On my updated CV you will see

22  under certifications, on the one that's with

23  my report I was a certified correctional

24  healthcare professional.  Now it says



```
 1   certified correctional healthcare physician.
 2   There are certain levels of certification one
 3   can get.
 4         Q.     Is this the only correction from
 5   professional to physician?
 6         A.     That's not a correction.
 7         Q.     I didn't mean correction.  I
 8   meant change.
 9         A.     There may be additional
10   lectures.  I normally provide an updated
11   lecture list.  There may be updated lectures.
12   There's no other substantial changes that I'm
13   aware of.
14                I've received now the CCHP dash
15   physician certification and at the time this
16   report was submitted, I had only CCHP basic.
17         Q.     We'll go ahead and mark this for
18   the record just so that we have it.
19                        -   -   -
20                (Deposition Exhibit No. 1,
21   Expert Report, was marked for
22   identification.)
23                        -   -   -
24                (Deposition Exhibit No. 2,
```



```
 1    Curriculum Vitae, was marked for

 2    identification.)

 3                          -   -   -

 4    BY MS. PROBST:

 5          Q.      I've marked what you've provided

 6    to me as Exhibit 2 as an updated curriculum

 7    vitae.  Is that a correct copy of what you

 8    gave me?

 9          A.      Yes.  It also has -- you also

10    have in there my updated case list, which you

11    can mark as part of that exhibit.

12          Q.      It's all included.

13          A.      It's a CV and case list.

14          Q.      Okay.  Have you ever written any

15    articles published by the National Commission

16    on Correctional Healthcare?

17          A.      No.

18          Q.      Have you ever written any

19    articles on correctional healthcare?

20          A.      No.

21          Q.      Did you review the standards for

22    health services and jails published by the

23    National Commission on Correctional

24    Healthcare in the provision of the opinion
```



1    we've marked as Exhibit 1?

2          A.     I did.

3          Q.     Do you have any specific

4    recollection of which sections of that

5    particular book you reviewed in creating

6    Exhibit 1?

7          A.     No.  I have the -- I have the

8    book in PDF format and I often review

9    multiple sections when I'm reviewing a case.

10         Q.     Did you make any specific

11   citation in your report to any specific

12   provision of the standards for health

13   services in jails?

14         A.     Not that I recall.

15         Q.     Did you review any other book

16   regarding correctional healthcare or medical

17   services in the provision of your report,

18   Exhibit 1?

19         A.     No.

20         Q.     I believe you indicated in your

21   updated Exhibit 2, there's a list of cases

22   that has also been updated.

23                And by list of cases, do you

24   mean cases in which you have testified as an



THOMAS FOWLKES, M.D.                        September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              33

1    expert witness?

2         A.     Yes.  My federal case list of

3    testimony in the last four years.

4         Q.     Have any of those cases been in

5    the State of Ohio?  You can look at it.  It's

6    not a memory test.

7         A.     Not to the best of my knowledge.

8                The reason I'm having to look

9    has to do with submission of reports are not

10   included.  Only sworn testimony and I believe

11   any other Ohio cases, only involve reports,

12   not sworn testimony.

13        Q.     Using the list you've provided

14   in Exhibit 2, starting with Angela Anderson,

15   et al. versus Marshall County MS and

16   BMH-DeSoto Hospital, did that case involve a

17   detention center?

18        A.     Yes.

19        Q.     What was the name of the

20   detention center?

21        A.     Marshall County Jail.

22        Q.     And do you have any recollection

23   of the circumstances surrounding that case?

24        A.     Not specifically.  I recall it



```
 1    was a death in custody of a psychiatric

 2    inmate.  Psychiatric detainee, I should say.

 3    A civil detainee.

 4         Q.    State of Mississippi versus Sean

 5    Hunt.  Do you have any recollection of

 6    whether that involved the death at a jail?

 7         A.    No.  I do.  I do recall and it

 8    did not.

 9         Q.    Why don't you look at the list

10    and tell me which ones involved death in a

11    jail.  Make it easier.

12         A.    Okay.  These four.

13         Q.    Oh, those four.  Thank you.

14               Okay.  Let's start with Lee

15    versus Jackson County, Mississippi.

16         A.    Yes.

17         Q.    What jail was at issue in that

18    case?

19         A.    Jackson County Detention Center.

20         Q.    What was the allegation if you

21    recall?

22         A.    A death in custody allegation of

23    inadequate medical care and deliberate

24    indifference.
```



1        Q.      With respect to Pallen versus

2    Titlebaum?

3        A.      That was not a jail case.  That

4    was not a jail case.

5        Q.      How about Boss versus Wexford?

6        A.      Yes.

7        Q.      What happened in that case?

8        A.      That is a jail death.

9        Q.      And what was the allegation?

10       A.      Inadequate medical care.

11   Inadequate medical care and deliberate

12   indifference.

13       Q.      And did it involve a nurse or a

14   doctor?

15       A.      I believe multiple different

16   healthcare providers.

17       Q.      With respect to the first one,

18   Lee versus Jackson County, did that involve

19   nursing care or doctor care?

20       A.      Both.

21       Q.      Singleton versus Southern Health

22   Partners.  Is that a jail case?

23       A.      Yes.

24       Q.      What were the circumstances



1    surrounding that case?

2         A.    Death in custody.  Alleging

3    inadequate medical care.

4         Q.    Did that involve nursing care or

5    doctor care?

6         A.    Both.

7         Q.    In those cases that we've

8    discussed with respect to a death in custody,

9    what were you -- were you retained by the

10   same law firm that you've been retained for

11   for today's case?

12        A.    No.

13        Q.    Were you retained by the same

14   client?

15        A.    No.

16        Q.    Meaning Correctional Healthcare

17   Company?

18        A.    No.

19        Q.    Were there any motions made to

20   exclude your testimony in any of those cases?

21        A.    Not to the best of my knowledge.

22        Q.    And were you compensated for

23   your testimony in those cases?

24        A.    Yes.



1      Q.      All right.  What date were you

2  retained in this case, sir?

3      A.      I don't recall an exact date,

4  but it was earlier this year.

5      Q.      2017?

6      A.      Yes.

7      Q.      And who made the initial contact

8  to you, sir?

9      A.      Someone from Schumacher's

10 office.

11     Q.      And your compensation

12 arrangements are contained in Exhibit 1?

13     A.      Yes.

14     Q.      And what was your understanding

15 of the assignment?

16     A.      That is outlined in the first

17 full paragraph of my report, the scope of

18 report.  That was my assignment; to opine

19 upon those items there.

20     Q.      So, when you say the scope of

21 the report in paragraph numbered I, scope of

22 report --

23     A.      Yes.  Roman Numeral I.

24     Q.      Yeah.  Page 1.  It says the



1    appropriateness of medical care provided Miss

2    Rhianna Filichia while she was incarcerated

3    at the Delaware County Ohio jail in January

4    and February of 2016.

5              Two, Roman Numeral II, how Miss

6    Filichia's chronic and ongoing medical

7    conditions may have played a role in her

8    symptoms, treatment and ultimately her death.

9              And then three:  Whether the

10   policies and procedures in place regarding

11   medical care at the Delaware County jail are

12   responsible and appropriate.

13             MR. SCHUMACHER:  Reasonable.

14             THE WITNESS:  Reasonable.

15             MS. PROBST:  Mine says

16   appropriate.

17             MR. SCHUMACHER:  Reasonable.

18             THE WITNESS:  You said

19   responsible.

20   BY MS. PROBST:

21       Q.    I apologize.  Are reasonable and

22   appropriate.

23             My opinion is limited to those I

24   can offer to a reasonable degree of medical



```
 1   probability or likelihood.
 2              Are those the three assignments
 3   you were given?
 4       A.    Yes, to review the records and
 5   opine upon those three directives -- those
 6   three areas.
 7       Q.    With respect to the records you
 8   reviewed, what records did you review?
 9       A.    A list that I reviewed at the
10   time that I've submitted this report are
11   contained --
12       Q.    Page 12?
13       A.    -- within 12 and 13.
14       Q.    Okay.
15       A.    And a list of records I've
16   reviewed since the time of my report are
17   contained on this sheet.
18       Q.    Okay.  Hold on one second.  Can
19   I have this?
20                   -   -   -
21              (Deposition Exhibit No. 3,
22   Handwritten Record, was marked for
23   identification.)
24                   -   -   -
```



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    40

```
 1    BY MS. PROBST:
 2         Q.    I'm handing you a document I've
 3    marked as Exhibit 3.  You indicated that in
 4    addition to the materials that are referenced
 5    beginning on Page 12 of your expert report
 6    which we've marked as Exhibit 1, that you
 7    reviewed additional materials which I've
 8    marked as Exhibit 3 and set in front of you.
 9             Do you see that?
10         A.    I do.
11         Q.    Did you compile this list?
12         A.    I did.
13         Q.    Is this your handwriting?
14         A.    It is.
15         Q.    On Number F, you indicate on
16    Exhibit 3, Detective Overly's video narrative
17    summary, 2/20 to 2/21 of 2016.
18             Did you see that?
19         A.    Yes.
20         Q.    Did you actually watch the
21    videos?
22         A.    I have not yet.
23         Q.    Do you have them?
24         A.    They have arrived at my office
```



```
 1    since I have left.
 2              MR. SCHUMACHER:  All 70 hours.
 3              MS. PROBST:  It's time
 4    consuming.
 5    BY MS. PROBST:
 6         Q.    With reference to Detective
 7    Overly's video narrative summary from 2/20
 8    and 2/21 of '16, do you recall -- and if you
 9    don't, that's fine, it's not a memory test,
10    if Detective Overly included in his summary
11    whether or not Miss Filichia brought a bag of
12    medicine with her to the jail?
13         A.    May I refer to that summary?
14         Q.    Please.  Sure.  Go right ahead.
15         A.    Yes, it does make reference to
16    that.
17         Q.    Do you or have you ever seen or
18    reviewed a bag of medicine from Correctional
19    Healthcare Companies?
20         A.    Have I personally seen a bag of
21    medicines?  No, I have not.
22         Q.    Have you ever seen any list
23    indicating what medicines Miss Filichia had
24    in that bag?
```



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE            42

1          A.      I have seen the testimony or I

2    have seen that report on the video that there

3    was medications that -- a bag that contained

4    pills and that the correctional officers

5    looked at them.  I've also seen some

6    deposition testimony that there were some

7    pills in that bag.  But the specific list, I

8    did not see.

9          Q.      Has anyone ever told you what

10   happened to that bag?

11         A.      I have no information about

12   that.

13         Q.      With respect to your job as the

14   medical director of a detention center, do

15   you have policies and procedures for your

16   detention center on what to do with

17   medications or pills, if you will, brought in

18   by potential detainees?

19         A.      My policies and procedures are

20   similar to the Delaware County jail policies

21   and procedures.

22         Q.      Do any of them call for

23   destruction of the medicine or pills?

24         A.      Mine do, yes.



```
1        Q.      When?

2        A.      After the person is no longer

3    there.  Just I need to clarify.

4        Q.      Sure.  Please.

5        A.      There's several different --

6    there's several different ways that

7    medications are handled.

8        Q.      Uh-huh.

9        A.      The Delaware County jail has a

10   way that was very similar to mine, which is

11   they often would make a list.  It depends on

12   whether the person is going to be there short

13   term or long term.  Often if a person going

14   to be there short term they would actually be

15   dispensed their medications that they had

16   brought in.  And if they had the correct

17   medications and a valid prescription.

18            If not, they would be counted

19   and then locked up in a locked cabinet,

20   unless they were a controlled substance, in

21   which case, at least in my facility, we lock

22   them up in a separate narcotics cabinet.  It

23   depends on whether the person is going to be

24   dispensed their medication, whether it's a
```



1  controlled substance or not.  Depends on
2  where it's housed.
3             Normally when a person leaves,
4  especially they come in, stay a day or two,
5  they leave, they would take their own
6  medications back with them or in the case of
7  say a weekender, the card would have been
8  made up, it would have been kept from weekend
9  to weekend and dispensed.
10            When the person is finally
11  discharged, normally they are given their
12  medications.  That's their policy to give
13  them back their medications.
14            However, because people are
15  often in a very big rush to get out of jail
16  and usually when they open the door, the
17  person goes out immediately and leaves their
18  medications and so once -- on a periodic
19  basis, we go through, find out whose
20  medicines are still there, that the person is
21  not still there and destroy them.
22       Q.    With respect to the opinion that
23  you've offered which we've marked as Exhibit
24  1, is this a sum total of all -- this written



THOMAS FOWLKES, M.D.                         September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                   45

1   opinion -- does this written opinion contain

2   each and every opinion that you intend to

3   offer in this case?

4          A.     No, it does not.

5          Q.     And why not?

6          A.     Well, number one, I have formed

7   a couple of supplemental opinions since I've

8   implemented this report.

9          Q.     Okay.

10         A.     Number two, it was designed to

11  be a summary of my main opinions and all of

12  the opinions that I am prepared to offer at

13  this time.

14                It's a summary of those but

15  certainly I may have other opinions based

16  upon other questions that you may ask me.

17         Q.     Fair.  What -- before we get to

18  the ones in there, can you identify the

19  supplemental opinions you've formed?

20         A.     I can.

21         Q.     Okay.

22         A.     This page just listed as

23  additional opinions since the initial report.

24         Q.     Uh-huh.



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                              46

1          A.      But in addition to that, this is

2     the opinions I have with which I disagree

3     with Miss LaMarre.  I don't know how to

4     pronounce her name.  I apologize.

5          Q.      Madeline LaMarre.  It's probably

6     pronounced differently because I'm from

7     Indiana.

8          A.      Sounds good.

9          Q.      And the summary of the

10    differences of opinion I have with

11    Dr. Manokas?  These are rebuttal reports that

12    you're offering today?

13         A.      No.

14         Q.      No?

15         A.      I mean they are --

16                 MR. SCHUMACHER:  They are notes.

17                 THE WITNESS:  They are notes

18    that I made.

19    BY MS. PROBST:

20         Q.      Okay.  I appreciate that.  Okay.

21                 MS. PROBST:  Off the record.

22                        -   -   -

23                 (Whereupon, there was a recess

24    commencing at 11:55 a.m. and concluding at



```
 1    12:09 p.m.)

 2                     -   -   -

 3              MS. PROBST:  Let's start.  All

 4    right.  Dr. Fowlkes, you have provided me and

 5    I have marked and identified and sat in front

 6    of you, I've marked Exhibit 4, which is three

 7    pages in length, which is titled summary of

 8    point in Miss LaMarre's report with which I

 9    disagree.

10              And then Exhibit 5, which I have

11    marked and it's titled summary of issues with

12    Dr. Manokas' report.

13                     -   -   -

14              (Deposition Exhibit No. 4,

15    Handwritten Record, was marked for

16    identification.)

17                     -   -   -

18              (Deposition Exhibit No. 5,

19    Handwritten record, was marked for

20    identification.)

21                     -   -   -

22    BY MS. PROBST:

23         Q.    Exhibit 6, additional opinions

24    since initial report.
```



```
 1                         -   -   -
 2                (Deposition Exhibit No. 6,
 3      Handwritten Record, was marked for
 4      identification.)
 5                         -   -   -
 6      BY MS. PROBST:
 7           Q.      Is that correct?
 8           A.      Yes.
 9           Q.      These are all documents you've
10      handwritten; is that correct?
11           A.      That is correct.
12           Q.      Now, looking at these three
13      documents and your original report, do they
14      contain all the opinions that you formed to
15      date?
16           A.      They contain a summary of the
17      opinions that I've formed to date.
18           Q.      All right.  Flipping to Exhibit
19      1, Page 7.
20           A.      Okay.
21           Q.      All right.  There is a bold word
22      titled opinions at the top page, beginning in
23      the second paragraph.
24                   Do you see that?
```



1          A.      I do.

2          Q.      Are all the statements made

3    following that bold line through Page 12 your

4    opinions in this case, in Exhibit 1?

5          A.      Those are my opinions expressed

6    in that report, yes.

7          Q.      Starting with the letter, Roman

8    numeral number one.  The actions taken by the

9    employees of Correct Care Solutions in their

10   assessment and treatment of Ms. Filichia

11   during January and February, 2016, while she

12   was incarcerated at the Delaware County jail

13   were reasonable and within the acceptable

14   standard of care for healthcare within a

15   detention facility.

16              Do you see that?

17         A.      I do.

18         Q.      All right.  Am I accurate in

19   stating, in that in forming this opinion, you

20   did not review the Ohio revised code

21   statutory section regarding L.P.N. scope of

22   practice?

23         A.      I did not specifically review

24   the nursing practice act, that is correct, in



```
1    that state.  Although I am familiar with
2    states in general.  I'm sorry.  I should
3    rephrase.
4             I am familiar with the practice
5    acts in states generally.
6         Q.    Is it accurate to state that at
7    the time of February 20 and 21st, there was
8    no medical staff on duty at the Delaware
9    County jail except licensed practical nurses?
10        A.    No, I don't believe that's
11   correct.
12        Q.    You believe there was -- you
13   believe there was another licensed medical
14   personnel at the Delaware County jail on
15   February 20th or 21st?
16        A.    That wasn't your question.
17        Q.    Okay.  So, tell me why you
18   didn't agree with my first question.
19        A.    You said on duty.  Oh, there was
20   a responsible health authority, there was a
21   registered nurse who had -- who had
22   supervisory authority over what was going on,
23   or a person.  I'm sorry, a person.
24        Q.    Do you think there was a
```



THOMAS FOWLKES, M.D.                        September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    51

```
 1   registered nurse on duty?
 2        A.      I believe that there was a
 3   registered nurse employed by -- I'm going to
 4   also use Correct Care Solutions
 5   interchangeably with I believe --
 6        Q.      That's fine.
 7        A.      I believe that they had a
 8   registered nurse who was charged with
 9   supervisory responsibility over that facility
10   and, therefore, being on duty, she was maybe
11   not present physically.
12              What I disagreed with, same as
13   the physician, there was a physician on duty.
14        Q.      That was a physician that could
15   be called.  Is that correct?
16        A.      That was responsible for the
17   care there and could be called 24 hours a
18   day, was there a supervisory nurse.
19              So, your term of on duty
20   confused me or not -- it didn't confuse me.
21   There were on duty.  I'm on duty 24 hours a
22   day at my jail although I'm not physically
23   present there.
24        Q.      Who gave you the name of any
```



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    52

1    supervisory nurse that was not an L.P.N.?
2         A.    In I believe it was Nurse
3    Bloomfield's deposition where she said that
4    there was responsible health authority that
5    was a registered nurse.
6         Q.    Did you read the portion of her
7    testimony where she indicated that there had
8    never been a registered nurse in the facility
9    while she was employed there?
10             MR. DOWNEY:  Objection.  I think
11   misstates the record.
12             THE WITNESS:  No, I did not read
13   something that said that.  I read that she
14   said that the -- nursing director or the --
15   I'm not sure if she said acting or nursing.
16   Her direct supervisor was another L.P.N.  I
17   believe that she was -- I believe that she
18   said that there was a registered nurse that
19   worked for Correct Care Solutions who was
20   their supervisor.
21        Q.    Do you recall Ms. Bloomfield
22   indicating that between February 20th or 21st
23   that anyone at the Delaware County jail ever
24   made a call to that registered nurse in that



1   two-day period regarding Ms. Filichia?

2        A.    In that two-day period, no, I do

3   not believe they did.

4        Q.    Did you see any notes in

5   Ms. Filichia's medical record, which

6   according to Exhibit 1, you reviewed,

7   indicating that anyone at the Delaware

8   County jail ever contacted -- withdrawn.

9              Did anyone with Corrective

10  Healthcare Solutions ever contacted anyone at

11  any registered nurse with respect to Miss

12  Filichia?

13       A.    A physician, but not a

14  registered nurse.

15       Q.    I know.  I'm asking about a

16  registered nurse.  There was no calls made in

17  any of the medical records for any consult

18  with any registered nurse; is that correct?

19       A.    I don't believe there was any

20  reason to do that and I didn't see any

21  evidence that anybody did that.

22       Q.    Let's talk about Dr. Betty

23  Mitchell.  Who is Dr. Betty Mitchell?

24       A.    It's my understanding she's the



1   responsible physician for that facility.

2        Q.     Other than the deposition of

3   Nurse Bloomfield, did you find any evidence

4   in the record that Dr. Betty Mitchell was

5   contacted for any other reason other than to

6   approve a Senna laxative on February 20th of

7   2016?

8             MR. DOWNEY:  Objection.

9   BY MS. PROBST:

10       Q.     February 20th, 2016.

11       A.     Some of Dr. Mitchell's prior

12  orders were still in effect at that time.

13  But with regards to Dr. Mitchell and the

14  phone call that occurred, I was trying to

15  give you this.

16            So she was contacted and as a

17  result of that phone contact, we see that an

18  order was given for the Senna laxative and I

19  don't know whether it was discussed with her

20  at that time.

21            But the medicine was also

22  continued that she had previously ordered.

23       Q.     Looking at that same page, could

24  you flip back, please.  Could you please read



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                   55

1    the Bates stamp page on the bottom into the

2    record?

3        A.      CCS 000009.

4        Q.      Are there any indication on that

5    page, Dr. Fowlkes, on that particular page,

6    who contacted the doctor to obtain a

7    telephone order for Senna?

8        A.      The person who wrote the order,

9    so, no, it does not say who contacted

10   Dr. Mitchell.

11       Q.      And -- go ahead.  I didn't mean

12   to interrupt you.  Go ahead.

13       A.      No.

14       Q.      Thank you.

15               MR. SCHUMACHER:  There is a

16   signature there.  Whether you can read it or

17   not --

18               THE WITNESS:  That's what I was

19   going to say.  There's a signature of someone

20   who recorded the order who spoke to the

21   physician.  There is no -- there's no record

22   there who spoke to the physician.

23   BY MS. PROBST:

24       Q.      There's no record that anyone



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    56

1    spoke to a physician; isn't that true?

2        A.    No, that's not true.

3        Q.    Other than that telephone order,

4    there is no order or note that anyone spoke

5    to a physician?

6        A.    Okay.  Other than this.  On this

7    sheet of paper, yes, that is correct.

8        Q.    All right.  Now, with respect

9    to -- have you ever reviewed the March 3rd,

10   2016 nurse's note from Miss Bloomfield which

11   was created 11 days after Miss Filichia died?

12       A.    I have.

13       Q.    In reviewing that particular

14   note, is there any indication in that note

15   that Miss Bloomfield contacted Dr. Mitchell

16   via telephone at any time?

17       A.    Give me a minute.

18       Q.    Sure.

19       A.    It does not say that.

20       Q.    Thank you.  Paragraph 1.  Under

21   Roman Numeral I, Page 7, Exhibit 1.  It

22   starts, During the weekend prior to February

23   20th, 2016, the nursing staff reviewed and

24   verified the medications Miss Filichia was



1    taking and continued the necessary

2    medications.

3              Do you see that?

4         A.    I do.

5         Q.    When you say reviewed and

6    verified the medications Miss Filichia was

7    taking, where did you obtain that statement?

8         A.    Okay.  So, it says in the

9    weekend prior to that -- we'll go right

10   here -- this was -- this page right here has

11   an example.  So, 1/8, that's a verification

12   of medications.

13             What this piece of paper says

14   that is that the patient, this is created on

15   1/8.  This is CCS 000022.

16        Q.    Uh-huh.

17        A.    Okay.  So, the patient reported

18   that she was on Metronidazole or Flagyl, 500,

19   twice a day for seven days; Gabapentin, 300

20   milligrams, three to four times daily;

21   Zanaflex, it's Tizanidine, but Zanaflex

22   muscle relaxer at nighttime; Cetirizine or

23   Zyrtec daily and Cheratussin, which is a

24   cough syrup daily.



THOMAS FOWLKES, M.D.                                      September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                          58

```
 1              So then what the nurse did was
 2    verify with the pharmacy.  The pharmacy's
 3    name is not on here but the prescribing
 4    provider, they do verify those meds because
 5    Dr. Alderman gave the first one, Dr. Stock
 6    gave the last four.
 7         Q.     Do you see a sheet similar to
 8    that for the medicine that Miss Filichia
 9    brought in with her on February 20th, 2016 in
10    the brown bag referred to in Detective
11    Overly's report?
12         A.     I wasn't done with my answer.
13         Q.     I'm sorry.  Go ahead.
14         A.     What they did was they verified
15    and spoke with the doctor and decided
16    which -- it doesn't say they spoke with the
17    doctor, but they decided which meds were
18    going to be continued and which were not;
19    either they made that decision independently,
20    which I would not expect or they spoke with a
21    physician and Dr. Miller, I'm sorry,
22    Dr. Mitchell later cosigned.  She agreed with
23    that.  Whether she approved it at the time or
24    not, she ultimately agreed with those orders.
```



```
 1              That's what I mean by
 2   verification and starting appropriate.  They
 3   didn't start some of them.  They did not
 4   start the Zyrtec, they did not start the
 5   Zanaflex and because of my hole punch, I
 6   think they did not start the Cheratussin.
 7   They did start the top two.
 8         Q.     Uh-huh.
 9         A.     That's my answer to that
10   question.
11         Q.     Thank you.  I did not mean to
12   interrupt you.
13         A.     That's all right.  Your next
14   question was did I see a similar sheet.  I
15   would not expect a similar sheet because this
16   was considered one incarceration starting
17   January 8th.  So, they were for ten weekends,
18   she was what is called a weekender.
19         Q.     Is it your testimony that if
20   Miss Filichia brought in a bag of pills with
21   her to the jail on February 20th, 2016, that
22   you would not expect a sheet indicating what
23   medicines she brought with her to the jail to
24   be completed by the nurse or medical staff on
```



```
1   duty?
2         A.      That is not my testimony.
3         Q.      Okay.
4         A.      My testimony is that I would
5   expect that it wouldn't be necessary to
6   repeat a sheet.  I do believe it would be
7   incumbent on them, on the person who assessed
8   Miss Filichia when she came in, to look at
9   those medications and find out whether there
10  were changes or any other medicines that
11  should be made.
12        Q.      Did you see any note in the
13  record that you've reviewed indicating that
14  those medications in that bag were reviewed
15  by any of the medical staff?
16        A.      Yes.  Nurse Bloomfield said that
17  it was -- said that -- I don't know whether
18  the Seneca was in there.  Ms. Filichia
19  reported being on the Seneca and she said she
20  would see what she could do.  I don't know
21  whether narcotics was in there, but Nurse
22  Bloomfield said it was a policy they weren't
23  going to continue the narcotics.
24        Q.      Isn't it true that that
```



```
 1    information was actually in nursing note and

 2    that was information that Miss Filichia

 3    reported to Miss Bloomfield, not information

 4    indicating that Miss Bloomfield went through

 5    the bag of pills to review what was in the

 6    bag and verified that it was all the same

 7    prescription?

 8                 MR. DOWNEY:  Objection.  Form.

 9                 THE WITNESS:  There was a --

10    there was a bag that was apparently visible,

11    as I told you before, I haven't reviewed it

12    myself, but there is the description that

13    there was a bag available that was brought

14    there at the time.  It was presented to the

15    nurse.  And so it would be my expectation

16    that that nurse reviewed that at some time.

17                 But you're asking me, your

18    question was did -- was there a form that

19    showed which medicines were or weren't

20    continued or which medicines were even in

21    that bag and no, I do not see such a form.

22                 Nor would I necessarily, I would

23    expect that the nurse would at least look

24    through them but whether there's another form
```



```
 1    or not, I can't say.
 2    BY MS. PROBST:
 3         Q.      And why would you expect the
 4    nurse to at least look through them?
 5         A.      Because there was a potential
 6    change in her condition from when she was
 7    last there.  And she brought in a bag of
 8    medications and some papers.  Again, I don't
 9    have those papers either, but there is a
10    description in there that there was paperwork
11    and there was a bag of medications that were
12    placed on the counter in the vicinity of the
13    nurse.  And I would expect that that would be
14    a part of her review of the assessment of a
15    patient coming back for another weekend.
16         Q.      What is the purpose of doing a
17    written assessment when an individual is
18    booked into a jail?
19         A.      To create a medical record which
20    can then be referred to by other members of
21    the healthcare team later on or to provide a
22    record for other administrative purposes like
23    this.
24         Q.      Did you see any written record
```



1   of an initial assessment on February 20th of

2   2016?

3         A.      Well, it is my recollection

4   that -- and what I first said in my report

5   was that it was my understanding that Correct

6   Care Solutions might be following a similar

7   policy to the Delaware County jail, which was

8   that they did not repeat paperwork each

9   subsequent weekend admission.  That they were

10  considering it -- so, it was my understanding

11  from the Delaware County jail that they

12  considered a week -- a person serving weekend

13  time to be under one incarceration.

14              So, one booking.  So, there was

15  one set of booking paperwork done.  They

16  actually considered them to be in the custody

17  of Delaware County jail for that entire time

18  and they gave them a pass to be gone, not a

19  pass, but they were gone each week and came

20  back.

21              So, they did not repeat the

22  intake paperwork each weekend that they came

23  back.

24              MR. DOWNEY:  Objection.  Move to



```
 1   strike.  Go ahead.
 2                THE WITNESS:  It was my
 3   understanding that Correct Care Solutions
 4   used a similar policy.  Therefore, did not
 5   create a new intake assessment form each time
 6   when they came back.
 7                In Ms. Bloomfield's deposition
 8   testimony she said that she did and it was
 9   lost.
10   BY MS. PROBST:
11        Q.     I understand that.  I've heard
12   that testimony.
13        A.     Right.
14        Q.     But in your review of the
15   written record, that's my question, did you
16   see a written initial assessment for February
17   20th, 2016?
18        A.     I did not.
19        Q.     Okay.  And did you see or have
20   you seen any nurse's notebook that Miss
21   Bloomfield wrote in to record Miss Filichia's
22   responses or vital signs at the time she was
23   admitted into the Delaware County jail?
24        A.     I've not seen that.
```



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    65

```
 1        Q.    Did you -- you've never seen it.
 2   That's what you just said.  Thank you.
 3              Did you see any notes in the
 4   record that Ms. Bloomfield communicated to
 5   any other nurse Miss Filichia's condition at
 6   the time of her delivery to the Delaware
 7   County jail on 2/20/2016?
 8        A.    The telephone order appearing
 9   from someone indicates that another nurse was
10   involved.  However, the specifics about her
11   communicating to anyone, I don't know, I'm
12   not exactly sure I follow your question.  But
13   I do see that another nurse was involved
14   because another nurse is the one that records
15   the telephone order.
16              And then later or then in
17   Ms. Bloomfield's deposition testimony, she
18   states that another nurse was present and was
19   essentially precepting her, as I recall
20   correctly.
21              But more than that, I don't know
22   about communication.  I'm not sure what you
23   mean about communication.  There was more
24   than one nurse that was present in that
```



1    facility.  I do know that, yes.

2         Q.    I'm just asking if you've

3    reviewed any written records that I've not

4    seen, indicating -- I want to know what

5    you've seen.  Make sure what it is and if

6    you've seen a written note indicating X, Y or

7    Z, specifically, my question, that

8    Ms. Bloomfield wrote I communicated so and so

9    and if you've seen that, I want to know.

10        A.    I did not see such a note.

11        Q.    All right.

12        A.    Nor would I expect to.

13        Q.    Well, if there is no written

14   initial assessment and no record of

15   communication of the condition of an

16   individual who is brought into the jail,

17   based on your experience as the director of a

18   detention facility, how would individuals who

19   are taking care of Miss Filichia following

20   that nurse's shift be able to determine what

21   her condition was when she came in?

22        A.    Well, when you said there was no

23   written assessment, there was a documentation

24   of that written assessment.  It was entered



THOMAS FOWLKES, M.D.                              September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                        67

```
 1   as a late entry.  And I did not have, prior
 2   to Ms. Bloomfield's deposition testimony, any
 3   idea why it wasn't in the record.
 4            But there is a written note of
 5   her assessment.  It was entered as a late
 6   entry.
 7       Q.    I understand there's a written
 8   noted dated March 3rd.  I'm asking you a
 9   question, based on the actual records that we
10   have, indicating that there was no written
11   assessment done on February 20th.
12            And if there is no written
13   assessment done, based on your experience as
14   the director of a detention facility for 20
15   years, how would the condition of the
16   individual who -- of whom no written
17   assessment was made be communicated to nurses
18   following the end of the shift of the nurse
19   who was to do the initial assessment?
20            MR. SCHUMACHER:  Let me just
21   object.  I guess it's to form at this point.
22            If you are asking Dr. Fowlkes to
23   assume that Terry Bloomfield's deposition
24   testimony, notwithstanding that she did not
```



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE
September 29, 2017
68

```
1   create an initial note that was subsequently
2   lost from the chart, then give him that
3   assumption.
4               MS. PROBST:  I'm -- first of
5   all, his report was written with what we all
6   have.  That meaning that there was no written
7   assessment done.
8               Ms. Bloomfield's testimony that
9   it was -- so, that's the written record.  I'm
10  asking him when that is the written record,
11  as it is in this case, how is the next shift
12  nurse supposed to become aware --
13              MR. SCHUMACHER:  You wanted for
14  purposes of this question to ignore the
15  Bloomfield testimony, which illuminates what
16  was and what wasn't in the record?
17              MS. PROBST:  What I would like
18  for everyone to realize is that
19  Ms. Bloomfield's -- if you're going to rely
20  on Ms. Bloomfield's testimony, fantastic.
21              So, Ms. Bloomfield indicates
22  that there was somehow a written assessment
23  that was lost.  But she was able to recreate
24  it on March 3rd after Miss Filichia died.
```



1           So, if her testimony -- let's

2    assume her testimony is false and there was

3    no written assessment.  How would the next

4    nurse on duty become aware of Miss Filichia's

5    condition if no written assessment was

6    completed?

7           MR. DOWNEY:  I'm going the

8    object to form.

9           MS. PROBST:  Sure.

10           MR. DOWNEY:  Go ahead.

11           THE WITNESS:  Number one, to say

12    there wasn't a written assessment ever done

13    or is not in the record, I don't believe is

14    accurate because there was a late entry that

15    was made on March 3rd, that documents her

16    assessment.

17           It is also clear from -- I'm

18    taking your assumption, though, that there

19    was no other thing done.

20           What I can also see from the

21    record, from the description of the videotape

22    that occurred, that a deputy came in, they

23    asked for a nurse to do an assessment.  A

24    nurse did do an assessment.  A nurse saw her,



```
 1   spoke with her, presumably examined her, we
 2   don't have that directly on the video, but
 3   spoke with her and then went to the nursing
 4   office and then medications were started as a
 5   result of that and then after that, another
 6   nurse came on duty.
 7              So, to say that one would not be
 8   able to know what happened is I don't believe
 9   accurate.
10              Because clearly an assessment
11   was done.  Whether a written report was
12   written at that time or not, an assessment
13   was clearly done, a decision was made about
14   what medications were or were not going to be
15   started.
16              And as usual protocol, one would
17   expect that the nurses had verbal
18   communications between shifts.  So, that's
19   the way it normally works.
20        Q.    Did you -- I believe you
21   indicated you didn't review any of the
22   videos.  Is that right?
23        A.    I have not yet had an
24   opportunity to review the 70 hours of videos.
```



1    But my intention is to do that.

2                What I did instead was to review

3    the -- this video summary, which is some 13

4    pages long that tells what happened on that

5    video.

6        Q.    Assuming that there's a video

7    that Nurse Lupu makes a statement, quote, I

8    had no idea she was up here, that's on us,

9    end quote.

10               Assuming that statement was made

11   in the video after Miss Filichia was

12   attempted resuscitation and taken to Grady

13   Memorial Hospital, does that assist you in

14   making a determination of whether or not

15   there was a written initial assessment ever

16   done?

17       A.    No, it does not.  You would have

18   to -- you would have to tell me exactly what

19   you mean, what's under -- what circumstances

20   that was written.

21               And that in and of itself

22   doesn't say much to me about what happened.

23       Q.    That the nurse on duty had no

24   idea that Miss Filichia was up there doesn't



 1    say much about what was going on?

 2                 MR. DOWNEY:  Object to form and

 3    argumentative.

 4                 THE WITNESS:  It does not assist

 5    me in making an opinion about what happened

 6    that weekend, no.

 7    BY MS. PROBST:

 8         Q.     Your next statement on Paragraph

 9    3, Page 8, is that Nurse Bloomfield evaluated

10    Miss Filichia in detail.

11                 Is that based on the nurse's

12    note?

13         A.     It is based upon the nurse's

14    note that was created, admittedly as a late

15    entry.  So, in other words, that is a

16    detailed assessment that she documents on

17    March 3rd.

18         Q.     Of 2016 after Miss Filichia was

19    deceased?

20         A.     That is correct.

21         Q.     And the -- withdrawn.

22                 She reviewed her medication and

23    her requests for additional medications.

24    Again, she reviewed her medication.  What do



1    you mean by that?

2         A.      What I mean is that, I said that

3    whole statement says her request for

4    additional medications beyond what was given

5    on previous weekends.

6              So, Miss Filichia was already on

7    three medications and so those were set up to

8    be continued on any subsequent weekends that

9    she came in.

10             So, she reviewed that.  Either

11   she set them up, I don't know if the

12   medication cart was set up in advance or at

13   my facility, one would have to set up the

14   medicines each weekend.  But in any event,

15   she reviewed those medications, decided that

16   the previous medications would be continued

17   and in addition to that, Miss Filichia asked

18   for a laxative, which she called Dr. Mitchell

19   and got an order for.  And narcotic pain

20   medicines, which she did not receive.

21        Q.      Your first statement that she

22   reviewed her medication as part of that

23   sentence, do you mean she reviewed the pills

24   that were in the brown bag?



1          A.      No.

2          Q.      Okay.  That's all I wanted to

3    make sure.

4                  So you mean she reviewed the

5    medication that was in her chart previously

6    on the MARs?

7          A.      I mean she reviewed those.  I

8    mean that she reviewed what Miss Filichia

9    told her that she wanted, a laxative and

10   narcotic pain medications and possibly

11   reviewed the medications in the bag.  I don't

12   know one way or another whether she did.

13                 I know that the bag was present

14   and my presumption would be that she reviewed

15   them as part of her assessment.

16                 But that being said, what you

17   asked me was what did I know she reviewed.

18   What I know she reviewed was the previous

19   medications that she continued.

20                 I also know that she, according

21   to the note later written, that she reviewed

22   with Miss Filichia what Ms. Filichia says she

23   wanted and I also -- and she spoke with

24   Dr. Mitchell about which of those meds she

THOMAS FOWLKES, M.D.                        September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    75

```
 1    would or wouldn't receive.  And I know that
 2    she was in the presence of a brown paper bag
 3    which contained medications and may well have
 4    reviewed those medications.
 5         Q.    How do you know that Nurse
 6    Bloomfield spoke to Dr. Mitchell about what
 7    medication, any medication, other than a
 8    Senna laxative?
 9         A.    There's an order written for a
10    telephone order.
11         Q.    I understand.  For a Senna
12    laxative; correct?
13         A.    Uh-huh.
14         Q.    How do you know that
15    Ms. Bloomfield spoke to Dr. Mitchell about
16    any other medication other than a Senna
17    laxative?
18         A.    Number one, I've not seen any
19    deposition testimony from Dr. Mitchell.
20         Q.    Thank you.
21         A.    Number two, in the deposition
22    testimony of Nurse Bloomfield, I believe that
23    she says she discussed the medications, but
24    we would have to go to that specific portion
```



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                76

```
 1   of her deposition to see exactly what it

 2   says.

 3        Q.     If you review the 3/3/2016

 4   nurse's note made after Miss Filichia died,

 5   it indicates, does it not, that

 6   Miss Bloomfield informed Miss Filichia

 7   directly, without contacting Dr. Mitchell,

 8   while still in the holding cell, that no

 9   narcotics would be given and that a Senna

10   laxative would be ordered?  Is that not

11   correct?

12        A.     And she may well have told her

13   that narcotics would not be given.  That

14   nurse writes that a Senna laxative could be

15   given, it can't be given by her without the

16   order of a physician, either by standing

17   order, protocol or telephone order or verbal

18   order.

19        Q.     All right.  In that nurse's

20   note, it does not indicate at any time that

21   Miss Bloomfield reviewed any medications that

22   Miss Filichia had previously been given

23   during her previous weekend visits; isn't

24   that right?
```



THOMAS FOWLKES, M.D.                        September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                  77

1          A.      It doesn't say in here that she

2     did.  But what she does do is make sure that

3     the medications are administered.  What I

4     mean is they are administered.  She didn't

5     stop them.  She quite likely had to reset up

6     the med cart because Miss Filichia had not

7     been there for the previous three weekends.

8     She had not shown, either they were on that

9     med cart the whole time and she didn't have

10    to do anything to restart it or they had been

11    stopped because she didn't show for three

12    weekends and they had to restart them.  One

13    of the two.

14         Q.      How do you know she's the one

15    that did that?

16         A.      Some nurse did.

17         Q.      Okay.

18         A.      She is the intake nurse.  She's

19    doing the assessment.  So it would normally

20    be the intake nurse, the assessing nurse job

21    to see what medications are going to begin.

22         Q.      I understand that's normally,

23    from your experience, what happens.

24                 But do you know of anything in



800.211.DEPO (3376)
EsquireSolutions.com

```
1   the record establishing that she's the one
2   that actually did that?
3        A.    I know that one of the nurses
4   did.
5        Q.    Okay.
6        A.    It could be the nurse that
7   documented the telephone order as well
8   because she was also a relatively new
9   employee and she was being precepted so
10  probably some of the work was being done by
11  her and some of them by her precepting nurse.
12       Q.    But the fact of the matter is we
13  don't have any actual record evidence that
14  Miss Bloomfield is the one that reviewed her
15  previous medications or restarted those
16  medications or made the order for the Senna
17  laxative; isn't that right?
18       A.    What we do know is that a nurse
19  did it there.  Some nurse on duty.
20       Q.    Thank you.  In the last sentence
21  of Paragraph 3 on Page 8, you state based
22  upon her findings, Nurse Bloomfield
23  appropriately did not find any indication for
24  special medical observation or monitoring of
```



1    Miss Filichia during her weekend stay.

2              Do you see that?

3         A.    I do.

4         Q.    All right.  And with respect to

5    that particular opinion, is that based on the

6    items that are set forth above it that you

7    discuss regarding Miss Bloomfield's activity

8    with respect to Miss Filichia in Paragraph

9    Number 3?

10        A.    There was lots of parts to that.

11   Could you repeat that question, please?

12              -    -    -

13            (Whereupon, the following

14   portion of the record was read by the court

15   reporter:

16            "QUESTION:  And with respect to

17   that particular opinion, is that based on the

18   items that are set forth above it that you

19   discuss regarding Miss Bloomfield's activity

20   with respect to Miss Filichia in Paragraph

21   Number 3?")

22              -    -    -

23            THE WITNESS:  It is based upon

24   my review of the records upon all the things



```
 1    that Nurse Bloomfield did and her previous

 2    records there.

 3    BY MS. PROBST:

 4         Q.     When you say her previous

 5    records there you mean Miss Filichia?

 6         A.     I do.

 7         Q.     As part of your review in

 8    forming the opinions that are set forth in

 9    Exhibit 1, you indicate that you reviewed the

10    CCS or CHC incorporated policies; is that

11    correct?

12         A.     I did.

13         Q.     And then you also indicated that

14    you reviewed the Delaware County jail's or

15    sheriff's office medical SOP; is that

16    correct?

17         A.     I did.

18         Q.     All right.  With respect to your

19    review, did you review the contract between

20    the Delaware County sheriff's office jail and

21    CCS for the provision of medical services in

22    the jail?

23         A.     To the best of my recollection,

24    I did not.
```



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              81

```
 1        Q.     All right.  Now, with respect to

 2   the medical standard operating procedure, do

 3   you recall whether or not the Delaware County

 4   sheriffs required that anyone in a state

 5   whose health was questionable be taken to a

 6   hospital prior to delivery to the jail?

 7        A.     Do you have that particular

 8   policy in front of you that I could review?

 9        Q.     No.

10        A.     Okay.  I recall -- I recall

11   discussions about that question and about

12   that policy from prior deposition

13   transcripts.  Actually, I believe I have it.

14   I believe it was somebody's deposition.  Let

15   me see if I have that policy so I could talk

16   more cognitively about it.  I do recall that

17   language.  I do not have it in front of me

18   and cannot refer to the specific language.

19        Q.     Let me ask a different question.

20   I don't like the question anyway because I

21   didn't bring it.

22               With respect to Ms. Filichia,

23   you would agree that when she visited the

24   emergency room prior to her February 20th
```



1  incarceration, when she visited the emergency

2  room on February 4th, that she was diagnosed

3  with colitis?

4      A.    That is what the record says.

5      Q.    You would agree that prior to

6  her incarceration on February 20th, she had

7  had surgery in October of 2015 for removal of

8  a portion of her colon as a result of

9  diverticulitis?

10     A.    That is correct.

11     Q.    You would agree, according to

12 your report, that Miss Filichia had a history

13 of the use of methadone in a therapeutic

14 manner for pain relief; right?

15     A.    I would not.

16     Q.    Okay.  You would agree that Miss

17 Filichia had a history of chronic pain for

18 which she had previously been on opiates;

19 correct?

20     A.    My basis for me saying that I

21 disagreed with what you just said, your

22 question was not that.

23     Q.    I understand.  I rephrased the

24 question.  You would agree that Miss



THOMAS FOWLKES, M.D.                                  September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                            83

1  Filichia, prior to her incarceration on

2  February 20th, had a history of the use of

3  opiates for treatment of her chronic pain?

4        A.    I agree that is what it says in

5  there and that is some of what is addressed

6  in my supplemental report.  My opinion

7  changed about that after reviewing additional

8  records.

9        Q.    You would agree that Miss

10  Filichia was diagnosed with colitis on

11  February 4th of 2016?

12        A.    Say it again.

13        Q.    You would agree that Miss

14  Filichia was diagnosed with colitis on

15  February 4th of 2016?

16        A.    By the emergency department

17  physician, yes.

18        Q.    You would agree that

19  Ms. Filichia was given prescriptions for

20  Flagyl and Cipro as a result of that

21  diagnosis?

22        A.    She was written a prescription

23  in the emergency department for Cipro for

24  five days and for Flagyl for ten days.  She



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              84

1    was told not to take the Flagyl for two days

2    because she had come to the emergency

3    department intoxicated and you're not

4    supposed to take Flagyl within about 48 hours

5    of ingesting alcohol.  So, she was told not

6    to start.  And she was given those two

7    prescriptions, yes.

8          Q.    You would agree that Miss

9    Filichia had also had a history of the use of

10   Ativan to treat anxiety?

11         A.    I would.  I need to correct my

12   answer.  I know that she was prescribed for a

13   diagnosis of Ativan.  I don't know and I

14   don't believe that the -- I didn't see in the

15   records a diagnosis of anxiety, at least not

16   in the recent records.  But I know she was on

17   chronic Benzo use, pretty high doses.

18         Q.    What do you mean Benzo?

19         A.    Ativan, Benzodiazepine, of which

20   Ativan is one example.

21         Q.    Thank you.  You would also agree

22   that when she presented at the Delaware

23   County jail she informed Miss Bloomfield that

24   she was having abdominal pain, would you not?



 1              MR. SCHUMACHER:  Object.

 2              THE WITNESS:  I do not know

 3     that.

 4     BY MS. PROBST:

 5         Q.     Would you agree that Deputy

 6     Mohnsen informed Ms. Bloomfield that she was

 7     having abdominal pain?

 8         A.     I do not know what the

 9     description was as it regards to abdominal

10     pain.  I know there was discussion about her

11     having gastrointestinal problems and having

12     been to the emergency department and having

13     had a colonoscopy scheduled, whether it was

14     abdominal pain or some other gastrointestinal

15     complaints, I don't know.

16         Q.     You were aware that Mr. James

17     Egbert asked that Ms. Filichia not be taken

18     to the jail because of her medical condition;

19     were you not?

20         A.     I read Mr. Egbert's deposition

21     testimony.  And I read the rest of the

22     record.  Other portions of the record had

23     said something about Mr. Egbert, for her to

24     be taken to the hospital.  But Mr. Egbert



1    said, to the best of my recollection, he

2    didn't tell them or he didn't ask them to

3    take her to the hospital.  He asked could she

4    stay at home because of ongoing abdominal

5    problems.

6        Q.    My question was, you read

7    Mr. Egbert's testimony and he indicated that

8    he did not want her to go to the jail because

9    of her condition.  Is that correct?

10       A.    He didn't want her to go to the

11   jail, yes.  And I believe it was due to her

12   abdominal -- it was due to her abdominal

13   problems, yes.

14       Q.    Okay.  Have you ever heard the

15   term fit for confinement?

16       A.    I have.

17       Q.    Do you know how it is defined in

18   the Delaware County -- in the agreement

19   between the Delaware County sheriff's office

20   and the Correctional Healthcare Company?

21       A.    How the term fit for confinement

22   is defined in that document?

23       Q.    Uh-huh.

24       A.    Well, I've not reviewed that



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    87

1    document.  So, if there is a definition of

2    fit for confinement in that document, I

3    wouldn't know what the language was.

4         Q.     Do you know what training

5    Correctional Healthcare Company provides, if

6    any, to its employees to determine whether or

7    not an individual is fit for confinement?

8         A.     You're talking about the

9    correctional officers?

10        Q.     No.  I'm talking about its

11   employees.

12        A.     Okay.  There's two different

13   things.  I'm sorry.  You said the Delaware --

14        Q.     I thought I said -- let me ask

15   again just so we're clear.

16        A.     Okay.

17        Q.     You do know what training, if

18   any, the Correctional Healthcare Company

19   provides to its employees to deter -- to make

20   a determination of whether or not someone is

21   fit for confinement?

22        A.     That would be part of the normal

23   intake screening training that is provided by

24   companies and I believe -- I can't say that I



THOMAS FOWLKES, M.D.                              September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                      88

1    reviewed the entire agenda of the orientation

2    manual, but part of the training would be

3    found under intake screening, how to do an

4    appropriate intake screening.

5              Because the fit for confinement

6    wording is typically a correctional word as

7    opposed to a medical term.

8         Q.      Turning to Page 10 of Exhibit 1.

9              The first sentence of Page 1,

10   Exhibit 1, says Miss Filichia had several

11   ongoing medical issues which contributed to

12   her death.

13             Do you see that?  Very first

14   sentence next to Roman Numeral II.

15        A.      Yes.

16        Q.      Which ongoing medical issues

17   that she had at the time of her admission

18   into the jail contributed to her death?

19   Which ongoing medical issues of Miss

20   Filichia, which she had at the time of her

21   admission to the jail, contributed to her

22   death?

23        A.      Her chronic pain syndrome.  Her

24   chronic gastrointestinal issues.



```
 1          Q.        Uh-huh.

 2          A.        Her chronic opiate use and her

 3    other substance use.

 4          Q.        Let's flip to Page 12, please.

 5    You indicate on Page 12 that, in Roman

 6    Numeral III that the policies and procedures

 7    in place regarding medical care at the

 8    Delaware County jail are reasonable and

 9    appropriate.

10                    Do you see that?

11          A.        I do.

12          Q.        And when you say the policies

13    and procedures plural, which ones do you mean

14    specifically?

15          A.        There are -- there are a number

16    of them.  I reviewed some 370 pages of

17    policies and procedures.

18          Q.        From the Delaware County jail?

19    I'm not talking about CCS.

20          A.        It says in place regarding

21    medical care.  So, that would be CCS

22    policies.

23          Q.        Okay.  So, you're talking about

24    CCS policies.  Thank you.
```



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

1      A.     Well, there were also -- I

2   reviewed a couple of policies from the jail;

3   the one you just referenced.  Those appeared

4   reasonable as well.  I did not review their

5   entire policy and procedure manual.  I wasn't

6   retained to provide opinions with regard to

7   the policies and procedures in the Delaware

8   County jail.

9      Q.     I understand that.  That's why I

10  was asking, with reference to the specific

11  question because it's a general statement and

12  you reference a Delaware County jail, if you

13  meant their policies or correctional

14  healthcare policies?

15     A.     All the policies I reviewed

16  regarding medical care, which were primarily

17  the CCS policies.  There were a couple of

18  policies that I reviewed regarding intake

19  screenings from the Delaware County jail and

20  they appeared reasonable as well, although I

21  was not retained for that purpose.

22     Q.     Next, you next say it is my

23  medical opinion that the practice of the

24  Delaware County jail of not repeating the



THOMAS FOWLKES, M.D.                         September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                  91

1    medical receiving screening on inmates
2    returning to serve weekend time is not in
3    compliance with the written policy requiring
4    it on each inmate upon arrival at the jail.
5              Do you see that?
6        A.    I do.
7        Q.    Okay.  You previously
8    testified -- well, do you continue to hold
9    that opinion?
10             MR. DOWNEY:  Object.  Go ahead.
11             THE WITNESS:  I believe that
12   the -- I hold that opinion in part and have
13   changed that opinion in part.
14             So, if the correctional -- if
15   CCS had a policy of not doing intake
16   screenings on inmates when they returned,
17   then it is not in compliance with the written
18   policy that required that.
19             The jail, I believe, I did not
20   see a policy, written policy with regards to
21   this, I only saw the opinions or the
22   statements in the -- in some investigator
23   reports or in the records, that they did not
24   repeat the booking paperwork which could or



THOMAS FOWLKES, M.D.                                September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                        92

1    could not include their screening.

2              So, a medical screening, when a

3    person comes into a jail facility, the first

4    document that is normally done is an intake

5    screening.  That screening can be done by a

6    trained correctional officer or by a trained

7    nurse, depending on who's on duty and how the

8    staffing is.

9              So, it could be done by either

10   one.  And that statement was to reflect that

11   if it is not the policy for that to be done

12   each time, it would potentially be -- it

13   would be not necessarily a breach of the

14   standard of care, but what I would consider

15   unsafe practice because it would be possible

16   that conditions could have changed.

17             In this particular situation,

18   it's clear that she was assessed by a nurse,

19   not even by a correctional officer, so the

20   correctional officers weren't involved in

21   that.

22   BY MS. PROBST:

23        Q.    Are you aware that the Delaware

24   County jail has its own intake procedure form



```
 1    for assessing patients?
 2         A.    You're talking about the policy?
 3         Q.    Are you aware -- let me reask
 4    the question.
 5               Are you aware that the Delaware
 6    County jail has an intake questionnaire for
 7    all of its detainees who are booked into the
 8    jail?
 9         A.    Yes.
10         Q.    Are you aware that that
11    particular intake questionnaire is separate
12    from an assessment done by a nurse?
13               MR. DOWNEY:  Objection.  You can
14    answer.
15               THE WITNESS:  I am aware that it
16    is not.
17    BY MS. PROBST:
18         Q.    You're aware that it is not.
19    You believe them to be the same thing?
20         A.    No.  Let me explain, please.
21               What I believe is that I'm going
22    to go back to Ms. Filichia's prior
23    incarceration to show you what I'm talking
24    about.  This form right here, it may be over
```



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    94

```
 1    in the medical chart.  I'm sorry.  I have it

 2    in the medical chart.

 3              This form.  Give me just a

 4    minute.

 5         Q.      Take your time.

 6         A.      I have the chart separated.

 7              So, this form right here, that

 8    right there is what is typically in the

 9    industry referred to as intake screening

10    form.  And it can be --

11              MR. DOWNEY:  What's the number

12    on that?

13              THE WITNESS:  CCS 000060.

14              That is an intake screening

15    form.  This is done when a person first

16    arrives to ask them questions that determines

17    emergent medical conditions so that you can

18    describe, as you said, fit for confinement or

19    questionable health.  That's what these forms

20    are used for.

21              And this form can be filled out,

22    according to -- NCCH guidelines, which don't

23    establish standards of care, but

24    nevertheless, are guidelines for best
```



1    practices, say that this form can be filled

2    out or asked -- for objection can be asked by

3    either a healthcare professional, i.e., a

4    nurse, or a trained correctional officer.

5    BY MS. PROBST:

6          Q.     Right.

7          A.     And so depending upon the

8    staffing of the facility in many facilities,

9    there are no nurses as a for instance at

10    nighttime or on the weekends or maybe even,

11    you know, depending.  There might not be any

12    nurse present nighttimes or weekends.  So,

13    this form would be filled out by a

14    correctional officer.

15          What then normally happens is

16    that there is a medical intake form and the

17    nurse reviews this and does a medical intake

18    form or does this form directly.

19          In this particular case, this

20    form was not filled out by the officer

21    because the nurse saw the person, saw

22    Ms. Filichia directly.  There was no

23    correctional officer involved in filling out

24    this form.



1     They said basically, we're

2 bypassing this form and asking the nurse to

3 see rather than have a specific form that we

4 have to fill out before we can ask a nurse to

5 see it.

6     So, this form can be filled out

7 by either and they ask Nurse Bloomfield

8 directly to see the nurse.  That's how that

9 works.

10   Q.  I appreciate that.  Do you

11 actually know if a correction officer at the

12 Delaware County jail made a conscious

13 decision that we're not going to fill out a

14 form and we're going to have Miss Filichia

15 seen by a nurse instead?

16   A.  Yes.

17   Q.  Oh, you do?  How?

18   A.  Well, when the deputy brought

19 the person in, when the deputy brought

20 Ms. Filichia in out of the sallyport, he said

21 we need to talk to the nurse.  We need the

22 nurse to assess.  That's what that means.

23     We're going to bypass the

24 normal -- we're going to bypass the normal



1    process of booking the person in and the

2    correctional officers, the booking officer

3    being the first to look at them.  Would you

4    please get the nurse to come do the

5    assessment.

6             This is standard in many

7    facilities.  It has different names, but it's

8    often called on the wall or behind the line

9    or before the line.  You saw a thing about

10   the red line.  They are asking a nurse to

11   make an assessment before the person is

12   accepted into the jail.  That's how it works.

13        Q.    I appreciate that.

14             Do you have any reason to

15   believe that Mr. -- why Mr. Mohnsen wanted

16   the -- Deputy Mohnsen wanted the nurse to

17   make the assessment?

18        A.    Yes.  Because -- yes.  The

19   reasons are that when they went to Miss

20   Filichia to arrest her, the boyfriend,

21   Mr. Egbert said she's having medical

22   problems.  Please don't take her to jail.

23   She said I have been to the ER, I have this

24   paperwork.  I am supposed to have a



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                 98

```
 1   colonoscopy next week and so he knew that
 2   some medical person needed to make an
 3   assessment about that.  When he got to the
 4   jail, he said we need the nurse to come here.
 5        Q.     We need the L.P.N. to come
 6   assess her medical condition?
 7        A.     We need the nurse on duty to
 8   come there.  He didn't ask for an L.P.N.  He
 9   didn't ask for anybody particularly.  He
10   asked for whoever.
11              But that determination is
12   appropriately made by a trained correctional
13   officer or in many facilities a medical
14   assistant, an EMT, paramedic or nurse in some
15   cases.
16        Q.     If the State of Ohio statute
17   prohibited an L.P.N. from making an initial
18   assessment, would your opinion change?
19              MR. DOWNEY:  Objection.  You can
20   answer.
21              THE WITNESS:  I don't believe
22   that any state's license practice would
23   prohibit an L.P.N. from making an initial
24   assessment of a patient in a jail.
```



```
 1    BY MS. PROBST:
 2         Q.     In a jail?  Is your opinion
 3    limited to in a jail?
 4         A.     You just said that the initial
 5    assessment.  What I'm telling you is I don't
 6    believe any state's medical practice would
 7    prohibit an L.P.N. from doing an initial
 8    assessment of a patient in a jail.  Yes, I
 9    don't believe that.
10         Q.     Okay.  Great.
11                Let's look at Exhibit 4, please.
12    It's titled summary of points in Miss
13    LaMarre's report with which I disagree.
14         A.     Okay.
15         Q.     All right.  When did you create
16    this document?
17         A.     Within the last few days.
18         Q.     Were you asked to create this by
19    Mr. Schumacher?
20         A.     I was not.
21         Q.     Why did you create it?
22         A.     Because I was asked to review
23    the expert reports and the depositions and so
24    because I did not agree with those findings
```



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
100

1    and because I wasn't sure that I could

2    remember all the reasons that I disagreed

3    with those findings, I wrote it down.

4         Q.    All right.  And is Exhibit 4 the

5    sum total of your disagreement with Miss

6    LaMarre?

7         A.    It's a summary.  Certainly not.

8    It is a summary of my findings.

9              MR. DOWNEY:  For the record,

10   it's three pages.

11             MS. PROBST:  Yes.  I think we

12   said that when we identified it.

13             All right.

14   BY MS. PROBST:

15        Q.    I want to ask you two questions

16   about Exhibit 4, Page 1, which is a number

17   one circled at the top right-hand corner,

18   numbered Paragraph 2 the last dash it says

19   consulted with a physician.

20             Do you see that?

21        A.    I do.

22        Q.    I'm assuming you mean to get a

23   Senna prescription; is that correct?

24        A.    No.



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                            101

```
 1          Q.      You don't mean that?
 2          A.      No.
 3          Q.      What other record is there that
 4   anyone at the Delaware County jail, the
 5   medical staff or the correction officers
 6   consulted with a physician for any purpose
 7   other than ordering a Senna laxative on
 8   February 20th or 21st?
 9          A.      I believe that Nurse Bloomfield
10   said that she called Dr. Mitchell,
11   consultation with a physician.  I don't
12   believe she said it was limited to that.  I
13   believe she said she called and spoke with
14   her about the case.
15          Q.      I understand that.  But her
16   nurse's note dated March 3rd of 2016, which
17   we've reviewed, which I'd like you to review
18   again, indicates, please -- you don't have
19   to --
20                 MR. SCHUMACHER:  We've been all
21   over this once.  Do we have to do it again?
22                 MS. PROBST:  They conflict.
23                 So, Ms. Bloomfield's deposition
24   testimony that she consulted with
```



```
 1   Dr. Mitchell conflicts with her nurse's note.
 2               So, and I'm asking you then,
 3   sir, do you agree with her deposition
 4   testimony or her nurse's note?
 5               MR. SCHUMACHER:  Objection.
 6               MR. DOWNEY:  I object.  Form.
 7               MR. SCHUMACHER:  Form.
 8               THE WITNESS:  And stating
 9   opinion.
10               MS. PROBST:  Go ahead.
11               THE WITNESS:  These are
12   supplemental reports or supplemental opinion
13   that I've created since reviewing the
14   additional records, since reviewing the
15   deposition testimony.
16               I don't believe that Nurse
17   Bloomfield's deposition testimony conflicts
18   with her nurses' notes.  I believe that the
19   nurse's note does not address that and that
20   Ms. Bloomfield's deposition testimony was
21   that she called and consulted with
22   Dr. Mitchell and that's the basis upon which
23   I made the supplemental opinion.
24   BY MS. PROBST:
```



1        Q.      What did she consult with

2    Dr. Mitchell about?

3                MR. DOWNEY:  Objection.  Asked

4    and answered.

5                THE WITNESS:  It's in her

6    deposition testimony.  I don't recall the

7    exact wording.

8    BY MS. PROBST:

9        Q.      Okay.  If you could, please,

10   look at Page 3 of Exhibit 4.

11       A.      Yes.

12       Q.      All right.  Number circled

13   Number 9 on the left.  Under that, you have

14   four dashes.  The first one being protocols,

15   ordered and approved by doctor.

16               Specifically, are you referring

17   to the three medications which Miss Filichia

18   was receiving as the protocols, the Remeron,

19   the Senna and the Pro Air?

20       A.      No.

21       Q.      What are you referring to then

22   as the protocols?

23       A.      Well, there was a whole series

24   of protocols about how to deal with certain



THOMAS FOWLKES, M.D.                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    104

1   conditions such as gastrointestinal

2   complaints, such as providing or not

3   providing narcotic medications.  Some of them

4   I'm quite sure are contained or some of them

5   are in the record but the actual protocols

6   are not.  The results of them are.

7               There's -- there are protocols

8   that drive the care of the nurses and the

9   medications which are or are not going to be

10  approved that have been promulgated by

11  Dr. Mitchell.  And as a result of having

12  those protocols and procedures in place, what

13  the nurses do in response to them is not

14  independent practice or independent

15  assessments.

16      Q.     With respect to the

17  gastrointestinal protocols, what

18  gastrointestinal protocols did the nurses on

19  duty, on February 20th, follow, if any?

20      A.     To the best of my knowledge,

21  Miss Filichia did not make a request for

22  medical care.

23      Q.     When?  Sorry.

24              Is it your testimony that on



1  February 20th, that Miss Filichia did not

2  indicate to Miss Bloomfield that she was

3  having abdominal pain and requesting narcotic

4  medication?

5      A.      I don't know the reason.  I know

6  that she requested narcotic medication.  I

7  don't know if the narcotic medication was

8  requested due to her gastrointestinal

9  symptoms or not.

10      Q.      Do you know or did you review

11  the video where Deputy Mohnsen referred to

12  Miss Filichia having pain in her abdomen?

13      A.      I reviewed a number of

14  deposition testimony with regard to that.

15  And I believe that it was not, they said it

16  wasn't pain but merely referring to the

17  abdominal area, maybe in reference to her

18  having been to the emergency department

19  diagnosed with colitis or having a

20  colostomy -- excuse me -- colonoscopy.

21          I don't know what it was in

22  reference to.

23      Q.      Doesn't colitis involve the

24  gastrointestinal tract?



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
106

1      A.      Yes.   And she clearly had a

2   history of gastrointestinal diagnosis, which

3   is entirely different than complaining of

4   gastrointestinal problems at that time or

5   requesting medical assistance for them.

6      Q.      She brought in her paperwork

7   from Grady Memorial and Miss Bloomfield noted

8   that in her nurse's note on March 3rd after

9   she died; right?

10      A.      I believe that she had some

11   discharge instructions from Grady Memorial

12   and I believe that Nurse Bloomfield did note

13   those, yes.

14      Q.      And we all agree that Miss

15   Filichia had been diagnosed with colitis

16   earlier in February; is that right?

17      A.      She had been to the emergency

18   department on February 4th and one of her

19   diagnoses was colitis.

20      Q.      And then we all agree that she

21   asked Nurse Bloomfield to be given narcotics

22   in the jail on February 20th; is that

23   correct?

24      A.      According to the note written by



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
107

```
1    Nurse Bloomfield she asked for narcotics.
2              Just to clarify on my last
3    answer, though, you said about the diagnosis
4    of colitis.
5              When she went to her general
6    surgeon, Dr. Fuller on the 17th, he said that
7    the findings were nonspecific.  He was unsure
8    if it was colitis or not.
9              So, it is true that the
10   diagnosis was given on an emergency
11   department visit, but Dr. Fuller, her own
12   surgeon, wasn't sure if that was the
13   diagnosis or not.
14        Q.    All right.
15              Knowing all of that, there was
16   no gastrointestinal protocol followed by
17   anyone on February 20th, 2016 at the time
18   Miss Filichia was admitted to the jail; isn't
19   that right?
20        A.    There was a protocol followed
21   for her assessment upon admission, giving her
22   medications.  Ms. Filichia did not fill out a
23   sick call request, requesting any particular
24   medical treatment and the treatment protocol
```



1    that is normally used in response to a sick

2    call request was not used in this case and it

3    should not have been.

4         Q.    The second dash you put

5    consulted with a physician.  Is that the same

6    thing you're talking about previously,

7    Ms. Bloomfield's statement in her deposition

8    that at some point she called the doctor?

9         A.    Well, it's documented in the

10   record that the doctor was called as well.

11        Q.    It's just -- the record

12   documents only the call of the Senna

13   laxative; correct?

14        A.    There is a -- there is a

15   telephone order which means that someone

16   spoke with the doctor and Dr. Mitchell later

17   cosigns that saying that she agreed with

18   that.

19             That is evidence that the doctor

20   was called and consulted with.

21        Q.    I understand that.  And that's

22   the limitation of your statement, consulted

23   with a physician, yes or no?

24        A.    That and Ms. Bloomfield's



1    deposition testimony.

2         Q.    Okay.  Doctor's orders for

3    prescription, what do you mean by that?  I'm

4    assuming RX means prescription?

5         A.    That is correct.

6         Q.    Go ahead.  What do you mean by

7    the dash doctor's orders for prescription?

8         A.    There were -- remember, this is

9    in reference to Ms. LaMarre's report.

10        Q.    I understand that.

11        A.    She had references in there that

12   they had decided which medicines to give or

13   not to give independently.  And therefore,

14   exceeded the scope of their practice.  That

15   is not, I do not believe it is true because

16   the doctor was the one ordering and

17   responsible for each of the medications in

18   this case.

19        Q.    Each of the medications that

20   there's a record of giving in the medical

21   records that you've reviewed; correct?

22        A.    That's correct.

23        Q.    You're -- you also agree though

24   that there was a bag of medicine that



1   Ms. Filichia brought in; correct?

2          A.      No.   I will agree that -- I will

3   agree that there was a bag.   I will agree

4   that the officers say there were pills in it.

5   Whether they were in bottles, whether it was

6   actually her medications or not, I don't

7   know.

8              As a for instance, whether the

9   Remeron, which is dispensed that night was

10  contained in that bag or whether it was on

11  the med cart, I don't know.

12             Whether the prescription that

13  had been -- the two prescriptions that had

14  been written on the 4th of --

15         Q.      February?

16         A.      -- February and should have been

17  completed by that time, whether they -- those

18  bottles were in there and whether, if they

19  were in there, whether they were empty or

20  whether Ms. Filichia had not taken them as

21  directed, I don't know.

22             I also don't know whether there

23  were narcotic medications.

24             What I do know is that there's



1    no evidence in the record anywhere of

2    Ms. Filichia being prescribed opiate

3    medications in the previous four months or

4    ever being prescribed methadone.  So I do

5    know that there would not be medications of

6    those in there.

7         Q.    Well, you haven't reviewed Miss

8    Filichia's Orr's reports which would contain

9    a complete record on prescribed medications;

10   is that true?

11        A.    I have not.

12        Q.    That would be the only complete

13   record of prescribed medications that would

14   indicate whether on not she had received

15   particular prescriptions and the length of

16   those prescriptions; isn't that right?

17        A.    I don't believe that's right.

18   Because in each of her Grady Hospital

19   reports, emergency department reports when it

20   asks who her personal physician is, it lists

21   Dr. Stock.  I got Dr. Stock's records and he

22   has a fairly extensive list of medications,

23   including controlled substances he's

24   prescribing.



THOMAS FOWLKES, M.D.                 September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE          112

```
 1              So, he makes no mention of other
 2    opiate being prescribed by another provider
 3    and there is no mention anywhere in the chart
 4    of her going to other providers.
 5              So, I don't believe that the
 6    Orr's report is the only source showing she
 7    didn't receive those medications.
 8              If it does show other
 9    medications, then she did it without
10    revealing it to Dr. Stock to the Grady
11    hospital or to Dr. Fuller.
12         Q.    With respect to Ativan, we all
13    agree that at some point she was prescribed
14    Ativan; right?
15         A.    She was prescribed it for a
16    number of years.
17         Q.    Right.  Do you have any
18    knowledge of whether or not she brought a
19    current prescription of Ativan with her to
20    the correctional facility that day?
21         A.    I do not.
22         Q.    Nobody knows what was in that
23    bag because it's gone, is that right, that
24    Ms. Filichia brought to the jail with her?
```



1    A.    I don't know if it's gone.  May

2 still be at the Delaware County jail locked

3 up.  I don't know where it is.

4           Or somebody could have picked it

5 up.  One of her relatives could have picked

6 it up.  I don't know.

7    Q.    Next you say that trained CO

8 staff are able to do screenings.  Do you see

9 that?

10   A.    I do.  I said I see that.  Tell

11 me where.

12           MR. SCHUMACHER:  Last thing on

13 Page 3.

14 BY MS. PROBST:

15   Q.    It's the last dash.

16   A.    Got you.

17   Q.    Next thing strained CO staff are

18 able to do screenings?

19   A.    Right.

20   Q.    Do you mean initial assessments?

21   A.    No.  I mean intake medical

22 screenings.

23   Q.    Do you mean the questionnaire we

24 were discussing earlier?



1      A.     It is typically called, in most

2  facilities, that is called an intake

3  screening.  Some places it's called an intake

4  health screening.

5          But in the -- in CCHC guidelines

6  it's referred to as a receiving screening.

7      Q.     Correct.

8      A.     And the receiving screening can

9  be performed by trained CO staff or by

10 healthcare professionals, either one.

11         In this case, and it would be a

12 better standard if a healthcare professional

13 were doing it.

14         So, in this case, it was done by

15 Nurse Bloomfield, by a nurse.  But it could

16 be done by a trained correctional officer.

17     Q.     Nurse Bloomfield, according to

18 your testimony, and hers, did an initial

19 assessment; is that right?

20     A.     She did do an assessment, that's

21 correct.

22     Q.     There is no medical intake

23 screening questionnaire for February 20th

24 that was completed by anyone; isn't that



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

1  right?

2        A.     I do not see the form.  I know

3  that she did the assessment.  I do not see

4  the form in the chart.

5        Q.     You don't know what questions

6  Ms. Bloomfield asked Miss Filichia other than

7  what she reported on her nurse's note that

8  she did on March 3rd after she died; is that

9  right?

10        A.     Ask the question again, please.

11        Q.     You do not know what questions

12  Ms. Bloomfield asked Miss Filichia during her

13  initial assessment other than what she wrote

14  in the nurse's note on March 3rd, 2016, which

15  was written after she died; right?

16        A.     And --

17              MR. DOWNEY:  Objection.  Go

18  ahead.

19              THE WITNESS:  And there is also

20  her deposition testimony.

21  BY MS. PROBST:

22        Q.     Right.

23        A.     This bullet point was not in

24  relationship to that, though.  It was that --



1    it is that Ms. LaMarre was saying that the

2    male P.E.N. that Miss Bloomfield did an

3    initial assessment or what she called and

4    independent assessment and made an

5    independent judgment and that was

6    inappropriate and beyond the scope of

7    practice for an L.P.N.

8              I'm saying that because not only

9    can L.P.N.s do it, but trained correctional

10   staff can do it.  There's no way it has to be

11   an L.P.N.  It does not have to be exceeding

12   the scope of an L.P.N.'s practice.

13       Q.    We've discussed the difference

14   between an initial screening, which is a form

15   and an initial assessment.  Is there not a

16   difference?

17       A.    No.  Well, first of all, so,

18   you're distinguishing number one between

19   forms.

20       Q.    I am.

21       A.    That's right.  Okay.  So there

22   is an assessment that is done.  That

23   assessment can be done by a trained

24   correctional officer.  If it is done by a



1    trained correctional officer, a nurse should

2    review it and as part of the initial

3    assessment -- so for instance, a correctional

4    officer cannot order medications.

5           Q.      Neither can an L.P.N.; correct?

6           A.      No.  No.  Cannot start -- cannot

7    continue medications.  Yes, an L.P.N. can

8    continue a valid prescription of medications.

9           Q.      I understand.

10          A.      A correctional officer should

11   not be doing that.  So if a correctional

12   officer does the intake assessment it needs

13   to be reviewed by the medical staff and then

14   and only then are medications started, are

15   vital signs taken, all of those kinds of

16   things that are then done and the orders are

17   followed.

18                  So, you can have it done that

19   way.  Or, as in this case, the nurse can do

20   the assessment directly, bypassing the first

21   step and that was what was done in this case.

22          Q.      There are two steps.  There is a

23   receiving screening or an intake

24   questionnaire that the Delaware County



```
 1   sheriff's jail fills out, according to their
 2   policies; isn't that right?
 3              MR. DOWNEY:  Objection.
 4              THE WITNESS:  No, I don't
 5   believe that's right.
 6   BY MS. PROBST:
 7        Q.    Did you ever read the intake
 8   procedure policy of the Delaware County jail?
 9              MR. DOWNEY:  Objection.  Asked
10   and answered.
11              THE WITNESS:  I saw individual
12   policies.  I did not see the entire policy.
13              But when a person is booked into
14   a jail, there is a form that either a
15   correctional officer or a nurse fills out.
16   The correctional officer does not have to do
17   it in advance of the nurse, to the best of my
18   understanding.
19   BY MS. PROBST:
20        Q.    All right.  Look at Number 10,
21   that same page, please.  I didn't mean to
22   order you.  Look at Number 10 on Page 3.
23              MR. DOWNEY:  I listened.
24   BY MS. PROBST:
```



1      Q.     Of Exhibit 4.

2      A.     Yes.

3      Q.     All right.  You next state, I

4  believe, that this is something you're

5  listing as a difference of opinion with

6  Ms. LaMarre that DCSO and CCS did not have an

7  adequate healthcare system or policies

8  forward slash procedures.

9            Do you see that on numbered list

10 ten?

11     A.     I do.

12     Q.     I'm going to ask a series of

13 questions related to this.  And so I want you

14 to -- I want you to assume.

15     A.     Could you stop for a moment,

16 please?

17     Q.     Yes.

18     A.     You told me to look at you and

19 listen to your series of questions.  But this

20 relates to a disagreement that I had with

21 Ms. LaMarre's report directly.  Can I turn to

22 that section where she addresses that?

23     Q.     That's fine.

24     A.     So, just for the record, this is



THOMAS FOWLKES, M.D.                      September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              120

1    on Page 10 of her rebuttal report, letter

2    number J, where she says Delaware County

3    sheriff's department and CHC did not

4    establish adequate healthcare system to

5    provide adequate healthcare to Rhianna

6    Filichia or other DCSO detainees.

7              And then she goes on to say what

8    an adequate healthcare system is.  And I

9    disagreed with her findings there, hence I

10   wrote that statement right there.

11        Q.    Okay.

12        A.    It references only that number

13   J.  I disagree with her findings in number J.

14        Q.    I appreciate that.

15              I'm going to ask you some

16   questions that I believe are related, but are

17   really not in either of your reports.

18        A.    Okay.

19        Q.    Okay.  Now, I know you indicated

20   that you've not seen the agreement with --

21   between the Delaware County jail and -- your

22   saying CCS is really confused my head --

23   between CHC, Inc. and the Delaware County

24   jail.  That's correct; right?



1          A.     That's correct.

2          Q.     I would like you to assume that

3    that contract indicates that there is no

4    registered nurse time provided by that

5    contract.  Okay?  For purposes of these

6    questions.  Please assume that.  Okay?

7          A.     Do you mean provided or

8    required?

9          Q.     In the -- what I mean is that

10   the contract states that there is not any

11   time to be paid for a registered nurse and

12   that a registered nurse is not on staff.  I

13   want you to assume that.  Okay?

14         A.     Okay.

15         Q.     All right.  Now, if a registered

16   nurse is not on staff -- well, we're assuming

17   that's assumption one.  And then assumption

18   two I want you to assume that the statute in

19   the State of Ohio prevents an L.P.N. from

20   doing an initial assessment.  Okay?  Those

21   two assumptions.  All right?

22                Now, with those two things being

23   true, if the Delaware County jail only has

24   L.P.N.s on staff at all time and the statutes



1   of the State of Ohio prevent those L.P.N.s

2   from doing initial assessments, is it true

3   that any individual detainee who's admitted

4   to that jail would not be given access to

5   medical care at the time they are admitted?

6              MR. DOWNEY:  Objection to the

7   form of the question.

8              MR. SCHUMACHER:  Objection.

9              MS. PROBST:  I'm terrible at

10  asking questions.  You're going to hear this

11  a lot.  Go ahead.

12             THE WITNESS:  In order for me to

13  give an answer to your hypothetical, I would

14  need to see what you're talking about, about

15  the Ohio Nursing Practice Act not allowing

16  initial assessments, because I don't believe

17  that any state has a nursing practice which

18  prohibits L.P.N.s from doing initial

19  assessments on patients in jail.

20             So, I don't believe that that is

21  what is meant by the Nursing Practice Act.

22             And if you want for me to assume

23  that, you're going to have to be more

24  specific.



1    BY MS. PROBST:

2         Q.    Okay.  Of course I brought it to

3    Nurse Connelly's deposition, but I didn't

4    bring it here.

5         A.    Okay.

6         Q.    So, my horribly asked

7    hypothetical, which by the way, I haven't

8    asked one in all of my depositions that has

9    not been objected to.

10              MR. SCHUMACHER:  What a

11   surprise.

12   BY MS. PROBST:

13        Q.    I don't think I have it.  I'm

14   almost certain I specifically told my

15   assistant not to make a copy of it.

16              MR. DOWNEY:  There's already

17   testimony that you don't have to have nurses

18   on duty to do assessments.  I mean the

19   witness is already on the record.

20              MS. PROBST:  I know that he said

21   that.  But I'm giving him a hypothetical, but

22   let me see if it works out for me.  I

23   appreciate that, though.

24   BY MS. PROBST:



```
 1         Q.      Let's move on then because I
 2    don't have it and I don't want to waste
 3    everyone's time.
 4         A.      Okay.
 5         Q.      Hypothesizing about something
 6    that you'd like to see.  Let's go to Exhibit
 7    5, which is titled summary of issues with
 8    Dr. Manokas' report.  All right.  Let's go to
 9    part two of that particular exhibit.  I mean
10    paragraph numbered two with a circle around
11    it.
12         A.      Uh-huh.
13         Q.      You state no evidence that
14    providing Ms. Filichia with a previously
15    prescribed laxative and encouraging her to
16    intake water (as the ED discharge
17    instructions had said, is quote, the worst
18    thing to do, end quote, Paragraph 3.
19         A.      Okay.
20         Q.      All right.  Why do you disagree
21    with that?
22         A.      Well, so Dr. Manokas said that
23    giving her a laxative and encouraging her to
24    drink water was, quote, the worst thing to
```



1  do.
2              So, I disagree with that
3  characterization of the worst.  It shouldn't
4  be the worst thing one could do.  There
5  should be worse things one could do than
6  giving her water, than giving her a laxative.
7  There should be worse things.  That is a
8  very -- hold on a minute.  I'm looking for
9  the word.  That's a very definitive
10 statement, I should say, that that is the
11 worst thing that could be done.
12             There's number one, always
13 something worse that could have been done.
14 But particularly in this case, she had
15 previously been prescribed the laxative and
16 when she had been to the emergency department
17 on the 4th and been given the discharge
18 instructions which she had been given and
19 which she may well have had with her at that
20 time, one of those instructions specifically
21 said drink plenty of water.
22             So, you were saying she likely
23 had those discharge instructions with her.  I
24 have the discharge instructions that she was



1  provided and one of them was drink plenty of

2  water.

3            So, I disagree with his finding.

4     Q.    All right.  And that's why,

5  based on the discharge instructions and the

6  use of the word worst.

7     A.    Well, he also, underlying that,

8  is that he presumed that there was a bowel

9  obstruction.  I didn't see any evidence of a

10  bowel obstruction.  She had not been vomiting

11  during that weekend that I saw any evidence

12  of or had other signs of an acute bowel

13  obstruction.

14            So, I don't believe that -- I

15  don't believe it's an underlying presumption

16  either.  Or I disagree with his underlying

17  presumption that she had a bowel obstruction,

18  number one.  And number two, those reasons

19  that I just stated.

20     Q.    All right.  On an off topic, you

21  indicate that the discharge instructions

22  indicated to drink plenty of water.

23            Do you remember that?

24     A.    Yes.



1          Q.      You're also aware, though, that

2    Ms. Filichia's water to her cell was cut off,

3    are you not?

4                  MR. DOWNEY:  Objection.

5    BY MS. PROBST:

6          Q.      Are you aware of that is the

7    question.

8          A.      I am aware that not only am I

9    aware of that, but I'm also aware that they

10   provided her a pitcher and gave her water on

11   multiple occasions.  I'm aware of both of

12   those instances.

13         Q.      When you say you're aware they

14   provided her water on multiple occasions,

15   where are you getting that information?

16         A.      There's testimony or I'm sorry,

17   not testimony, the investigative reports of

18   multiple correctional officers in both their

19   statements and in the deposition reports,

20   Nurse Bloomfield as well, plus at the time of

21   the death investigation there was a picture

22   taken where they took the pitcher out.  The

23   pitcher itself was brought out of the room so

24   you could see that there was a pitcher in the



 1  room that had been providing her water.

 2      Q.      I understand that there was a

 3  pitcher in the room.

 4      A.      Uh-huh.

 5      Q.      What evidence did you see of

 6  individuals giving her water?

 7      A.      Their statements.

 8      Q.      Whose?

 9      A.      The correctional officers.

10      Q.      Okay.  There's only been a few

11  that have been deposed.  So, which ones?

12      A.      No.  There was also, they gave

13  statements to the --

14      Q.      Detective Overly?

15      A.      Uh-huh.  Between those and their

16  deposition testimony.  I can't point out

17  exactly which ones at this moment.  If you

18  wanted to give me time to review that I'd be

19  glad to look for it.

20      Q.      I just wanted to know from where

21  you obtained that conclusion.

22              Exhibit 6, title.  Additional

23  opinions since initial report.

24      A.      Okay.



THOMAS FOWLKES, M.D.  September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE  129

```
 1          Q.      Paragraph 3.
 2          A.      Yes.
 3          Q.      Highlighted.  Based on the
 4   toxicology from February 4th of 2016,
 5   emergency department visit, Miss Filichia was
 6   taking at least two medications forward slash
 7   substances for which she had not recently
 8   been given a prescription.
 9                  What are those two substances?
10          A.      If you would give me just a
11   moment.  On Grady Hospital -- this may be my
12   Bates stamp.  I'm not sure that it was a
13   Bates stamp --
14          Q.      Go ahead.
15          A.      GMH 001008.
16          Q.      Uh-huh.
17          A.      Which is a part of the record
18   from her emergency department visit on
19   February 4th, 2016.
20                  There was a urine drug screen
21   done.  That urine drug screen was positive
22   for Benzodiazepines, Methadone and opiate.
23          Q.      That's the February 4th drug
24   screen; is that correct?
```



1    A.    That's correct.  The emergency

2    department visit.

3            Ms. Filichia had been given

4    prescriptions by Dr. Stock for Ativan, which

5    is a Benzodiazepine and for Ultram, which is

6    an opioid but not an opiate.

7            What I mean by that is, as it

8    relates to this screen, it would not show

9    positive for opiates, the Ultram would not.

10   The Benzodiazepine would show positive for

11   the Benzodiazepine.

12           This result is consistent with

13   her taking some of the benzodiazepine, but

14   there is no screen for Ultram on here.  So we

15   don't see whether she did or didn't take it

16   as a result of this screen.  They don't test

17   for Ultram.

18           It tests positive for methadone,

19   which means that she had been taking

20   methadone.

21   Q.    Uh-huh.

22   A.    She had no prescription, had

23   never been given a prescription for

24   methadone, anywhere in the record I find no



1    evidence of a prescription for methadone.

2               The opiate screen, although

3    methadone is an opiate, it's a synthetic

4    opiate and it does not cause the opiate

5    screen to turn positive.  If you were only

6    taking methadone, the methadone would be

7    positive and the opiate would be negative.

8    That's why they have two different classes on

9    that screen.

10              So, in addition to being

11   prescribed Ultram which is an opiate, but

12   wouldn't test positive, in addition to taking

13   methadone, despite not being prescribed it,

14   she also was taking another opiate.  And I

15   don't know what that opiate was, but it

16   wasn't one of these.  And she had not been

17   prescribed opiates since back in October.

18   And she was only given a limited quantity at

19   that time.

20              So, I don't know what the two

21   substances specifically were.

22        Q.    Okay.

23        A.    I know that it was methadone

24   that she doesn't have a prescription for and



1    some other opiate that she doesn't have a

2    prescription for or could be the elicit

3    opiate heroin as well would test that

4    positive.

5         Q.    Okay.  Let's go to that same

6    exhibit, page numbered circled two.  I'm

7    going from the bottom up, if you will.

8         A.    Okay.

9         Q.    Your statement says based upon

10   review of the autopsy findings, toxicology

11   and photographs to a reasonable degree of

12   medical probability the cause of death was

13   not peritonitis.

14             Do you see that?

15        A.    I do.

16        Q.    All right.  These materials that

17   you base this on, the autopsy findings, the

18   toxicology and the photographs, you had all

19   of those before you wrote the opinion that

20   you've provided and that we've reviewed as

21   Exhibit 1; right?

22        A.    I did not have the autopsy

23   photographs, no.  I only received them after

24   the report.  And I did not have all of her



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
133

```
1   medical records at the time of that first

2   report, either.

3        Q.      But you didn't use those for

4   this particular conclusion.

5             So, what caused you to decide to

6   opine about her cause of death?

7        A.      Just give me one moment, please.

8        Q.      That's fine.  Of course.

9        A.      So, it was an expansion of what

10  my initial opinion had been that originally I

11  had said that on the autopsy note,

12  perforation was identified and there was a

13  predominance of chronic inflammation.

14            So, I was expanding upon or my

15  opinion was not a new -- it was not a new

16  opinion, but rather an expansion upon what I

17  had previously found or previously thought

18  about as a result of reviewing additional

19  records about what happened to her, the cause

20  of her death.

21       Q.      Did anyone contact you and say,

22  hey, you should look, there's a cut in the

23  wall of the cecum?  Did anyone call and tell

24  you to look at that specifically?
```



1      A.     No.  No.  I identified that as

2    part of my original review of the records.

3      Q.     Okay.

4      A.     If I might just explain there

5    just for a moment, my review of the

6    photographs of the autopsy photographs, it

7    appeared to me that the fluid that I saw

8    there appeared more feculent than purulent.

9    That was one of my main findings that led me

10   to believe it wasn't really peritonitis.  The

11   pictures looked more like feculent fluid

12   rather than purulent fluid.

13     Q.     So then it's your opinion that

14   the coroner -- excuse me, that Dr. MacDowell

15   is wrong?

16     A.     It is my opinion that the cause

17   of her death was not peritonitis and was --

18   was not peritonitis.

19     Q.     Dr. MacDowell made your finding.

20   Your opinion is that Dr. MacDowell is wrong?

21     A.     I disagree with his finding of

22   the cause of death.

23     Q.     All right.  Going with Number 1

24   on Exhibit 6, the last sentence, do you see,



1    it says some parts did not need to be

2    repeated such as restarting the previously

3    verified meds, but screening was done each

4    time.

5              What do you mean screening?  And

6    this is my -- just to kind of ask you what

7    I'm saying, because I don't want to keep

8    asking the same questioning and boring

9    everyone.  When you say screening do you mean

10   the initial assessment or do you mean the

11   intake screening document?

12        A.    Well, we're not talking about

13   document here.  We're talking about actual

14   screening and the screening is -- the

15   screening or an assessment or an action.  The

16   form that may be documented as a result of

17   that assessment or that screening is a form,

18   is a paper record of whether that screening

19   or that assessment were done.  But the

20   screening and the assessing are an action,

21   not a form.

22        Q.    What leads you to the conclusion

23   that it is done every time an individual

24   arrives at the Delaware County jail,



THOMAS FOWLKES, M.D.                      September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              136

1    regardless of status, as a weekender or

2    otherwise, by the employees of the

3    correctional healthcare company?

4         A.    My opinion was not that it was

5    done each time that a person comes there.

6    That is not my opinion.  My opinion is that

7    she did it -- she said that she did it on

8    that date.

9         Q.    Okay.  Your opinion says was

10   done each time.

11        A.    Was --

12        Q.    It says it right there.  Was

13   done each time.

14        A.    The assessment was done each

15   time that she came.  Each time Ms. Filichia

16   came.  You just said -- I said I don't know

17   about every time a person comes.  Each time

18   Ms. Filichia came, she was assessed and

19   screened each time she came.

20        Q.    And -- all right.  So, this

21   paragraph is about Miss Filichia

22   specifically, not about everyone that comes?

23        A.    That's correct.

24        Q.    Is that fair?



1        A.      That's correct.

2        Q.      All right.  Okay.  What makes

3   you believe that she was assessed every time

4   she came to the Delaware County jail?

5        A.      Well, particularly on this

6   incident, this time, the 20th, she's, Nurse

7   Bloomfield is seen on camera doing the

8   assessment.  She's seen doing the assessment.

9            She said that not only did she

10  do the assessment, but she filled out the

11  paperwork.  She filled out the assessment

12  intake paperwork is what her testimony is.

13           I admit that we do not have that

14  paperwork.  I don't know what happened to it.

15  We don't have it.

16           It was my understanding when I

17  first wrote the report that they didn't do

18  that form each time that a person, a

19  weekender came back.  Not each person.  A

20  weekender is a rare occurrence -- not rare,

21  but it's not the usual.  Somebody has done an

22  assessment and those forms are filled out

23  both by the correctional people and the

24  healthcare staff every time a person is



1   arrested and booked into a jail.  That is

2   their policy and that is what they say they

3   follow.

4           A weekender is different because

5   they are considered to be incarcerated from

6   the time of their first incarceration until

7   they get done with the ten weekends that they

8   are assigned.  They are essentially on leave

9   in between there.  So, the paperwork is not

10  repeated each time, according to my

11  information.

12          However, Ms. Bloomfield said

13  that she, in fact, did it this time.  And so

14  each time at the very least, each time

15  Ms. Bloomfield came back she was seen by a

16  nurse, her medicines were restarted.  Certain

17  things were done.

18          So whether or not the forms were

19  filled out anew each time is not really the

20  point, but Ms. Bloomfield, it is that she was

21  assessed each time.

22      Q.      Okay.  For Ms. Filichia's visits

23  prior to February, do you know that

24  Ms. Bloomfield did not work at the Delaware



1    County jail?

2        A.     Since reading her deposition,

3    I'm aware that she said she started around

4    the first of February.  So, yes.

5        Q.     All right.

6        A.     On the two prior incarcerations

7    during this weekend, you know, during this

8    weekend -- I'm sorry -- do you mind if I

9    get -- let me get my timeline out.

10            So, Ms. Filichia was there on

11   the weekends of the 8th through the 10th, the

12   15th through the 17th of January and the 22nd

13   through the 24th.

14       Q.     Uh-huh.

15       A.     Then she failed to report on the

16   Fridays of the 29th of January, the 5th of

17   February and the 12th.  And the 19th of

18   February.

19            She failed to report those four

20   Fridays.

21            And it was my understanding that

22   Nurse Bloomfield started some time around the

23   1st of February.

24       Q.     Okay.  The paperwork from



1   January for Miss Filichia, we can agree that

2   there is not an initial assessment done of

3   Miss Filichia for each of those three visits

4   in January that you just detailed; isn't that

5   right?

6         A.      You mean the form?  Is that what

7   you're talking about?

8         Q.      No.  I mean that there was not

9   an initial assessment done?

10              MR. DOWNEY:  Object.

11              THE WITNESS:  There is an usual

12   assessment that is done on the 8th of

13   January.

14   BY MS. PROBST:

15        Q.      I understand.

16        A.      Okay.  On the next two weekends,

17   there is evidence that nurses talked to her

18   and assessed her and restarted and started

19   medications.

20        Q.      Go ahead.  I don't mean to

21   interrupt you.  You pause and I think you're

22   done.

23        A.      That's all right.  I talk slow.

24   I'm sorry.



```
 1              There is evidence that nurses
 2    talked with, assessed Ms. Filichia and
 3    provided medications and care to her.  The
 4    initial forms are not repeated those two
 5    times.
 6         Q.    All right.  Other than the
 7    medical records showing that Miss Filichia
 8    received medication on the next two visits,
 9    what evidence is there that anybody assessed
10    her in January other than January 8th,
11    please.
12         A.    And I presume you're talking
13    about the weekend of January 8th through the
14    10th.
15         Q.    Correct.
16         A.    Not just --
17         Q.    Correct.
18         A.    I'm flipping to those records
19    and I have them in chronological order.
20              And on this first, we have the
21    first admission that you're asking me to not
22    do.
23              So, on the next weekend -- and
24    this is CCS 18, this is where the nurse notes
```



1    these medicines on the medication

2    verification, they speak with Dr. Mitchell

3    who approves the medicines and says approved.

4    I believe that these shorthands for positive

5    are give him and the shorthand for negative

6    was not to give him.

7              A nurse saw Ms. Filichia on the

8    15th.  She starts these three medications.

9    She does not start this medication.

10             There is likewise an order for a

11   chart that says that.  The nurse saw her,

12   talked with, this is a telephone order again.

13   Spoke with Dr. Mitchell and orders three

14   medications.  I'm sorry, four medications and

15   not only did they speak to her that day, but

16   Dr. Mitchell didn't sign.  They have an

17   order.

18        Q.    Stop right there.  Let's just do

19   that one.

20             There is nothing in those two

21   documents indicating that anyone spoke with

22   Miss Filichia directly at all; isn't that

23   true?

24        A.    I don't believe you can draw



1   that inference.  I believe they would have to

2   speak to her to find out what medication she

3   was on.

4          Q.     Isn't it true that if Miss

5   Filichia brought in a bag of medications as

6   she did on her last visit to the Delaware

7   County jail, that a nurse could make that

8   report without speaking to her?

9          A.     So, you're saying that unlike

10  Nurse Bloomfield who actually went up there

11  to the booking desk, saw her, did an

12  assessment, they could have not done that on

13  that day.  Is that what you're saying?

14         Q.     Yes.  There's no written record

15  that she was assessed that day; isn't that

16  true?  There's no written record she was

17  assessed that day?

18         A.     I don't believe that's

19  consistent with normal nursing practice.

20              But is it theoretically possible

21  that someone could not do that, yes.  She was

22  assessed; whether she was assessed face to

23  face or whether they were assessing her

24  medications.



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                 144

1        Q.      Here's what I'm saying.

2                You just said that is not normal

3    nursing practice.  Do you remember just

4    saying that?

5        A.      I do.

6        Q.      Okay.  So, what I'm asking you,

7    is if there's -- the record is absent of a

8    document indicating that she was assessed,

9    other than the medication record for the

10   weekend of January 15th through the 17th.  Is

11   that right?

12       A.      The record has a medication

13   verification sheet.

14       Q.      Uh-huh.

15       A.      The record also has that

16   Dr. Mitchell was called and gave some

17   medications and by a nurse and that is the

18   only nursing note that I see during that

19   weekend, that is correct.

20       Q.      Okay.  Thank you.

21               You're -- you previously

22   stated -- the reason I'm asking these

23   questions is because you previously stated

24   that on the weekends when Miss Filichia came



```
 1   to the Delaware County jail, she was
 2   assessed.  And I'm trying to determine,
 3   Dr. Fowlkes, how you can make that
 4   determination from the record in front of
 5   you.  On the weekend of the 15th through the
 6   17th, all you see is a medical administration
 7   record and some approvals from Dr. Mitchell;
 8   correct?
 9              MR. DOWNEY:  Objection to form.
10   I don't know what exactly you asked him.
11   BY MS. PROBST:
12        Q.    So -- but -- I'm trying to have
13   a conversation without seeming like I'm
14   attacking you because I'm not trying to.  I'm
15   trying to understand how you can conclude she
16   was assessed from the written record?
17        A.    During that weekend, there
18   was -- at least that interaction, that
19   assessment.  And there's not only that, but
20   the medications were prescribed.
21        Q.    So there was a medication
22   assessment?
23        A.    Okay.  And orders given by the
24   doctor.
```



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
146

1      Q.      To take those medications that
2  were listed?
3      A.      Yes.  And one of the medications
4  that was -- there was also the order for
5  Flagyl, which wasn't one of those
6  medications.  And in is some other mention in
7  the record about where that was because if
8  you recall, that was before the 2/4,
9  emergency department visit where she was
10  given Flagyl and I believe there is some
11  mention in the record about why she was on
12  that Flagyl.
13          And I don't recall what -- I
14  can't make you a -- I can point to that where
15  in the record it is.  There is some
16  discussion of that.
17          In addition to that, she is
18  prescribed the medication.  She's prescribed
19  the medication.  She's prescribed the
20  medication, according to this on that
21  weekend.  Let's move to the weekend on the
22  23rd where that happens again and in addition
23  to that, there's the gastrointestinal.  She's
24  seen by a nurse for the gastrointestinal



1   complaint.

2        Q.     The gastrointestinal protocol is

3   what you're discussing now; correct?

4        A.     It's called a pathway where she

5   was seen in response to a complaint and that

6   pathway was utilized, yes.

7        Q.     A complaint about abdominal

8   pain; isn't that right?

9        A.     That is correct.

10       Q.     All right.  That particular

11  pathway that you're discussing is not or was

12  never used in assessing Ms. Filichia on

13  February 20th, 2016 or February 21st, 2016?

14       A.     It's not an assessment document,

15  so, therefore, it was not used, that is

16  correct.

17       Q.     I know it's not an assessment

18  document.  But it was not used; right?

19       A.     If it was, it is no longer in

20  the record.

21       Q.     Like the assessment.

22              MR. DOWNEY:  Objection.

23  Argumentative.

24  BY MS. PROBST:



THOMAS FOWLKES, M.D.                September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                148

```
 1          Q.      Would you agree that a nursing
 2   note entered 11 days after Miss Filichia died
 3   was outside the acceptable standard of care
 4   for a nurse?
 5                  MR. SCHUMACHER:  Objection.
 6                  MR. DOWNEY:  Object.
 7   BY MS. PROBST:
 8          Q.      Go ahead.
 9          A.      No, I would not agree with that.
10          Q.      You think that it's within the
11   standard of care to make late nursing note
12   entries?
13          A.      I believe that it's within the
14   standard of care to make a note at any time
15   to reconstruct a note at any time when one
16   recognizes that a previously made note is not
17   there or is not documented in whatever
18   fashion.
19          Q.      Do you believe it's within the
20   standard of care to create a nursing note to
21   replace a note that was never taken?  Do you
22   believe it is within the standard of care to
23   create a nursing note to replace a note that
24   was never taken?
```



THOMAS FOWLKES, M.D.                     September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              149

```
1         A.    I believe it could be

2    appropriate for you to document an

3    interaction with a patient after the fact,

4    even if you had not created any note in the

5    first place, yes.  Yes, I do believe that is

6    appropriate.  No, I don't believe that that

7    would be a violation of standard of care.

8              MS. PROBST:  I don't have any

9    other questions.

10             MR. DOWNEY:  No questions.  I

11   don't have any questions today.  Thank you.

12             MR. SCHUMACHER:  We'll read and

13   sign.

14                     -  -  -

15             (Whereupon, the deposition

16   concluded at 2:12 p.m.)

17                     -  -  -

18

19

20

21

22

23

24
```



THOMAS FOWLKES, M.D.                         September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE              150

```
 1                 C E R T I F I C A T E

 2

 3        I hereby certify that the proceedings

 4   and evidence noted are contained fully and

 5   accurately in the notes taken by me on the

 6   deposition of the above matter, and that this

 7   is a correct transcript of the same.

 8

 9

10

11

12

13            _Teresa M. Beaver_____

14            Teresa M. Beaver

15

16

17        (The foregoing certification of this

18   transcript does not apply to any reproduction

19   of the same by any means, unless under the

20   direct control and/or supervision of the

21   certifying shorthand reporter.)

22

23

24
```



THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                    151

```
 1              DEPOSITION ERRATA SHEET

 2

 3   Case Caption:  BERRY V. DELAWARE COUNTY

 4

 5    DECLARATION UNDER PENALTY OF PERJURY

 6            I declare under penalty of perjury

 7   that I have read the entire transcript of my

 8   Deposition taken in the captioned matter or

 9   the same has been read to me, and the same is

10   true and accurate, save and except for

11   changes and/or corrections, if any, as

12   indicated by me on the DEPOSITION ERRATA

13   SHEET hereof, with the understanding that I

14   offer these changes as if still under oath.

15

16         Signed on the  23RD   day of

17   October         , 2017.

18   Thomas Fowlkes, MD

19           THOMAS FOWLKES, M.D.

20

21                    ID # 117493

22                   ASHLEY FRYE

23              Commission Expires
                  Sept. 22, 2020
24
```

STATE OF MISSISSIPPI NOTARY PUBLIC — LAFAYETTE COUNTY



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                           152

```
 1                    DEPOSITION ERRATA SHEET

 2                         Pg 6 - line 20
                        & Pg 25 - line 7
 3       Page No.____ Line No.____ Change to:_____

 4       Fayette  should  be  Lafayette

 5       Reason for change: transcription error

 6

 7       Page No. 12 Line No. 1 Change to:_____

 8       DD's should be struck

 9       Reason for change: transcription error

10

11       Page No. 21 Line No. 6 Change to:_____

12       doses should be overdoses

13       Reason for change: transcription error

14

15       Page No. 94 Line No. 22 Change to:_____

16       NccH  should  be  NCCHC

17       Reason for change: transcription error

18

19       Page No. 95 Line No. 2 Change to:_____

20       objection should be example

21       Reason for change: transcription error

22

23       SIGNATURE: Thomas Fowlkes MD  DATE: 10-23-17

24             THOMAS FOWLKES, M.D.
```



800.211.DEPO (3376)
EsquireSolutions.com

1           DEPOSITION ERRATA SHEET

2

3     Page No. 102 Line No. 8 Change to: _____
4     "And stating" should be "I stated my"
5     Reason for change: transcription error

6                    Pg 111 - line 8
                    ✓Pg 112 - line 6
7     Page No. _____ Line No. _____ Change to: _____
8     _____ Orr's should be OARRS
9     Reason for change: _____

10

11    Page No. 116 Line No. 2 Change to: _____
12    "Male P.E:N." should be "opinion"
13    Reason for change: transcription error

14

15    Page No. 117 Line No. 6 Change to: _____
16    2ND cannot should be can
17    Reason for change: transcription error

18

19    Page No. 132 Line No. 2 Change to: _____
20    elicit should be illicit
21    Reason for change: transcription error

22

23    SIGNATURE: Thomas Fowlkes MD DATE: 10-23-17
24              THOMAS FOWLKES, M.D.


800.211.DEPO (3376)
EsquireSolutions.com

THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
153

| 1 | DEPOSITION ERRATA SHEET |
|---|---|
| 2 | |

3   Page No. 138 Line No. ~~20~~ 15 Change to: _____

4   Bloomfield should be Filichia

5   Reason for change: _____

6

7   Page No. 142 Line No. ~~6~~ 5 Change to: _____

8   him should be them

9   Reason for change: transcription error

10

11   Page No. ____ Line No. ____ Change to: _____

12   _____

13   Reason for change: _____

14

15   Page No. ____ Line No. ____ Change to: _____

16   _____

17   Reason for change: _____

18

19   Page No. ____ Line No. ____ Change to: _____

20   _____

21   Reason for change: _____

22

23   SIGNATURE: Thomas Fowlkes MD  DATE: 10-23-17

24          THOMAS FOWLKES, M.D.



800.211.DEPO (3376)
EsquireSolutions.com

THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: $40..48

**$**

**$40**
8:17

**0**

**000009**
55:3
**000022**
57:15
**000060**
94:13
**001008**
129:15

**1**

**1**
6:2 30:20
32:1,6,18
37:12,24
40:6
44:24
48:19
49:4 53:6
56:20,21
80:9
88:8,9,10
100:16
132:21
134:23
**1/8**
57:11,15
**10**
88:8
118:20,22
120:1
**10th**
139:11
141:14

**11**
56:11
148:2
**11:55**
46:24
**12**
39:12,13
40:5 49:3
89:4,5
**12:09**
47:1
**12th**
139:17
**13**
39:13
71:3
**140**
9:12
**15th**
139:12
142:8
144:10
145:5
**16**
41:8
**160**
9:10
**168**
9:17
**17th**
107:6
139:12
144:10
145:6
**18**
141:24
**1955**
6:10
**19th**
139:17

**1st**
139:23

**2**

**2**
30:24
31:6
32:21
33:14
100:18
**2/20**
40:17
41:7
**2/20/2016**
65:7
**2/21**
40:17
41:8
**2/4**
146:8
**20**
9:5 50:7
67:14
**2000**
25:7
**2007**
25:7
**2015**
82:7
**2016**
17:10
38:4
40:17
49:11
54:7,10
56:10,23
58:9
59:21
63:2
64:17
72:18

83:11,15
101:16
107:17
115:14
129:4,19
147:13
**2017**
37:5
**20th**
17:10
50:15
52:22
54:6,10
56:23
58:9
59:21
63:1
64:17
67:11
81:24
82:6 83:2
101:8
104:19
105:1
106:22
107:17
114:23
137:6
147:13
**21st**
50:7,15
52:22
101:8
147:13
**22nd**
139:12
**23rd**
146:22
**24**
9:16
51:17,21
**24th**
139:13

**26**
6:5
**29th**
139:16

**3**

**3**
39:21
40:3,8,16
72:9
78:21
79:9,21
103:10
113:13
118:22
124:18
129:1
**3/3/2016**
76:3
**300**
57:19
**370**
89:16
**3rd**
56:9 67:8
68:24
69:15
72:17
101:6
106:8
115:8,14

**4**

**4**
47:6,14
99:11
100:4,16
103:10
119:1
**48**



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: 4th..ahead

84:4

**4th**
82:2
83:11,15
106:18
110:14
125:17
129:4,19,
23

**5**

**5**
47:10,18
124:7

**500**
57:18

**5th**
139:16

**6**

**6**
47:23
48:2
128:22
134:24

**7**

**7**
48:19
56:21

**70**
41:2
70:24

**8**

**8**
72:9

78:21

**8th**
59:17
139:11
140:12
141:10,13

**9**

**9**
103:13

**A**

a.m.
46:24

abdomen
105:12

abdominal
84:24
85:7,9,14
86:4,12
105:3,17
147:7

ability
17:17

absent
144:7

accept
8:22

acceptable
49:13
148:3

accepted
97:12

access
122:4

accreditati
on
29:9

accurate
19:17
20:4
49:18
50:6
69:14
70:9

act
10:19
24:20,24
49:24
122:15,21

acting
15:10
52:15

action
135:15,20

actions
49:8

activities
13:5

activity
79:7,19

acts
13:8 50:5

actual
67:9
78:13
104:5
135:13

acute
126:12

add
23:21

addiction
6:21
7:13,14

addition
8:3 40:4
46:1
73:17

131:10,12
146:17,22

additional
23:22
30:9 40:7
45:23
47:23
72:23
73:4 83:7
102:14
128:22
133:18

address
6:9
102:19

addressed
83:5

addresses
119:22

adequate
119:7
120:4,5,8

administer
12:5

administere
d
77:3,4

administrat
ion
145:6

administrat
ive
62:22

admission
20:18
63:9
88:17,21
107:21
141:21

admit
137:13

admitted
17:9
64:23
107:18
122:3,5

admittedly
72:14

advance
73:12
118:17

advanced
11:2

agenda
88:1

agree
14:18,21
15:1,2
50:18
81:23
82:5,11,
16,24
83:4,9,
13,18
84:8,21
85:5
99:24
102:3
106:14,20
109:23
110:2,3
112:13
140:1
148:1,9

agreed
58:22,24
108:17

agreement
86:18
120:20

ahead
30:17
41:14
55:11,12



58:13
64:1
69:10
91:10
102:10
109:6
115:18
122:11
129:14
140:20
148:8

**Air**
103:19

**alcohol**
84:5

**Alderman**
58:5

**allegation**
34:20,22
35:9

**Alleging**
36:2

**allowed**
13:4

**allowing**
122:15

**American**
6:21 7:12

**and/or**
12:8 27:4

**Anderson**
33:14

**anew**
138:19

**Angela**
33:14

**annually**
25:13

**antibiotic**
23:7

**antibiotics**
21:18,21
22:5,7,19

**anxiety**
84:10,15

**apologize**
38:21
46:4

**apparently**
61:10

**appeared**
90:3,20
134:7,8

**appearing**
65:8

**appropriate ly**
78:23
98:12

**appropriate ness**
23:13
38:1

**approvals**
145:7

**approve**
54:6

**approved**
58:23
103:15
104:10
142:3

**approves**
142:3

**approximate ly**
9:10
25:7,13

**April**
29:6

**area**
105:17

**areas**
39:6

**argumentati ve**
72:3
147:23

**arrangement s**
37:12

**arrest**
97:20

**arrested**
138:1

**arrival**
91:4

**arrived**
40:24

**arrives**
94:16
135:24

**articles**
31:15,19

**asks**
111:20

**assess**
14:17
96:22
98:6

**assessed**
60:7
92:18
136:18
137:3
138:21
140:18
141:2,9
143:15,
17,22
144:8

145:2,16

**assessing**
15:6
77:20
93:1
135:20
143:23
147:12

**assessment**
14:4,6,11
49:10
62:14,17
63:1
64:5,16
66:14,23,
24 67:5,
11,13,17,
19 68:7,
22 69:3,
5,12,16,
23,24
70:10,12
71:15
72:16
74:15
77:19
93:12
97:5,11,
17 98:3,
18,24
99:5,8
107:21
114:19,20
115:3,13
116:3,4,
15,22,23
117:3,12,
20 121:20
135:10,
15,17,19
136:14
137:8,10,
11,22
140:2,9,
12 143:12
145:19,22

147:14,
17,21

**assessments**
104:15
113:20
122:2,16,
19 123:18

**assigned**
25:12
138:8

**assignment**
37:15,18

**assignments**
39:2

**assist**
71:13
72:4

**assistance**
106:5

**assistant**
25:3,4,
10,14,21
26:4,14
98:14
123:15

**associates**
13:3

**association**
8:2,7

**assume**
67:23
69:2
119:14
121:2,6,
13,18
122:22

**assuming**
71:6,10
100:22
109:4
121:16



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE          Index: assumption..bring

**assumption**
68:3
69:18
121:17

**assumptions**
121:21

**Ativan**
84:10,13,
19,20
112:12,
14,19
130:4

**attacking**
145:14

**attempted**
71:12

**attend**
28:20

**attended**
29:3

**authority**
50:20,22
52:4

**autopsy**
27:4
132:10,
17,22
133:11
134:6

**aware**
25:24
26:16
30:13
68:12
69:4
85:16
92:23
93:3,5,
10,15,18
127:1,6,
8,9,11,13
139:3

**B**

**back**
19:23
27:6
44:6,13
54:24
62:15
63:20,23
64:6
93:22
131:17
137:19
138:15

**background**
24:7,9

**bag**
41:11,18,
20,24
42:3,7,10
58:10
59:20
60:14
61:5,6,
10,13,21
62:7,11
73:24
74:11,13
75:2
109:24
110:3,10
112:23
143:5

**baker's**
25:18

**base**
132:17

**based**
45:15
66:17
67:9,13
72:11,13
78:21

79:5,17,
23 126:5
129:3
132:9

**basic**
30:16

**basically**
96:1

**basis**
44:19
82:20
102:22

**Bates**
55:1
129:12,13

**beds**
9:10

**begin**
10:24
77:21

**beginning**
40:5
48:22

**Benzo**
84:17,18

**benzodiazep
ine**
84:19
130:5,10,
11,13

**Benzodiazep
ines**
129:22

**Betty**
53:22,23
54:4

**big**
44:15

**bit**
15:19

**Bloomfield**
52:21
54:3
56:10,15
60:16,22
61:3,4
64:21
65:4 66:8
68:15,21
72:9
75:6,15,
22 76:6,
21 78:14,
22 80:1
84:23
85:6 96:7
101:9
105:2
106:7,12,
21 107:1
114:15,17
115:6,12
116:2
127:20
137:7
138:12,
15,20,24
139:22
143:10

**Bloomfield'
s**
52:3 64:7
65:17
67:2,23
68:8,19,
20 79:7,
19 101:23
102:17,20
108:7,24

**BMH-DESOTO**
33:16

**board**
7:21

**body**
27:1

**bold**
48:21
49:3

**book**
32:5,8,15

**booked**
62:18
93:7
118:13
138:1

**booking**
63:14,15
91:24
97:1,2
143:11

**boring**
135:8

**Boss**
35:5

**bottle**
18:22
22:13

**bottles**
110:5,18

**bottom**
55:1
132:7

**bowel**
126:8,10,
12,17

**Box**
6:10

**boyfriend**
97:20

**breach**
92:13

**bring**
24:4
81:21
123:4

THOMAS FOWLKES, M.D.                          September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE      Index: brought..chronic

brought
  41:11
  42:17
  43:16
  58:9
  59:20,23
  61:13
  62:7
  66:16
  96:18,19
  106:6
  110:1
  112:18,24
  123:2
  127:23
  143:5
brown
  58:10
  73:24
  75:2
bulk
  8:19
bullet
  115:23
business
  6:9
bypass
  96:23,24
bypassing
  96:2
  117:20

        C

cabinet
  43:19,22
calculate
  9:15
call
  5:14,16,
  21 9:16
  42:22

52:24
54:14
107:23
108:2,12
133:23
called
  13:1
  51:15,17
  59:18
  73:18
  97:8
  101:10,13
  102:21
  108:8,10,
  20 114:1,
  2,3 116:3
  144:16
  147:4
calling
  5:20
calls
  53:16
camera
  137:7
card
  44:7
care
  12:10,13
  13:16,18,
  20,22,23
  34:23
  35:10,11,
  19 36:3,
  4,5 38:1,
  11 49:9,
  14 51:4,
  17 52:19
  63:6 64:3
  66:19
  89:7,21
  90:16
  92:14
  94:23
  104:8,22

122:5
141:3
148:3,11,
14,20,22
149:7
carry
  12:1
cart
  73:12
  77:6,9
  110:11
case
  6:6 15:9
  22:1
  31:10,13
  32:9
  33:2,16,
  23 34:18
  35:3,4,7,
  22 36:1,
  11 37:2
  43:21
  44:6 45:3
  49:4
  68:11
  95:19
  101:14
  108:2
  109:18
  114:11,14
  117:19,21
  125:14
cases
  25:12
  32:21,23,
  24 33:4,
  11 36:7,
  20,23
  98:15
cash-based
  8:16
caused
  133:5

CCHC
  114:5
CCHP
  30:14,16
CCS
  55:3
  57:15
  80:10,21
  89:19,21,
  24 90:17
  91:15
  94:13
  119:6
  120:22
  141:24
cecum
  133:23
cell
  76:8
  127:2
census
  9:11
center
  7:8,9,13,
  16 9:1,8
  27:24
  28:2
  33:17,20
  34:19
  42:14,16
Centers
  6:21
certificati
on
  30:2,15
certificati
ons
  29:8,10,
  14,22
certified
  7:21
  29:23

30:1
cetera
  8:22
  13:24
  18:23
  21:23
Cetirizine
  57:22
change
  30:8 62:6
  98:18
changed
  83:7
  91:13
  92:16
characteriz
ation
  125:3
charged
  51:8
chart
  68:2 74:5
  94:1,2,6
  112:3
  115:4
  142:11
CHC
  80:10
  120:3,23
Cheratussin
  57:23
  59:6
chronic
  15:15
  38:6
  82:17
  83:3
  84:17
  88:23,24
  89:2
  133:13



THOMAS FOWLKES, M.D.                                September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE Index: chronological..contained

chronological
    141:19
Cipro
    83:20,23
circle
    124:10
circled
    100:17
    103:12
    132:6
circumstances
    21:11,22
    26:21
    33:23
    35:24
    71:19
citation
    32:11
civil
    26:10
    34:3
clarify
    43:3
    107:2
classes
    131:8
clear
    69:17
    87:15
    92:18
client
    36:14
clinic
    8:6,9
clues
    27:17
code
    49:20

cognitively
    81:16
colitis
    82:3
    83:10,14
    105:19,23
    106:15,19
    107:4,8
collaboration
    11:12
colon
    82:8
colonoscopy
    85:13
    98:1
    105:20
colostomy
    105:20
commencing
    46:24
Commission
    28:4,14,
    17,18
    29:1
    31:15,23
communicated
    65:4 66:8
    67:17
communicating
    65:11
communication
    65:22,23
    66:15
communications
    70:18
companies

41:19
    87:24
company
    6:23 7:17
    12:12
    36:17
    86:20
    87:5,18
    136:3
company-
    wide
    16:20
compensated
    36:22
compensation
    37:11
compile
    40:11
complaining
    106:3
complaint
    147:1,5,7
complaints
    85:15
    104:2
complete
    24:8,10
    111:9,12
completed
    11:19
    59:24
    69:6
    110:17
    114:24
completely
    11:13
compliance
    91:3,17
concern
    21:4

conclude
    145:15
concluding
    46:24
conclusion
    128:21
    133:4
    135:22
condition
    23:13
    62:6 65:5
    66:15,21
    67:15
    69:5
    85:18
    86:9 98:6
conditions
    11:8
    27:19
    38:7
    92:16
    94:17
    104:1
confinement
    86:15,21
    87:2,7,21
    88:5
    94:18
conflict
    101:22
conflicts
    102:1,17
confuse
    51:20
confused
    13:13
    51:20
    120:22
conjunction
    18:9,12
    19:14

Connelly's
    123:3
conscious
    96:12
consideration
    23:8
considered
    59:16
    63:12,16
    138:5
consistent
    130:12
    143:19
consult
    53:17
    103:1
consultation
    101:11
consulted
    100:19
    101:6,24
    102:21
    108:5,20,
    22
consuming
    41:4
contact
    37:7
    54:17
    133:21
contacted
    53:8,10
    54:5,16
    55:6,9
    56:15
contacting
    76:7
contained
    24:8,10



THOMAS FOWLKES, M.D.                                         September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE          Index: continue..custody

37:12
39:11,17
42:3 75:3
104:4
110:10

**continue**
15:6 17:4
20:22
21:7,12
60:23
91:8
117:7,8

**continued**
18:14
19:16
54:22
57:1
58:18
61:20
73:8,16
74:19

**contract**
80:19
121:3,5,
10

**contributed**
88:11,18,
21

**controlled**
43:20
44:1
111:23

**conversatio
n**
145:13

**copy**
6:5 31:7
123:15

**corner**
100:17

**coroner**
24:20,24
25:2

134:14

**correct**
7:11
27:11
29:17
31:7
43:16
48:7,10,
11 49:9,
24 50:11
51:4,15
52:19
53:18
56:7 63:5
64:3
72:20
75:12
76:11
80:11,16
82:10,19
84:11
86:9
100:23
106:23
108:13
109:5,21,
22 110:1
114:7,21
117:5
120:24
121:1
129:24
130:1
136:23
137:1
141:15,17
144:19
145:8
147:3,9,
16

**correction**
30:4,6,7
96:11
101:5

**correctiona
l**
14:8
16:14
28:5,14,
18 29:1,
11,23
30:1
31:16,19,
23 32:16
36:16
41:18
42:4
86:20
87:5,9,18
88:6
90:13
91:14
92:6,19,
20 95:4,
14,23
97:2
98:12
112:20
114:16
116:9,24
117:1,3,
10,11
118:15,16
127:18
128:9
136:3
137:23

**Corrective**
53:9

**correctly**
65:20

**cosigned**
58:22

**cosigns**
108:17

**cough**
57:24

**counted**

43:18

**counter**
62:12

**County**
6:20 7:6,
10 8:24
9:2 15:22
16:2,17
17:9 25:8
27:24
28:3
33:15,21
34:15,19
35:18
38:3,11
42:20
43:9
49:12
50:9,14
52:23
53:8
63:7,11,
17 64:23
65:7
80:14,20
81:3
84:23
86:18,19
89:8,18
90:8,12,
19,24
92:24
93:6
96:12
101:4
113:2
117:24
118:8
120:2,21,
23 121:23
135:24
137:4
139:1
143:7
145:1

**couple**
45:7
90:2,17

**courses**
24:15
28:3,11,
13,19

**court**
20:2 26:4
79:14

**create**
62:19
64:5 68:1
99:15,18,
21
148:20,23

**created**
6:24
56:11
57:14
72:14
102:13
149:4

**creating**
13:16
32:5

**creative**
8:10

**criminal**
26:7

**Criminally**
26:10

**current**
6:8,15
19:20
20:7
112:19

**curriculum**
31:1,6

**custody**
34:1,22
36:2,8



| | | | | |
|---|---|---|---|---|
| 63:16 | 22:8,12, 21 56:11 | **decided** 58:15,17 | 96:12 101:4 | 22:4 43:11,23 |
| **cut** 127:2 133:22 | 57:19 83:24 84:1 | 73:15 109:12 | 113:2 117:24 118:8 | 44:1 **deposed** 128:11 |
| **CV** 6:6 24:10 27:22 | 99:17 148:2 **DCSO** | **decision** 58:19 70:13 | 120:2,21, 23 121:23 135:24 | **deposition** 5:24 30:20,24 |
| 29:17,19, 21 31:13 | 119:6 120:6 | 96:13 **decision-** | 137:4 138:24 143:6 | 39:21 42:6 47:14,18 |
| D | **DD's** 12:1 | **making** 16:4 | 145:1 **deliberate** | 48:2 52:3 54:2 64:7 |
| **daily** 57:20,23, 24 | **deal** 103:24 | **defined** 86:17,22 **definition** | 34:23 35:11 **delivering** | 65:17 67:2,23 75:19,21 |
| **dash** 30:14 | **death** 25:12,15, 23 26:2, | 19:8 87:1 **definitive** 125:9 | 13:24 **delivery** 65:6 81:6 | 76:1 81:12,14 85:20 101:23 |
| 100:18 108:4 109:7 | 5,13,19, 21 27:7 34:1,6, | **degree** 38:24 132:11 | **dentist** 22:7,20 **department** | 102:3,15, 17,20 103:6 |
| 113:15 **dashes** 103:14 | 10,22 35:8 36:2,8 | **Delaware** 15:22 16:2,17 | 83:16,23 84:3 85:12 | 105:14 108:7 109:1 |
| **date** 37:1,3 48:15,17 | 38:8 88:12,18, 22 127:21 | 17:9 38:3,11 42:20 | 105:18 106:18 107:11 | 115:20 123:3 127:19 |
| 136:8 **dated** 67:8 | 132:12 133:6,20 134:17,22 | 43:9 49:12 50:8,14 | 111:19 120:3 125:16 | 128:16 139:2 **depositions** |
| 101:16 **day** 5:21 9:16 | **deceased** 72:19 **decedent** | 52:23 53:7 63:7,11, | 129:5,18 130:2 146:9 | 99:23 123:8 **deputy** |
| 44:4 51:18,22 57:19 | 27:10 **decide** 17:15,17 | 17 64:23 65:6 80:14,20 | **depend** 20:11 21:20 | 69:22 85:5 96:18,19 |
| 112:20 142:15 143:13, | 18:9,13, 15,19 19:15 | 81:3 84:22 86:18,19 | **depending** 92:7 95:7,11 | 97:16 105:11 **describe** |
| 15,17 **days** 9:16 | 20:22 21:12 23:11,17, | 87:13 89:8,18 90:7,12, | **depends** 9:15 11:10 | 94:18 **description** 61:12 |
| 21:17 | 19,22 133:5 | 19,24 92:23 93:5 | | |



| | | | | |
|---|---|---|---|---|
| 62:10<br>69:21<br>85:9<br><br>**designed**<br>45:10<br><br>**desk**<br>143:11<br><br>**destroy**<br>44:21<br><br>**destruction**<br>42:23<br><br>**detail**<br>72:10<br><br>**detailed**<br>72:16<br>140:4<br><br>**detainee**<br>34:2,3<br>122:3<br><br>**detainees**<br>42:18<br>93:7<br>120:6<br><br>**Detective**<br>40:16<br>41:6,10<br>58:10<br>128:14<br><br>**detention**<br>7:8,9<br>9:1,7<br>27:24<br>28:2<br>33:17,20<br>34:19<br>42:14,16<br>49:15<br>66:18<br>67:14<br><br>**deter**<br>87:19 | **determinati<br>on**<br>14:22<br>18:3<br>20:17<br>26:13<br>71:14<br>87:20<br>98:11<br>145:4<br><br>**determine**<br>15:5<br>16:24<br>17:3<br>19:5,19<br>20:6 23:1<br>26:18<br>66:20<br>87:6<br>145:2<br><br>**determines**<br>94:16<br><br>**determining**<br>23:8<br><br>**diagnose**<br>11:8<br>14:15,16<br><br>**diagnosed**<br>82:2<br>83:10,14<br>105:19<br>106:15<br><br>**diagnoses**<br>106:19<br><br>**diagnosing**<br>14:13<br><br>**diagnosis**<br>11:7<br>23:19<br>83:21<br>84:13,15<br>106:2<br>107:3,10, | 13<br><br>**diagnostic**<br>11:15<br><br>**died**<br>56:11<br>68:24<br>76:4<br>106:9<br>115:8,15<br>148:2<br><br>**difference**<br>10:9<br>28:23<br>116:13,16<br>119:5<br><br>**differences**<br>10:21,23<br>46:10<br><br>**differently**<br>46:6<br><br>**direct**<br>52:16<br><br>**directed**<br>110:21<br><br>**direction**<br>15:11<br><br>**directions**<br>20:12<br><br>**directive**<br>15:17<br><br>**directives**<br>39:5<br><br>**directly**<br>70:2 76:7<br>95:18,22<br>96:8<br>117:20<br>119:21<br>142:22<br><br>**director**<br>7:7,15 | 9:1,4<br>15:14<br>16:9<br>27:23<br>28:2,9<br>42:14<br>52:14<br>66:17<br>67:14<br><br>**disagree**<br>25:22<br>46:2 47:9<br>99:13<br>120:13<br>124:20<br>125:2<br>126:3,16<br>134:21<br><br>**disagreed**<br>51:12<br>82:21<br>100:2<br>120:9<br><br>**disagreemen<br>t**<br>100:5<br>119:20<br><br>**discharge**<br>106:11<br>124:16<br>125:17,<br>23,24<br>126:5,21<br><br>**discharged**<br>44:11<br><br>**discontinue<br>d**<br>19:21<br>20:9<br>21:17<br><br>**discuss**<br>18:8,24<br>19:13<br>79:7,19 | **discussed**<br>36:8<br>54:19<br>75:23<br>116:13<br><br>**discussing**<br>113:24<br>147:3,11<br><br>**discussion**<br>85:10<br>146:16<br><br>**discussions**<br>81:11<br><br>**dispensatio<br>n**<br>15:23<br>16:15<br><br>**dispense**<br>15:12,15<br><br>**dispensed**<br>43:15,24<br>44:9<br>110:9<br><br>**distinguish<br>ing**<br>116:18<br><br>**diverticuli<br>tis**<br>82:9<br><br>**doctor**<br>5:12,18,<br>19,20<br>8:17 19:7<br>35:14,19<br>36:5 55:6<br>58:15,17<br>103:15<br>108:8,10,<br>16,19<br>109:16<br>145:24<br><br>**doctor's** |



109:2,7

doctorate
  11:6

doctors
  9:21 12:1

doctors'
  13:24

document
  5:24 40:2
  86:22
  87:1,2
  92:4
  99:16
  135:11,13
  144:8
  147:14,18
  149:2

documentati
on
  66:23

documented
  78:7
  108:9
  135:16
  148:17

documents
  48:9,13
  69:15
  72:16
  108:12
  142:21

door
  44:16

doses
  21:6
  84:17

doubts
  18:23

DOWNEY
  52:10
  54:8 61:8
  63:24

69:7,10
72:2
91:10
93:13
94:11
98:19
100:9
102:6
103:3
115:17
118:3,9,
  23 122:6
123:16
127:4
140:10
145:9
147:22
148:6
149:10

dozens
  25:17,18,
  19

draw
  142:24

drink
  124:24
  125:21
  126:1,22

drive
  104:8

drug
  129:20,
  21,23

due
  86:11,12
  105:8

duties
  25:9

duty
  50:8,19
  51:1,10,
  13,19,21
  60:1 69:4

70:6
71:23
78:19
92:7 98:7
104:19
123:18

_____

        E

earlier
  8:5 37:4
  106:16
  113:24

early
  12:17

easier
  34:11

ED
  124:16

education
  24:13,16

educational
  24:7,9

effect
  54:12

Egbert
  85:17,23,
  24 97:21

Egbert's
  85:20
  86:7

elicit
  132:2

emergency
  7:22,23
  24:14
  81:24
  82:1
  83:16,23
  84:2
  85:12

105:18
106:17
107:10
111:19
125:16
129:5,18
130:1
146:9

emergent
  94:17

employ
  6:24

employed
  6:22 51:3
  52:9

employee
  6:19,20
  7:5,12
  8:24 78:9

employees
  49:9
  87:6,11,
  19 136:2

employer
  6:16

employment
  7:18

empty
  110:19

EMT
  98:14

encouraging
  124:15,23

end
  67:18
  71:9
  124:18

entered
  66:24
  67:5
  148:2

entire
  63:17
  88:1 90:5
  118:12

entries
  148:12

entry
  67:1,6
  69:14
  72:15

environment
  29:12

ER
  97:23

essentially
  17:15
  65:19
  138:8

establish
  94:23
  120:4

establishin
g
  78:1

et al
  33:15

evaluated
  72:9

event
  73:14

everyone's
  124:3

evidence
  53:21
  54:3
  78:13
  108:19
  111:1
  124:13
  126:9,11
  128:5



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: exact..Filichia

131:1
140:17
141:1,9

**exact**
37:3
103:7

**examination**
5:6 27:1

**examined**
70:1

**examiner**
25:3,4,
10,14,21
26:4,14,
18

**exceeded**
109:14

**exceeding**
116:11

**exclude**
36:20

**excuse**
105:20
134:14

**exhibit**
6:1 29:17
30:20,24
31:6,11
32:1,6,
18,21
33:14
37:12
39:21
40:3,6,8,
16 44:23
47:6,10,
14,18,23
48:2,18
49:4 53:6
56:21
80:9
88:8,10
99:11

100:4,16
103:10
119:1
124:6,9
128:22
132:6,21
134:24

**expand**
29:7

**expanding**
133:14

**expansion**
133:9,16

**expect**
16:6
23:18,21
58:20
59:15,22
60:5
61:23
62:3,13
66:12
70:17

**expectation**
61:15

**expected**
15:16

**expecting**
17:20

**experience**
66:17
67:13
77:23

**expert**
8:3 24:8
30:21
33:1 40:5
99:23

**expired**
19:9
22:16

**explain**
17:24
93:20
134:4

**expressed**
49:5

**extensive**
111:22

**extracted**
22:9

---

**F**

**face**
143:22,23

**facilities**
95:8 97:7
98:13
114:2

**facility**
9:19
16:17
43:21
49:15
51:9 52:8
54:1
66:1,18
67:14
73:13
92:3 95:8
112:20

**fact**
78:12
138:13
149:3

**factor**
23:1

**factors**
20:12

**facts**
15:19

**failed**
139:15,19

**fair**
45:17
136:24

**fairly**
111:22

**false**
69:2

**familiar**
10:17
50:1,4

**fantastic**
68:20

**fashion**
148:18

**father-in-law**
5:19

**Fayette**
6:20 25:8

**February**
17:10
38:4
49:11
50:7,15
52:22
54:6,10
56:22
58:9
59:21
63:1
64:16
67:11
81:24
82:2,6
83:2,11,
15 101:8
104:19
105:1
106:16,
18,22
107:17

110:15,16
114:23
129:4,19,
23 138:23
139:4,17,
18,23
147:13

**feculent**
134:8,11

**federal**
33:2

**fee**
6:7

**Filichia**
17:8 38:2
41:11,23
49:10
53:1,12
56:11,24
57:6 58:8
59:20
60:8,18
61:2
66:19
68:24
71:11,24
72:10,18
73:6,17
74:8,22
76:4,6,22
77:6
79:1,8,20
80:5
81:22
82:12,17
83:1,10,
14,19
84:9
85:17
88:10,20
95:22
96:14,20
97:20
103:17
104:21



THOMAS FOWLKES, M.D.                                September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE          Index: Filichia's..giving

105:1,12
106:15
107:18,22
110:1,20
111:2
112:24
115:6,12
120:6
124:14
129:5
130:3
136:15,
18,21
139:10
140:1,3
141:2,7
142:7,22
143:5
144:24
147:12
148:2

**Filichia's**
38:6 53:5
64:21
65:5 69:4
93:22
111:8
127:2
138:22

**fill**
96:4,13
107:22

**filled**
94:21
95:1,13,
20 96:6
137:10,
11,22
138:19

**filling**
95:23

**fills**
118:1,15

**finally**

44:10

**find**
44:19
54:3 60:9
78:23
130:24
143:2

**finding**
126:3
134:19,21

**findings**
27:5
78:22
99:24
100:3,8
107:7
120:9,13
132:10,17
134:9

**fine**
12:17
41:9 51:6
119:23
133:8

**firm**
36:10

**fit**
86:15,21
87:2,7,21
88:5
94:18

**Flagyl**
57:18
83:20,24
84:1,4
146:5,10,
12

**flip**
54:24
89:4

**flipping**
48:18
141:18

**fluid**
134:7,11,
12

**follow**
11:24
15:16
65:12
104:19
138:3

**follow-up**
17:21

**forensic**
24:16

**form**
61:8,18,
21,24
64:5
67:21
69:8 72:2
92:24
93:24
94:3,7,
10,15,21
95:1,13,
16,18,20,
24 96:2,
3,6,14
102:6,7
115:2,4
116:14
118:14
122:7
135:16,
17,21
137:18
140:6
145:9

**format**
32:8

**formed**
45:6,19
48:14,17

**forming**
49:19

80:8

**forms**
94:19
116:19
137:22
138:18
141:4

**forward**
119:8
129:6

**found**
26:15
88:3
133:17

**Fowlkes**
5:11,14,
15,17
7:2,19
8:9 47:4
55:5
67:22
145:3

**frame**
22:5,6
23:15

**Fridays**
139:16,20

**front**
40:8 47:5
81:8,17
145:4

**full**
37:17

**Fuller**
107:6,11
112:11

**G**

**Gabapentin**
57:19

**gastrointes
tinal**
85:11,14
88:24
104:1,17,
18 105:8,
24 106:2,
4 107:16
146:23,24
147:2

**gave**
31:8
51:24
58:5,6
63:18
127:10
128:12
144:16

**general**
13:4
14:14
16:3 22:3
50:2
90:11
107:5

**generally**
10:17
50:5

**give**
6:8
17:17,22
22:7,19
44:12
54:15
56:17
68:2 94:3
109:12,13
122:13
128:18
129:10
133:7
142:5,6

**giving**
107:21



109:20
123:21
124:23
125:6
128:6

glad
128:19

GMH
129:15

good
46:8

Grady
71:12
106:7,11
111:18
112:10
129:11

Great
99:10

guess
9:17
67:21

guidelines
94:22,24
114:5

**H**

habit
5:22

hand
5:24

handing
40:2

handled
43:7

handwriting
40:13

handwritten
39:22

47:15,19
48:3,10

happen
24:3

happened
35:7
42:10
70:8
71:4,22
72:5
133:19
137:14

head
120:22

health
31:22
32:12
35:21
50:20
52:4 81:5
94:19
114:4

healthcare
16:14
28:5,15,
18 29:2,
11,24
30:1
31:16,19,
24 32:16
35:16
36:16
41:19
49:14
53:10
62:21
86:20
87:5,18
90:14
95:3
114:10,12
119:7
120:4,5,8
136:3

137:24

hear
122:10

heard
64:11
86:14

held
9:2

heroin
132:3

hey
133:22

high
84:17

Highlighted
129:3

historical
27:9

history
27:16
82:12,17
83:2 84:9
106:2

hold
39:18
91:8,12
125:8

holding
76:8

hole
59:5

home
86:4

horribly
123:6

hospital
12:12
33:16
71:13
81:6

85:24
86:3
111:18
112:11
129:11

hours
9:13,16,
18 41:2
51:17,21
70:24
84:4

housed
44:2

Hunt
34:5

Hypothesizing
124:5

hypothetical
122:13
123:7,21

**I**

i.e.
95:3

idea
67:3
71:8,24

identification
30:22
31:2
39:23
47:16,20
48:4

identified
47:5
100:12
133:12
134:1

identify
45:18

ignore
68:14

II
38:5
88:14

III
89:6

illuminates
68:15

immediately
44:17

implemented
45:8

important
27:12,13,
15

inaccurate
26:15

inadequate
34:23
35:10,11
36:3

inappropriate
22:18,22
116:6

incarcerated
38:2
49:12
138:5

incarceration
59:16
63:13
82:1,6
83:1
93:23
138:6



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE Index: incarcerations..Jackson

incarcerati
ons
    139:6
incident
    137:6
include
    92:1
included
    31:12
    33:10
    41:10
includes
    22:12
including
    12:21
    20:12
    111:23
incorporate
d
    7:3 16:15
    80:10
incumbent
    60:7
independent
    104:14
    116:4,5
independent
ly
    11:9,10,
    14,21,23
    14:17
    58:19
    109:13
Indiana
    46:7
indicating
    41:23
    52:22
    53:7
    59:22
    60:13
    61:4

66:4,6
67:10
142:21
144:8
indication
    55:4
    56:14
    78:23
indifferenc
e
    34:24
    35:12
individual
    15:5
    17:1,4
    62:17
    66:16
    67:16
    87:7
    118:11
    122:3
    135:23
individuals
    66:18
    128:6
industry
    94:9
infection
    23:4,7
inference
    143:1
inflammatio
n
    133:13
information
    23:23
    42:11
    61:1,2,3
    127:15
    138:11
informed
    76:6

84:23
85:6
ingesting
    84:5
initial
    14:3,6,11
    37:7
    45:23
    47:24
    63:1
    64:16
    66:14
    67:19
    68:1
    71:15
    98:17,23
    99:4,7
    113:20
    114:18
    115:13
    116:3,14,
    15 117:2
    121:20
    122:2,16,
    18 128:23
    133:10
    135:10
    140:2,9
    141:4
inmate
    19:21
    20:8 24:4
    34:2 91:4
inmates
    22:10
    91:1,16
instance
    22:7 95:9
    110:8
    117:3
instances
    127:12

instruction
s
    106:11
    124:17
    125:18,
    20,23,24
    126:5,21
insurance
    12:8,12
intake
    63:22
    64:5
    77:18,20
    87:23
    88:3,4
    90:18
    91:15
    92:4,24
    93:6,11
    94:9,14
    95:16,17
    113:21
    114:2,3,
    22
    117:12,23
    118:7
    124:16
    135:11
    137:12
intend
    45:2
intention
    71:1
interaction
    145:18
    149:3
interchange
ably
    51:5
interrupt
    55:12
    59:12
    140:21

intoxicated
    84:3
investigati
on
    26:24
    127:21
investigati
ve
    26:23
    127:17
investigato
r
    91:22
involve
    33:11,16
    35:13,18
    36:4
    105:23
involved
    34:6,10
    65:10,13
    92:20
    95:23
issue
    34:17
issues
    47:11
    88:11,16,
    19,24
    124:7
items
    37:19
    79:6,18
IV
    12:5 13:6
IVS
    12:5

_____

    J

Jackson



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: jail..levels

34:15,19
35:18

jail
  9:5,6,7
  15:22
  16:2,17
  17:9
  19:16
  21:2,5
  33:21
  34:6,11,
  17 35:3,
  4,8,22
  38:3,11
  41:12
  42:20
  43:9
  44:15
  49:12
  50:9,14
  51:22
  52:23
  53:8
  59:21,23
  62:18
  63:7,11,
  17 64:23
  65:7
  66:16
  80:20,22
  81:6
  84:23
  85:18
  86:8,11
  88:18,21
  89:8,18
  90:2,8,
  12,19,24
  91:4,19
  92:3,24
  93:6,8
  96:12
  97:12,22
  98:4,24
  99:2,3,8
  101:4

106:22
107:18
112:24
113:2
118:1,8,
14
120:21,24
121:23
122:4,19
135:24
137:4
138:1
139:1
143:7
145:1

jail's
  80:14

jails
  31:22
  32:13

James
  85:16

January
  38:3
  49:11
  59:17
  139:12,16
  140:1,4,
  13
  141:10,13
  144:10

job
  7:6,13
  8:23
  42:13
  77:20

jobs
  6:18

judgment
  116:5

K

kidding
  25:19

kind
  7:24 22:3
  28:22
  135:6

kinds
  117:15

knew
  98:1

Knowing
  107:15

knowledge
  33:7
  36:21
  104:20
  112:18

L

L.P.N.
  10:8
  12:23
  13:16
  14:3,12,
  18,21
  15:4,10,
  16 16:24
  17:3
  18:2,19
  19:5,12,
  13,18
  20:5,17
  49:21
  52:1,16
  98:5,8,
  17,23
  99:7
  116:7,11
  117:5,7

121:19
L.p.n.'s
  116:12

L.p.n.s
  12:5,6
  14:15
  116:9
  121:24
  122:1,18

L.p.n.s.
  12:22

Lafayette
  7:6,10
  8:24 9:2
  27:24
  28:3

Lamarre
  46:3,5
  100:6
  116:1
  119:6

Lamarre's
  47:8
  99:13
  109:9
  119:21

language
  10:20
  13:13
  81:17,18
  87:3

late
  67:1,5
  69:14
  72:14
  148:11

law
  26:5
  36:10

laxative
  54:6,18
  73:18

74:9
75:8,12,
17 76:10,
14 78:17
101:7
108:13
124:15,23
125:6,15

leads
  135:22

learn
  11:6

leave
  44:5
  138:8

leaves
  44:3,17

lecture
  30:11

lectures
  30:10,11

led
  134:9

Lee
  34:14
  35:18

left
  41:1
  103:13

length
  21:23
  47:7
  111:15

letter
  49:7
  120:1

level
  10:6
  11:2,6

levels
  30:2



license
  98:22

licensed
  12:24
  13:1
  17:14,16
  50:9,13

likelihood
  39:1

likewise
  142:10

limit
  19:1

limitation
  108:22

limited
  38:23
  99:3
  101:12
  131:18

list
  6:7 30:11
  31:10,13
  32:21,23
  33:2,13
  34:9
  39:9,15
  40:11
  41:22
  42:7
  43:11
  111:22
  119:9

listed
  29:16
  45:22
  146:2

listen
  119:19

listened
  118:23

listing
  119:5

lists
  111:20

litigation
  8:4

located
  8:11

location
  7:17 9:24

lock
  43:21

locked
  43:19
  113:2

locum
  7:24

long
  9:2 43:13
  71:4

longer
  43:2
  147:19

looked
  42:5
  134:11

lost
  64:9
  68:2,23

lot
  122:11

lots
  79:10

Lupu
  71:7

M

M.D.
  7:2,19

Macdowell
  134:14,
  19,20

made
  26:14
  36:19
  37:7 44:8
  46:18
  49:2
  52:24
  53:16
  58:19
  60:11
  67:17
  69:15
  70:13
  71:10
  76:4
  78:16
  96:12
  98:12
  102:23
  116:4
  134:19
  148:16

Madeline
  46:5

main
  45:11
  134:9

make
  14:22
  18:3
  32:10
  34:11
  41:15
  43:11
  66:5 74:3
  77:2
  87:19
  97:11,17
  98:2
  104:21
  123:15
  143:7

145:3
146:14
148:11,14

makes
  20:17
  71:7
  112:1
  137:2

making
  14:3,6,11
  71:14
  72:5
  98:17,23

male
  116:2

manner
  25:11,23
  27:7
  82:14

Manokas
  46:11
  124:22

Manokas'
  47:12
  124:8

manual
  88:2 90:5

March
  56:9 67:8
  68:24
  69:15
  72:17
  101:16
  106:8
  115:8,14

mark
  30:17
  31:11

marked
  6:1 30:21
  31:1,5
  32:1

39:22
40:3,6,8
44:23
47:5,6,
  11,15,19
48:3

marketing
  8:10

MARS
  74:6

Marshall
  33:15,21

masters
  11:5

materials
  40:4,7
  132:16

matter
  78:12

meaning
  36:16
  68:6

means
  96:22
  108:15
  109:4
  130:19

meant
  28:22
  30:8
  90:13
  122:21

med
  77:6,9
  110:11

Medicaid
  8:22

medical
  7:7,15
  8:5,9
  9:1,4



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: medication..monitoring

15:14,22
16:4,9
24:1,2
25:3,4,
10,14,21
26:4,14,
18,20
27:1,8,9,
16,23
28:2
32:16
34:23
35:10,11
36:3
38:1,6,
11,24
42:14
50:8,13
53:5,17
59:24
60:15
62:19
78:24
80:15,21
81:2
85:18
88:7,11,
16,19
89:7,21
90:16,23
91:1 92:2
94:1,2,17
95:16,17
97:21
98:2,6,13
99:6
101:5
104:22
106:5
107:24
109:20
113:21
114:22
117:13
122:5
132:12
133:1

141:7
145:6
medication
14:19
18:3,4,8,
22 19:16
20:22
21:1,9,
13,14,15
23:2,6,9,
15 43:24
72:22,24
73:12,22
74:5
75:7,16
105:4,6,7
141:8
142:1,9
143:2
144:9,12
145:21
146:18,
19,20
medications
11:9,15,
22 12:6
13:6
14:23
15:13,24
16:16,22
18:13
20:16
21:19
22:12
27:17,18
42:3,17
43:7,15,
17 44:6,
12,13,18
56:24
57:2,6,12
60:9,14
62:8,11
70:4,14
72:23
73:4,7,

15,16
74:10,11,
19 75:3,
4,23
76:21
77:3,21
78:15,16
103:17
104:3,9
107:22
109:17,19
110:6,23
111:3,5,
9,13,22
112:7,9
117:4,7,
8,14
129:6
140:19
141:3
142:8,14
143:5,24
144:17
145:20
146:1,3,6
medicine
7:22
17:18
24:15
41:12,18
42:23
54:21
58:8
109:24
medicines
41:21,23
44:20
59:23
60:10
61:19,20
73:14,20
109:12
138:16
142:1,3
meds

58:4,17
74:24
135:3
members
62:20
Memorial
71:13
106:7,11
memory
33:6 41:9
mention
112:1,3
146:6,11
methadone
82:13
111:4
129:22
130:18,
20,24
131:1,3,
6,13,23
Metronidazo
le
57:18
mid
10:6
Miller
58:21
milligrams
57:20
mind
139:8
mine
5:22
13:13
38:15
42:24
43:10
minute
12:20
19:12

56:17
94:4
125:8
Mississippi
6:11,13,
20 7:4
8:11,12
25:8
34:4,15
misstates
52:11
Mitchell
53:23
54:4,13
55:10
56:15
58:22
73:18
74:24
75:6,15,
19 76:7
101:10
102:1,22
103:2
104:11
108:16
142:2,13,
16 144:16
145:7
Mitchell's
54:11
Mohnsen
85:6
97:15,16
105:11
moment
12:16
119:15
128:17
129:11
133:7
134:5
monitoring
78:24



months
    22:11,17,
    20 111:3
motions
    36:19
move
    63:24
    124:1
    146:21
multiple
    32:9
    35:15
    127:11,
    14,18
muscle
    57:22

        N

names
    97:7
narcotic
    15:12,13,
    23 16:16,
    21 73:19
    74:10
    104:3
    105:3,6,7
    110:23
narcotics
    15:15
    43:22
    60:21,23
    76:9,13
    106:21
    107:1
narrative
    40:16
    41:7
National
    28:4,14,
    16,17

29:1
31:15,23
nationwide
    7:17
NCCH
    94:22
necessarily
    11:10
    23:20
    61:22
    92:13
needed
    98:2
negative
    131:7
    142:5
night
    110:9
nighttime
    57:22
    95:10
nighttimes
    95:12
nonspecific
    107:7
nonwritten
    13:23
normal
    9:11
    87:22
    96:24
    143:19
    144:2
note
    56:4,10,
    14 60:12
    61:1
    66:6,10
    67:4 68:1
    72:12,14
    74:21

76:4,20
101:16
102:1,4,
    19 106:8,
    12,24
    115:7,14
    133:11
    144:18
    148:2,11,
    14,15,16,
    20,21,23
    149:4
notebook
    64:20
noted
    67:8
    106:7
notes
    46:16,17
    53:4 65:3
    102:18
    141:24
notwithstan
ding
    67:24
number
    7:21
    20:12
    40:15
    45:6,10
    49:8
    69:11
    75:18,21
    79:9,21
    89:15
    94:11
    100:16
    103:12,13
    105:13
    112:16
    116:18
    118:20,22
    120:2,12,
    13 125:12

126:18
134:23
numbered
    37:21
    100:18
    119:9
    124:10
    132:6
numeral
    37:23
    38:5 49:8
    56:21
    88:14
    89:6
nurse
    8:14,18
    10:5,7,23
    11:1,3,4,
    19 12:9,
    14 13:10,
    21 17:15,
    16 18:15
    22:19
    23:11,16,
    18 35:13
    50:21
    51:1,3,8,
    18 52:1,
    2,5,8,18,
    24 53:11,
    14,16,18
    54:3 58:1
    59:24
    60:16,21
    61:15,16,
    23 62:4,
    13 65:5,
    9,13,14,
    18,24
    67:18
    68:12
    69:4,23,
    24 70:6
    71:7,23
    72:9

75:5,22
76:14
77:16,18,
    20 78:6,
    11,18,19,
    22 80:1
    92:7,18
    93:12
    95:4,12,
    17,21
    96:2,4,7,
    8,15,21,
    22 97:4,
    10,16
    98:4,7,14
    101:9
    102:16
    106:12,21
    107:1
    114:15,17
    117:1,19
    118:15,17
    121:4,11,
    12,16
    123:3
    127:20
    137:6
    138:16
    139:22
    141:24
    142:7,11
    143:7,10
    144:17
    146:24
    148:4
nurse's
    56:10
    64:20
    66:20
    72:11,13
    76:4,19
    101:16
    102:1,4,
    19 106:8
    115:7,14



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: nurses..order

nurses
10:2,11,
14 11:20
12:21
13:11
14:14
18:12
20:21
21:6,12
22:14,22
50:9
67:17
70:17
78:3 95:9
104:8,13,
18 123:17
140:17
141:1

nurses'
102:18

nursing
10:19
12:1,2,7,
9,13
13:2,8,
12,16,18,
20 35:19
36:4
49:24
52:14,15
56:23
61:1 70:3
122:15,
17,21
143:19
144:3,18
148:1,11,
20,23

O

object
67:21
69:8 72:2
85:1

91:10
102:6
140:10
148:6

objected
123:9

objection
52:10
54:8 61:8
63:24
93:13
95:2
98:19
102:5
103:3
115:17
118:3,9
122:6,8
127:4
145:9
147:22
148:5

observation
78:24

obstruction
126:9,10,
13,17

obtain
55:6 57:7

obtained
128:21

occasion
7:22

occasions
127:11,14

occurred
54:14
69:22

occurrence
137:20

October
82:7

131:17
offer
26:1,3
29:7,8,9,
10 38:24
45:3,12

offered
28:11,13
44:23

offering
46:12

offers
28:18

office
6:10
37:10
40:24
70:4
80:15,20
86:19

officer
92:6,19
95:4,14,
20,23
96:11
97:2
98:13
114:16
116:24
117:1,4,
10,12
118:15,16

officers
42:4 87:9
92:20
97:2
101:5
110:4
127:18
128:9

Ohio
10:16
13:20

14:2
33:5,11
38:3
49:20
98:16
121:19
122:1,15

Ohio's
13:15

one's
27:17

ongoing
38:6 86:4
88:11,16,
19

open
44:16

operating
8:6 11:11
81:2

opiate
89:2
111:2
112:2
129:22
130:6
131:2,3,
4,7,11,
14,15
132:1,3

opiates
82:18
83:3
130:9
131:17

opine
25:15
37:18
39:5
133:6

opinion
31:24
38:23

44:22
45:1,2
46:10
49:19
72:5
79:5,17
83:6
90:23
91:9,12,
13 98:18
99:2
102:9,12,
23 119:5
132:19
133:10,
15,16
134:13,
16,20
136:4,6,9

opinions
45:7,11,
12,15,19,
23 46:2
47:23
48:14,17,
22 49:4,5
80:8 90:6
91:21
128:23

opioid
130:6

opportunity
70:24

opposed
88:7

order
11:9,14,
23 26:18
54:18
55:7,8,20
56:3,4
65:8,15
73:19
75:9,10



76:16,17,
18 78:7,
16 108:15
117:4
118:22
122:12
141:19
142:10,
12,17
146:4

**ordered**
27:3,5
54:22
76:10
103:15

**ordering**
101:7
109:16

**orders**
12:1
13:24
20:14
54:12
58:24
109:2,7
117:16
142:13
145:23

**orientation**
88:1

**original**
48:13
134:2

**originally**
133:10

**Orr's**
111:8
112:6

**outline**
16:7

**outlined**
37:16

**Overly**
41:10
128:14

**Overly's**
40:16
41:7
58:11

**Oxford**
6:10 7:16
8:12

---

**P**

**P.E.N.**
116:2

**p.m.**
47:1

**PA**
7:2,19

**pages**
47:7 71:4
89:16
100:10

**paid**
121:11

**pain**
73:19
74:10
82:14,17
83:3
84:24
85:7,10,
14 88:23
105:3,12,
16 147:8

**Pallen**
35:1

**paper**
56:7
57:13
75:2
135:18

**papers**
62:8,9

**paperwork**
62:10
63:8,15,
22 91:24
97:24
106:6
137:11,
12,14
138:9
139:24

**paragraph**
37:17,21
48:23
56:20
72:8
78:21
79:8,20
100:18
124:10,18
129:1
136:21

**paramedic**
98:14

**part**
31:11
62:14
73:22
74:15
80:7
87:22
88:2
91:12,13
117:2
124:9
129:17
134:2

**Partners**
35:22

**parts**
79:10
135:1

**pass**
63:18,19

**past**
27:16

**pathway**
147:4,6,
11

**patient**
14:13
19:6
57:14,17
62:15
98:24
99:8
149:3

**patients**
8:16
14:15
93:1
122:19

**patterns**
16:8

**pause**
140:21

**PDF**
32:8

**people**
44:14
137:23

**perforation**
133:12

**perform**
13:4

**performed**
114:9

**period**
53:1,2

**periodic**
44:18

**peritonitis**

**person**
43:2,12,
13,23
44:3,10,
17,20
50:23
55:8 60:7
63:12
92:3
94:15
95:21
96:19
97:1,11
98:2
118:13
136:5,17
137:18,
19,24

**person's**
27:16

**personal**
111:20

**personally**
41:20

**personnel**
50:14

**pharmacology**
11:7

**pharmacy**
24:2 58:2

**pharmacy's**
58:2

**phone**
54:14,17

**photographs**
132:11,
18,23
134:6

---



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE   Index: physically..prescription

**physically**
51:11,22

**physician**
6:18,19,
23 7:1,14
11:12
15:8,11,
17 16:5
17:5,18
18:8,9,
13,16,24
19:14,15,
19 20:6,
13,15,19
23:24
25:22
30:1,5,15
51:13,14
53:13
54:1
55:21,22
56:1,5
58:21
76:16
83:17
100:19
101:6,11
108:5,23
111:20

**physician's**
20:24

**physicians**
7:23 9:23

**picked**
113:4,5

**picture**
127:21

**pictures**
134:11

**piece**
57:13

**pills**
42:4,7,

17,23
59:20
61:5
73:23
110:4

**pitcher**
127:10,
22,23,24
128:3

**Pittsburgh**
24:14,22

**place**
38:10
89:7,20
104:12
149:5

**places**
114:3

**plan**
12:10,13
13:16,18,
19,22,23

**planning**
13:23

**plans**
12:2

**played**
38:7

**plenty**
125:21
126:1,22

**plural**
89:13

**point**
15:3 47:8
67:21
108:8
112:13
115:23
128:16
138:20
146:14

**points**
99:12

**police**
26:22

**policies**
16:1,7,13
38:10
42:15,19,
20 80:10
89:6,12,
17,22,24
90:2,7,
13,14,15,
17,18
118:2,12
119:7

**policy**
15:13,22
16:20
44:12
60:22
63:7 64:4
81:8,12,
15 90:5
91:3,15,
18,20
92:11
93:2
118:8,12
138:2

**portion**
20:2 52:6
75:24
79:14
82:8

**portions**
85:22

**position**
9:3 15:4
16:19

**positive**
129:21
130:9,10,
18 131:5,

7,12
132:4
142:4

**possibly**
74:10

**Post**
6:10

**potential**
42:18
62:5

**potentially**
92:12

**practical**
12:24
17:14,16
50:9

**practice**
8:4,16
10:10,14,
15,19,22
11:13,17,
21 13:8,
21 16:3,8
49:22,24
50:4
90:23
92:15
98:22
99:6
104:14
109:14
116:7,12
122:15,
17,21
143:19
144:3

**practices**
95:1

**practitioner**
10:5,23
11:1,4

**practitioners**
8:15,19

**precepted**
78:9

**precepting**
65:19
78:11

**predominance**
133:13

**prepared**
6:3 45:12

**prescribe**
11:8,22
14:19
15:12,15

**prescribed**
14:23
17:18
18:5
23:20
84:12
111:2,4,
9,13
112:2,13,
15 124:15
125:15
131:11,
13,17
145:20
146:18,19

**prescribing**
21:3 58:3
111:24

**prescription**
15:7
18:6,17,
20 19:7,
20 20:7
22:15
23:1,14



THOMAS FOWLKES, M.D.                              September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE  Index: prescriptions..providing

43:17
61:7
83:22
100:23
109:3,4,7
110:12
112:19
117:8
129:8
130:22,23
131:1,24
132:2

**prescriptions**
17:5,7
83:19
84:7
110:13
111:15,16
130:4

**presence**
75:2

**present**
51:11,23
65:18,24
74:13
95:12

**presented**
61:14
84:22

**presume**
141:12

**presumed**
126:8

**presumption**
74:14
126:15,17

**pretty**
84:17

**prevent**
122:1

**prevents**

13:15
121:19

**previous**
73:5,16
74:18
76:23
77:7
78:15
80:1,4
111:3

**previously**
6:1 54:22
74:5
76:22
82:18
91:7
108:6
124:14
125:15
133:17
135:2
144:21,23
148:16

**primarily**
90:16

**prior**
5:23
28:1,6
54:11
56:22
57:9 67:1
81:6,12,
24 82:5
83:1
93:22
138:23
139:6

**prison**
9:6

**prisoners**
9:9

**Pro**
103:19

**probability**
39:1
132:12

**problems**
85:11
86:5,13
97:22
106:4

**PROBST**
5:8 31:4
38:15,20
40:1
41:3,5
46:19,21
47:3,22
48:6 54:9
55:23
62:2
64:10
68:4,17
69:9 72:7
80:3 85:4
92:22
93:17
95:5 99:1
100:11,14
101:22
102:10,24
103:8
113:14
115:21
118:6,19,
24 122:9
123:1,12,
20,24
127:5
140:14
145:11
147:24
148:7
149:8

**procedure**
81:2 90:5
92:24
118:8

**procedures**
16:2,7,14
38:10
42:15,19,
21 89:6,
13,17
90:7
104:12
119:8

**proceedings**
26:8,12

**process**
97:1

**professional**
7:15 8:1,
6 29:24
30:5 95:3
114:12

**professionals**
29:10
114:10

**program**
11:5,19
12:23
13:2,3

**programs**
11:6

**prohibit**
14:5
98:23
99:7

**prohibited**
14:11,13
15:23
16:11,15
98:17

**prohibits**
13:15
14:3
122:18

**promulgated**
104:10

**pronounce**
46:4

**pronounced**
46:6

**protocol**
70:16
76:17
107:16,
20,24
147:2

**protocols**
11:24
103:14,
18,22,24
104:5,7,
12,17,18

**provide**
12:9
30:10
62:21
90:6
120:5

**provided**
28:4 31:5
33:13
38:1 47:4
87:23
121:4,7
126:1
127:10,14
132:20
141:3

**provider**
10:6 58:4
112:2

**providers**
14:17
35:16
112:4

**providing**
104:2,3



124:14
128:1

**provision**
8:20
31:24
32:12,17
80:21

**psychiatric**
34:1,2

**published**
31:15,22

**punch**
59:5

**purpose**
62:16
90:21
101:6

**purposes**
62:22
68:14
121:5

**purulent**
134:8,12

**put**
21:9
108:4

**Q**

**qualify**
21:15,18

**quantity**
131:18

**question**
16:11,22
17:16
19:1,22
20:4
28:10,12
50:16,18
59:10,14

61:18
64:15
65:12
66:7 67:9
68:14
79:11,16
81:11,19,
20 82:22,
24 86:6
90:11
93:4
115:10
122:7
127:7

**questionabl**
**e**
81:5
94:19

**questioning**
135:8

**questionnai**
**re**
93:6,11
113:23
114:23
117:24

**questions**
45:16
94:16
100:15
115:5,11
119:13,19
120:16
121:6
122:10
144:23
149:9,10,
11

**quote**
71:7,9
124:17,
18,24

**R**

**rare**
137:20

**read**
19:22
20:2
52:6,12,
13 54:24
55:16
79:14
85:20,21
86:6
118:7
149:12

**reading**
139:2

**realize**
68:18

**reask**
19:2 93:3

**reason**
21:8 33:8
53:20
54:5
97:14
105:5
144:22

**reasonable**
38:13,14,
17,21,24
49:13
89:8
90:4,20
132:11

**reasons**
97:19
100:2
126:18

**rebuttal**
46:11
120:1

**recall**
29:2
32:14
33:24
34:7,21
37:3 41:8
52:21
65:19
81:3,10,
16 103:6
146:8,13

**receive**
73:20
75:1
112:7

**received**
30:14
111:14
132:23
141:8

**receiving**
91:1
103:18
114:6,8
117:23

**recent**
84:16

**recently**
129:7

**recess**
46:23

**recognizes**
148:16

**recollectio**
**n**
32:4
33:22
34:5 63:3
80:23
86:1

**reconstruct**
148:15

**record**
5:10 20:2
30:18
39:22
46:21
47:15,19
48:3
52:11
53:5 54:4
55:2,21,
24 60:13
62:19,22,
24 64:15,
21 65:4
66:14
67:3
68:9,10,
16 69:13,
21 78:1,
13 79:14
82:4
85:22
100:9
101:3
104:5
108:10,11
109:20
111:1,9,
13 119:24
123:19
129:17
130:24
135:18
143:14,16
144:7,9,
12,15
145:4,7,
16 146:7,
11,15
147:20

**recorded**
55:20

**records**
24:1,2
27:2,8,9
39:4,7,8,



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE       Index: recreate..responsible

15 53:17
65:14
66:3 67:9
79:24
80:2,5
83:8
84:15,16
91:23
102:14
109:21
111:21
133:1,19
134:2
141:7,18

recreate
68:23

red
97:10

refer
41:13
81:18

reference
13:17,19
41:6,15
90:10,12
105:17,22
109:9

referenced
40:4 90:3

references
109:11
120:12

referred
58:10
62:20
94:9
105:11
114:6

referring
103:16,21
105:16

reflect
92:10

regard
90:6
105:14

registered
10:7
11:3,18,
20 12:9,
14 13:10
50:21
51:1,3,8
52:5,8,
18,24
53:11,14,
16,18
121:4,11,
12,15

Regular
25:18

related
119:13
120:16

relates
119:20
130:8

relations
7:16

relationshi
p
115:24

relatives
113:5

relaxer
57:22

relief
82:14

rely
68:19

remember
100:2
109:8
126:23
144:3

Remeron
103:18
110:9

removal
82:7

removed
22:17

repeat
60:6
63:8,21
79:11
91:24

repeated
135:2
138:10
141:4

repeating
90:24

rephrase
50:3

rephrased
82:23

replace
148:21,23

report
6:2,6
24:8
29:23
30:16,21
32:11,17
37:17,18,
21,22
39:10,16
40:5 42:2
45:8,23
47:8,12,
24 48:13
49:6
58:11
63:4 68:5
70:11
82:12
83:6

99:13
109:9
112:6
119:21
120:1
124:8
128:23
132:24
133:2
137:17
139:15,19
143:8

reported
57:17
60:19
61:3
115:7

reporter
20:3
79:15

reports
26:22
33:9,11
46:11
91:23
99:23
102:12
111:8,19
120:17
127:17,19

request
24:1,2
73:3
104:21
107:23
108:2

requested
105:6,8

requesting
105:3
106:5
107:23

requests
16:9

72:23

required
13:20
81:4
91:18
121:8

requirement
s
12:8

requiring
91:3

reset
77:5

residency
24:21,23

respect
7:18 8:23
27:8
28:24
35:1,17
36:8 39:7
42:13
44:22
53:11
56:8
79:4,8,
16,20
80:18
81:1,22
104:16
112:12

response
104:13
108:1
147:5

responses
64:22

responsibil
ity
51:9

responsible
10:1 16:5



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE                Index: rest..Sean

38:12,19
50:20
51:16
52:4 54:1
109:17

rest
    85:21

restart
    77:10,12

restarted
    78:15
    138:16
    140:18

restarting
    135:2

result
    54:17
    70:5 82:8
    83:20
    104:11
    130:12,16
    133:18
    135:16

results
    27:6
    104:6

resuscitati
on
    71:12

retained
    36:9,10,
    13 37:2
    90:6,21

returned
    91:16

returning
    91:2

revealing
    112:10

review
    6:3 20:19

26:18
31:21
32:8,15
39:4,8
49:20,23
61:5
62:14
64:14
70:21,24
71:2 76:3
79:24
80:7,19
81:8 90:4
99:22
101:17
105:10
117:2
128:18
132:10
134:2,5

reviewed
    32:5
    39:8,9,16
    40:7
    41:18
    53:6
    56:9,23
    57:5
    60:13,14
    61:11,16
    66:3
    72:22,24
    73:10,15,
    22,23
    74:4,7,8,
    11,14,17,
    18,21
    75:4
    76:21
    78:14
    80:9,14
    86:24
    88:1
    89:16
    90:2,15,
    18 101:17

105:13
109:21
111:7
117:13
132:20

reviewing
    32:9
    56:13
    83:7
    102:13,14
    133:18

reviews
    95:17

revised
    49:20

Rhianna
    38:2
    120:5

right-hand
    100:17

RN
    11:16,18

RNS
    14:16

role
    38:7

Roman
    37:23
    38:5 49:7
    56:21
    88:14
    89:5

room
    81:24
    82:2
    127:23
    128:1,3

routine
    20:21

rule
    6:5 25:11

ruled
    27:6

ruling
    25:22

rush
    44:15

RX
    109:4


            S

sack
    22:11

sallyport
    96:20

sat
    47:5

scene
    26:24

schedule
    6:7

scheduled
    85:13

school
    11:4

Schumacher
    38:13,17
    41:2
    46:16
    55:15
    67:20
    68:13
    85:1
    99:19
    101:20
    102:5,7
    113:12
    122:8
    123:10
    148:5
    149:12

Schumacher'
s
    37:9

science
    24:17

scope
    11:16
    37:17,20,
    21 49:21
    109:14
    116:6,12

scopes
    10:10,13,
    15,22

screen
    129:20,
    21,24
    130:8,14,
    16 131:2,
    5,9

screened
    136:19

screening
    87:23
    88:3,4
    91:1
    92:1,2,5
    94:9,14
    114:3,4,
    6,8,23
    116:14
    117:23
    135:3,5,
    9,11,14,
    15,17,18,
    20

screenings
    90:19
    91:16
    113:8,18,
    22

Sean
    34:4



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: section..staffing

section
  49:21
  119:22

sections
  32:4,9

self-
employed
  6:17,19

seminars
  28:20,24
  29:7,9

Seneca
  60:18,19

Senna
  54:6,18
  55:7
  75:8,11,
  16 76:9,
  14 78:16
  100:23
  101:7
  103:19
  108:12

sentence
  73:23
  78:20
  88:9,14
  134:24

separate
  43:22
  93:11

separated
  94:6

series
  103:23
  119:12,19

serve
  91:2

services
  8:20
  31:22
  32:13,17

80:21

serving
  63:12

set
  16:6 40:8
  63:15
  73:7,11,
  12,13
  79:6,18
  80:8

setting
  14:8

sheet
  39:17
  56:7 58:7
  59:14,15,
  22 60:6
  144:13

sheriff's
  80:15,20
  86:19
  118:1
  120:3

sheriffs
  81:4

shift
  66:20
  67:18
  68:11

shifts
  70:18

short
  43:12,14

shorthand
  142:5

shorthands
  142:4

show
  77:11
  93:23
  112:8

130:8,10

showed
  61:19

showing
  112:6
  141:7

shown
  77:8

sick
  107:23
  108:1

sign
  142:16
  149:13

signature
  55:16,19

signs
  64:22
  117:15
  126:12

similar
  42:20
  43:10
  58:7
  59:14,15
  63:6 64:4

Singleton
  35:21

sir
  37:2,8
  102:3

site
  16:19

situation
  92:17

slash
  119:8
  129:6

slightly
  10:20

slow
  140:23

sole
  7:1

Solutions
  49:9 51:4
  52:19
  53:10
  63:6 64:3

somebody's
  81:14

SOP
  80:15

Sounds
  46:8

source
  112:6

Southern
  35:21

speak
  142:2,15
  143:2

speaking
  143:8

special
  78:24

specific
  11:20
  15:21
  16:8,19
  32:3,10,
  11 42:7
  75:24
  81:18
  90:10
  96:3
  122:24

specifical
ly
  12:24
  13:7 14:8

15:10
  33:24
  49:23
  66:7
  89:14
  103:16
  123:14
  125:20
  131:21
  133:24
  136:22

specifics
  22:1
  65:10

spend
  9:14,18

spoke
  55:20,22
  56:1,4
  58:15,16,
  20 70:1,3
  74:23
  75:6,15
  101:13
  108:16
  142:13,21

sporadicall
y
  7:23

staff
  9:22 10:2
  50:8
  56:23
  59:24
  60:15
  101:5
  113:8,17
  114:9
  116:10
  117:13
  121:12,
  16,24
  137:24

staffing



THOMAS FOWLKES, M.D.                               September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE          Index: stamp..synthetic

92:8 95:8

**stamp**
  55:1
  129:12,13

**standard**
  49:14
  81:2
  92:14
  97:6
  114:12
  148:3,11,
  14,20,22
  149:7

**standards**
  29:9
  31:21
  32:12
  94:23

**standing**
  76:16

**start**
  20:17
  22:14
  34:14
  47:3
  59:3,4,6,
  7 84:6
  117:6
  142:9

**started**
  12:17
  20:16
  70:4,15
  117:14
  139:3,22
  140:18

**starting**
  5:23
  33:14
  49:7
  59:2,16

**starts**
  56:22

142:8

**state**
  5:9
  10:16,18
  11:11
  12:11
  13:14
  14:2 33:5
  34:4
  50:1,6
  78:21
  81:4
  98:16
  119:3
  121:19
  122:1,17
  124:13

**state's**
  98:22
  99:6

**stated**
  126:19
  144:22,23

**statement**
  57:7
  71:7,10
  72:8
  73:3,21
  90:11
  92:10
  108:7,22
  120:10
  125:10
  132:9

**statements**
  49:2
  91:22
  127:19
  128:7,13

**states**
  10:18
  11:11,13
  12:4
  13:1,9

50:2,5
  65:18
  121:10

**stating**
  49:19
  102:8

**status**
  136:1

**statute**
  98:16
  121:18

**statutes**
  13:15
  121:24

**statutory**
  49:21

**stay**
  44:4 79:1
  86:4

**step**
  117:21

**steps**
  117:22

**Steve**
  5:21

**Stock**
  58:5
  111:21
  112:10
  130:4

**Stock's**
  111:21

**stop**
  8:13 77:5
  119:15
  142:18

**stopped**
  77:11

**strained**
  113:17

**strike**
  64:1

**submission**
  33:9

**submitted**
  30:16
  39:10

**subsequent**
  63:9 73:8

**subsequentl
y**
  68:1

**substance**
  43:20
  44:1 89:3

**substances**
  111:23
  129:7,9
  131:21

**substantial**
  30:12

**sum**
  44:24
  100:5

**summaries**
  26:23

**summary**
  40:17
  41:7,10,
  13 45:11,
  14 46:9
  47:7,11
  48:16
  71:3
  99:12
  100:7,8
  124:7

**supervise**
  12:21
  13:9

**supervising**

20:15

**supervisor**
  52:16,20

**supervisory**
  50:22
  51:9,18
  52:1

**supplementa
l**
  45:7,19
  83:6
  102:12,23

**support**
  8:4

**supposed**
  68:12
  84:4
  97:24

**surgeon**
  107:6,12

**surgeries**
  27:19

**surgery**
  82:7

**surprise**
  123:11

**surrounding**
  26:21
  33:23
  36:1

**sworn**
  33:10,12

**symptoms**
  38:8
  105:9

**syndrome**
  88:23

**synonymous**
  9:8

**synthetic**



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

September 29, 2017
Index: syrup..titled

131:3

syrup
  57:24

system
  119:7
  120:4,8

---

T

taking
  17:8
  19:11
  27:18
  57:1,7
  66:19
  69:18
  129:6
  130:13,19
  131:6,12,
  14

talk
  22:1
  23:24
  53:22
  81:15
  96:21
  140:23

talked
  140:17
  141:2
  142:12

talking
  14:7,9
  19:18
  20:6
  87:8,10
  89:19,23
  93:2,23
  108:6
  122:14
  135:12,13
  140:7
  141:12

team
  62:21

telephone
  55:7
  56:3,16
  65:8,15
  75:10
  76:17
  78:7
  108:15
  142:12

telling
  99:5

tells
  71:4

ten
  5:20
  59:17
  83:24
  119:10
  138:7

ten-year-
old
  18:16

tenens
  7:24

term
  43:13,14
  51:19
  86:15,21
  88:7

terms
  9:8

terrible
  122:9

Terry
  67:23

test
  33:6  41:9
  130:16
  131:12
  132:3

testified
  32:24
  91:8

testimony
  26:1,3
  27:22
  33:3,10,
  12  36:20,
  23  42:1,6
  52:7
  59:19
  60:2,4
  64:8,12
  65:17
  67:2,24
  68:8,15,
  20  69:1,2
  75:19,22
  85:21
  86:7
  101:24
  102:4,15,
  17,20
  103:6
  104:24
  105:14
  109:1
  114:18
  115:20
  123:17
  127:16,17
  128:16
  137:12

testing
  11:9,15,
  23  27:3,4

tests
  130:18

theoretical
ly
  143:20

therapeutic
  82:13

thing

16:19
69:19
93:19
97:9
108:6
113:12,17
124:18,24
125:4,11

things
  12:3
  23:23
  26:17
  79:24
  87:13
  117:16
  121:22
  125:5,7
  138:17

Thomas
  5:11  7:2,
  19  8:9

thought
  87:14
  133:17

time
  12:18
  17:8
  20:18
  21:23
  22:4,6
  23:14
  25:1,20
  30:15
  39:10,16
  41:3
  45:13
  50:7
  54:12,20
  56:16
  58:23
  61:14,16
  63:13,17
  64:5,22
  65:6
  70:12

76:20
77:9
88:17,20
91:2
92:12
94:5
106:4
107:17
110:17
121:4,11,
24  122:5
124:3
125:20
127:20
128:18
131:19
133:1
135:4,23
136:5,10,
13,15,17,
19  137:3,
6,18,24
138:6,10,
13,14,19,
21  139:22
148:14,15

timeline
  139:9

times
  18:12,18
  57:20
  141:5

timing
  22:24

title
  7:6
  128:22

Titlebaum
  35:2

titled
  47:7,11
  48:22
  99:12
  124:7

THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE         Index: Tizanidine..verified

Tizanidine
  57:21

today
  6:13,14
  46:12
  149:11

today's
  36:11

told
  13:5
  22:21
  42:9
  61:11
  74:9
  76:12
  84:1,5
  119:18
  123:14

Tom
  5:17

tooth
  22:8,16

top
  48:22
  59:7
  100:17

topic
  126:20

total
  44:24
  100:5

town
  8:17

toxicological
  27:4

toxicology
  129:4
  132:10,18

tract
  105:24

trained
  13:7
  14:16
  92:6 95:4
  98:12
  113:7
  114:9,16
  116:9,23
  117:1

training
  11:2
  87:4,17,
  23 88:2

transcripts
  81:13

treat
  84:10

treatment
  7:16 38:8
  49:10
  83:3
  107:24

true
  56:1,2
  60:24
  107:9
  109:15
  111:10
  121:23
  122:2
  142:23
  143:4,16

turn
  119:21
  131:5

turned
  8:18,21

Turning
  88:8

two-day
  53:1,2

Tylenol

21:3,5,6,
  7

type
  7:19 10:4
  23:4,7
  27:2

types
  26:17

typically
  88:6 94:8
  114:1

          U

Uh-huh
  43:8
  45:24
  57:16
  59:8
  75:13
  86:23
  89:1
  124:12
  128:4,15
  129:16
  130:21
  139:14
  144:14

ultimately
  38:8
  58:24

Ultram
  130:5,9,
  14,17
  131:11

underlying
  126:7,15,
  16

understand
  64:11
  67:7
  75:11
  77:22

82:23
  90:9
  101:15
  108:21
  109:10
  117:9
  128:2
  140:15
  145:15

understandi
ng
  16:18
  37:14
  53:24
  63:5,10
  64:3
  118:18
  137:16
  139:21

understood
  28:10

undertake
  24:15

uninsured
  8:16

University
  24:14,21

unlike
  143:9

unsafe
  92:15

unsure
  107:7

updated
  29:19,21
  30:10,11
  31:6,10
  32:21,22

urgency
  23:12

urgent
  20:24

21:14,15,
  19 23:2,
  9,10

urine
  129:20,21

usual
  70:16
  137:21
  140:11

utilized
  147:6

          V

valid
  18:6,19,
  21 19:6,
  8,19 20:7
  43:17
  117:8

varies
  9:20
  12:11

verbal
  70:17
  76:17

verificatio
n
  57:11
  59:2
  142:2
  144:13

verificatio
ns
  24:3

verified
  56:24
  57:6
  58:14
  61:6
  135:3



THOMAS FOWLKES, M.D.                                    September 29, 2017
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE            Index: verify..Zanaflex

**verify**
  58:2,4

**versus**
  33:15
  34:4,15
  35:1,5,
  18,21

**vicinity**
  62:12

**video**
  40:16
  41:7 42:2
  70:2
  71:3,5,6,
  11 105:11

**videos**
  40:21
  70:22,24

**videotape**
  69:21

**violation**
  149:7

**visible**
  61:10

**visit**
  107:11
  129:5,18
  130:2
  143:6
  146:9

**visited**
  81:23
  82:1

**visits**
  76:23
  138:22
  140:3
  141:8

**vitae**
  31:1,7

**vital**

  64:22
  117:15

**vocational**
  13:1,2

**vomiting**
  126:10

——————

**W**

**wall**
  97:8
  133:23

**wanted**
  8:22
  68:13
  74:2,9,23
  97:15,16
  128:18,20

**waste**
  124:2

**watch**
  40:20

**water**
  124:16,24
  125:6,21
  126:2,22
  127:2,10,
  14 128:1,
  6

**ways**
  43:6

**week**
  9:13,17,
  20 63:12,
  19 98:1

**weekend**
  44:8,9
  56:22
  57:9
  62:15
  63:9,12,
  22 72:6

  73:14
  76:23
  79:1 91:2
  126:11
  139:7,8
  141:13,23
  144:10,19
  145:5,17
  146:21

**weekender**
  44:7
  59:18
  136:1
  137:19,20
  138:4

**weekends**
  59:17
  73:5,8
  77:7,12
  95:10,12
  138:7
  139:11
  140:16
  144:24

**Wexford**
  35:5

**wishes**
  20:24
  21:7

**withdrawn**
  17:2 23:5
  26:2
  27:13
  53:8
  72:21

**word**
  48:21
  88:6
  125:9
  126:6

**wording**
  88:6
  103:7

**words**
  11:22
  23:14
  72:15

**work**
  7:20,23,
  24 78:10
  138:24

**worked**
  8:15
  52:19

**working**
  9:14
  29:11

**works**
  70:19
  96:9
  97:12
  123:22

**worse**
  125:5,7,
  13

**worst**
  124:17,24
  125:3,4,
  11 126:6

**writes**
  76:14

**written**
  12:9,14
  13:19,21
  16:1
  31:14,18
  44:24
  45:1
  62:17,24
  64:15,16
  66:3,6,
  13,23,24
  67:4,7,
  10,12,16
  68:5,6,9,
  10,22

  69:3,5,12
  70:11,12
  71:15,20
  74:21
  75:9
  83:22
  91:3,17,
  20 106:24
  110:14
  115:15
  143:14,16
  145:16

**wrong**
  134:15,20

**wrote**
  55:8
  64:21
  66:8
  100:3
  115:13
  120:10
  132:19
  137:17

——————

**Y**

**year**
  8:5,20
  22:16
  29:6 37:4

**years**
  5:20 9:5
  18:5 33:3
  67:15
  112:16

**Yesterday**
  6:14

——————

**Z**

**Zanaflex**
  57:21
  59:5



THOMAS FOWLKES, M.D.
BERRY vs DELAWARE COUNTY SHERIFF'S OFFICE

```
Zyrtec
   57:23
   59:4
```

