Pursuant to Fed. R. Civ. P. 26(a)2(B), Thomas D. Fowlkes, M.D. submits the following Expert Report on behalf of Defendant Correctional Healthcare, Inc., nka Correct Care Solutions

(i) **A complete statement of all opinions the witness will express and the basis and reasons for them.**

**Scope of report:** (I.) The appropriateness of the medical care provided Ms. Rhianna Filichia while she was incarcerated at the Delaware County Ohio Jail (DCJ) in January & February 2016 (II.) How Ms. Filichia's chronic and on-going medical conditions may have played a role in her symptoms, treatment and, ultimately, her death. (III.) Whether the Policies & Procedures in place regarding medical care at the DCJ are reasonable and appropriate. My opinion is limited to those that I can offer to a reasonable degree of medical probability or likelihood.

**Factual Summary:** 1. Ms. Rhianna Filichia was a 38 year single female with multiple chronic and severe medical conditions including:

a. diverticulitis with at least two prior perforations of the colon in 2015. After the second hospitalization she underwent a partial colectomy in October 2015. Following this surgery, she had a slow recovery and she continued to have abdominal pain.

b. chronic back pain for which she had previously been on long-term opiates and muscle relaxers.

1



EXHIBIT-1
9/29/17
Reporter:
Teresa Beaver

    c. alcoholism, which led to legal charges. She had previously been on a SCRAM device and was serving a sentence on weekends only at the DCJ at the time of her death.

    d. neuropathy for which she took gabapentin

    e. anxiety for which she took lorazepam

    f. chronic obstructive pulmonary disease (COPD) which required the use of inhalers. She continued to smoke.

2.    During the early part of 2016, Ms. Filichia was serving weekends at the DCJ. In January 2016 she served 3 weekends starting January 8th.

    a. During that first weekend (January 8-10, 2016), a Medical Receiving Screen was completed, her medications were verified and she was monitored for signs of alcohol and benzodiazepine withdrawal because she reported drinking 1 bottle liquor/6-8 beers everyday with last intake on "Thursday night." No signs of withdrawal developed and no medications were required for withdrawal.

    b. During the second weekend incarceration (January 15-17) her medications were verified again and dispensed.

    c. During the third weekend (January 22-24) her meds were resumed. On January 23, 2016 at 5:45 pm Ms. Filichia was seen by a nurse for complaint of abdominal pain. The pain was described as 10/10 on the pain scale and being described as "contractions". Her vital signs were normal with a heart rate of 92,

blood pressure of 122/80 and oxygen saturation of 98%. The second page of the 3 page assessment is missing.

    d. On the last weekend in January, Ms. Filichia did not report to the DCJ as scheduled.

3. On February 4, 2016 Ms. Filichia was seen at Grady Memorial Hospital (GMH) Emergency Department (ED) for a complaint of abdominal pain. I do not have the entire ED record but a CT Scan of the Abdomen & Pelvis with contrast was performed which showed that the colon just proximal to the surgery site had wall thickening and inflammatory change consistent with an "underlying infectious/inflammatory colitis. No discrete collection. No free air. No evidence of bowel obstruction." She was discharged home that same morning.

4. On the weekends of February 6th and 13th, Ms. Filichia was not present at the DCJ. Information in the record indicates that Ms. Filichia did not report to the DCJ for the prior 3 weekends due to her abdominal pain and she reported that "my lawyer was supposed to call you guys."

5. On February 17, 2016 Ms. Filichia saw Dr. Raymond Fuller in his office for abdominal pain. Dr. Fuller noted that "She had been doing reasonably well until recently. She has developed recurrent abdominal pain." He described the pain and her recent visit to the ED along with the CT findings. He reported: "She was diagnosed with colitis and was given prescriptions for Cipro and Flagyl. She still

has a couple days of antibiotics left. She has not seen any significant improvement in her symptoms." The review of systems was positive for appetite change, diarrhea and abdominal distention. On exam Dr. Fuller noted that "Her abdomen is soft. She does have some mild diffuse tenderness. There is no palpable mass. There are no peritoneal signs." In his plan Dr. Fuller noted that: "I think the changes are somewhat subtle." He was not certain of the cause and he decided to "continue the work-up with a colonoscopy". He told her to complete the antibiotics and he presumably scheduled an out-patient, non-urgent colonoscopy. (There is no note in the chart about the scheduling of a colonoscopy but Ms. Filichia later says that it was scheduled for 2/25/16.)

6. On the morning of February 20, 2016 Ms. Filichia was arrested and transported to the DCJ. Terri Bloomfield, the nurse on duty was asked by the booking officers to come assess the patient before she was accepted into the facility. Nurse Bloomfield spoke with Ms. Filichia, learned about her complaints of abdominal pain, her medications, recent ED visit and upcoming colonoscopy. She took vital signs (including temperature and oxygen saturation), which were within normal limits and she determined that Ms. Filichia could be accepted into the facility. Ms. Filichia complained of constipation and requested her laxative and pain meds be re-started. Nurse Bloomfield told Ms. Filichia that she could not re-start narcotics but would re-start a laxative. There were reports of a pill found on

4

Ms. Filichia and the nurse reported that security staff was going to keep Ms. Filichia under close observation in a holding cell due to the concern of her possibly having contraband on her person. Ms. Filichia was placed in a holding cell in close proximity to and constant view of correctional officers. (N.B. The nursing note documented by Nurse Bloomfield is entered as a late entry on 3/3/16.)

7. That same day Nurse Bloomfield re-started the meds Ms. Filichia had been on during the prior weekends. In addition, she verified with the pharmacy that Ms. Filichia did have a current prescription for Senna laxative, received a telephone order from the physician for that medication and she started it twice a day as ordered. She also performed a pregnancy test on Ms. Filichia and recorded the results as negative. There are no further reports of complaints by Ms. Filichia or interaction with nursing staff for the remainder of February 20th except that her evening meds were dispensed to her.

8. Overnight that night (February 20/21) there is a note documented by the nurse on duty (Nurse Wall, LPN) that while she was in the intake area where Ms. Filichia was housed, she heard Ms. Filichia "moaning & groaning". Nurse Wall went into Ms. Filichia's cell to assess her. Ms. Filichia was "tearful" and was complaining of "abdominal pain due to unable to 'poop.' Stated wanted to go to ER." Nurse Wall instructed her to drink more water to assist the laxative to work. Nurse Wall reports that she later saw Ms. Filichia on the toilet and that she did not

have complaints the rest of the shift. (N.B. The nursing note written by Nurse Wall appears to have the date of either 2/20/16 or 2/22/16 but given that Ms. Filichia was only incarcerated overnight one night, the correct date would have to be 2/21/16.)

9. During the day shift of February 21 there is no documentation of any complaint by Ms. Filichia or any staff interaction with her except that meds were dispensed to her as ordered. Subsequent investigative interviews indicate that Ms. Filichia mostly slept during that day and ate little.

10. In the evening of February 21, 2016 at approximately 8:20 p.m., the nurse was performing evening medication pass. When she and a correctional officer entered her cell, Ms. Filichia appeared weak and was having difficulty sitting up and swallowing water. Shortly after attempting to drink water with her medication she suddenly began vomiting and then rapidly became unresponsive. EMS was called and the nursing and correctional officers performed CPR until EMS arrived. Ms. Filichia was transported to GMH where she was pronounced dead at 9:15 p.m.

11. An autopsy was performed by the Franklin County Coroner's Office on February 22, 2016 which showed "the peritoneal cavity contains over 500 milliliters of yellow-tan, foul-smelling fluid." In addition, the remaining colon was "markedly dilated," there were no perforations found and on microscopic exam the surrounding "adventitial adipose tissue with chronic and acute inflammation with

predominance of the chronic component." In addition, a significant level of methadone was found in the blood. The pathologist listed the cause of death as: "Peritonitis, unknown etiology" and listed other significant condition as "Recent methadone use."

**Opinions:** The following are my opinions to a reasonable degree of medical probability on each of these areas based upon my training, experience, and a review of the records in this case:

I.  The actions taken by the employees of Correct Care Solutions in their assessment and treatment of Ms. Filichia during January & February 2016 while she was incarcerated at the Delaware County Jail were reasonable and within the acceptable standard of care for healthcare within a detention facility. Specifically:

    1. During the weekends prior to February 20, 2016 the nursing staff reviewed and verified the medications Ms. Filichia was taking and continued the necessary medications. In addition, they performed a medical receiving screening and monitored the patient for signs of withdrawal. Since essentially no signs or symptoms of withdrawal developed, the screenings were discontinued.

    2. The Delaware County Jail apparently had a practice of not repeating the booking process/paperwork (including the medical receiving screening form) for Ms. Filichia each weekend. According to Sgt. Jackson in the Sheriff Death Investigation file: "She does not get booked in because she was on our 'temp

7

release' due to being a weekender." This is potentially an unsafe practice because it may fail to detect a change in medical condition or suicide risk from one weekend to the next. However, in this case, the booking officers acted with more caution than merely filling out booking paperwork again. They had the on-duty nurse evaluate Ms. Filichia in person to determine if she was medically stable to remain at the jail.

3. Nurse Bloomfield evaluated Ms. Filichia in detail. She reviewed her medication and her request for additional medications beyond what was given on previous weekends, she reviewed her past history and recent ED visit, she completed a set of vital signs (which were normal) and correctly determined that Ms. Filichia was medically stable to remain at the jail. She noted that the correctional officers were going to keep Ms. Filichia under close observation in a holding cell due to concern of her having contraband (pills) on her person. Later she also did a pregnancy test, verified the new medication Ms. Filichia requested (laxative), got an order for it and prepared the meds for Ms. Filichia to receive that weekend. Based upon her findings, Nurse Bloomfield appropriately did not find any indication for special medical observation or monitoring of Ms. Filichia during her weekend stay.

4. There is no evidence in the record that after this initial encounter Ms. Filichia initiated a request for medical attention. During the night while near Ms.

8

Filichia's cell, the nurse on duty heard Ms. Filichia moaning and she went into her cell to evaluate her. Ms. Filichia reported abdominal pain due to constipation and wanted to go to ER. Since a laxative had been administered during the past evening's pill call, Nurse Wall appropriately encouraged Ms. Filichia to drink water to help the laxative to work and advised her to contact medical staff if the symptoms persist. Ms. Filichia did not complain or request medical assistance the rest of the night and Nurse Wall later noted Ms. Filichia was sitting on the toilet, indicating that the laxative had begun to work.

5. Morning medication pass was performed, Ms. Filichia received her medication and there was no indication of distress or a request for medical attention from Ms. Filichia at that time or throughout the day on February 21st.

6. On evening medication pass, Nurse Bloomfield went into Ms. Filichia's cell to administer her medications. Shortly after attempting to drink some water with the pills, Ms. Filichia vomited and rapidly became unresponsive. The nurses and correctional officers on duty provided appropriate emergency care and promptly requested EMS. CPR was performed and, according to information provided by a representative of the manufacturer of the Automated External Defibrillator (AED), the person who performed CPR "did an excellent job. The chest compressions were right where they needed to be..."

II. Ms. Filichia had several on-going medical issues which contributed to her death. Specifically:

1. Ms. Filichia had severe, long-standing intestinal problems, which had necessitated multiple hospitalizations and a partial colectomy. After the surgery approximately 4 months before this incarceration, Ms. Filichia continued to have problems including abdominal pain and constipation. Ms. Filichia had been to the ED approximately 2 weeks before this incarceration. Despite a CT scan showing abnormalities, the ED did not find an urgent problem requiring hospitalization or urgent treatment. Then just 3 days before this incarceration, Ms. Filichia saw her general surgeon. She continued to complain of these same issues. Again, he did not find an urgent condition requiring hospitalization or urgent intervention.

Ms. Filichia's chronic symptoms continued on the day of her arrest. The symptoms described during that weekend are of a similar quality and magnitude to those which she had been having and which she described to 2 physicians in the prior two weeks. Given this and the findings on autopsy that no perforation was identified and there was a predominance of chronic inflammation, it is almost certain that Ms. Filichia's intra-abdominal inflammatory process had been ongoing for an extended period of time prior to her incarceration. It would not be expected that the nurses at the DCJ would determine her symptoms to be an urgent condition when two recent physicians had not.

2. Ms. Filichia had previously used opiates chronically for pain. Opiates are well known to cause and/or worsen bowel dysfunction. In addition, methadone, which is a potent opioid, can lead to decreased level of consciousness, respiratory drive and subsequent difficulty with protecting one's airway or swallowing. Ms. Filichia's surgeon had determined in November of 2015, "I do not think she needs any more narcotics." There is no record that he or any other provider prescribed methadone to Ms. Filichia in 2016. In the Delaware County Sheriff's Death Investigative Report, it is reported that Ms. Filichia's fiancé told investigators that "within the last three to four days he caught Rhianna stealing some of his methadone pills he is prescribed for pain." Ms. Filichia did not report having methadone with her when she was brought into the jail and she was not administered methadone by the jail staff during that weekend. Yet Ms. Filichia had enough quantity of methadone in her post-mortem blood that the coroner listed "Recent Methadone Use" as a significant finding.

From the available information, it certainly appears likely that Ms. Filichia may have ingested enough methadone either shortly before her arrest and/or during the weekend, to cause her to sleep much of the weekend and may have contributed to her difficulty swallowing water with her medication on the evening of February 21. The difficulty swallowing with subsequent vomiting and possible aspiration, likely led to her sudden respiratory and cardiac arrest.

11

III. The Policies & Procedures in place regarding medical care at the DCJ are reasonable and appropriate. It is my medical opinion that the practice of the DCJ of not repeating the Medical Receiving Screen on inmates returning to serve weekend time is not in compliance with the written policy requiring it on "each inmate upon arrival at the jail." The practice could potentially overlook the development of serious medical or psychiatric issues. However, in this case, the security staff requested and the nursing staff performed an in-person evaluation and assessment of Ms. Filichia prior to accepting her into the facility in place of merely a paper form.

These opinions are expressed as requested to a reasonable degree of medical probability or likelihood. I reserve the right to review additional materials as noted or as they become available and to amend or modify these opinions based on the review of additional materials.

> **(ii) The facts or data considered by the witness in forming these opinions.**

To assist me in forming these medical opinions I have reviewed records in this case, including:

1. DCJ Booking Records from 2013-2016 consisting of 38 pages

2. DCJ Medical Records from 7/30/14 - 2/21/16 consisting of 61 pages

3. Medical Records from Dr. Raymond Fuller- 35 pages

4. Grady Memorial Hospital ED Record from 2/21/16 and partial record from 2/4/16 (CT scan report only)

5. Grady Memorial Hospital partial record from October 2015 - 12 pages- computerized EHR only - No H&P, Op Note, Progress Notes, Orders or Discharge Summary included

6. Coroner's Report and Autopsy Report

7. Sheriff's Death Investigation Report - 43 pages

8. The complaint and amended complaint

9. Delaware County Jail Intake & Medical SOP

10. Correct Care Solutions Policies & Procedures for Delaware County- 327 pages

> (iii) **Any exhibits that will be used to summarize or support these opinions.**

None at this time other than the documents listed above.

> (iv) **The witness's qualifications, including a list of all publications authored in the previous 10 years.**

See Appendix A for my current CV.

> (v) **A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.**

See Appendix B for my case list from the last four years.

  (vi) **A statement of the compensation to be paid for the study and testimony in the case.**

See Appendix C for my fee schedule.

*Thomas D. Fowlkes, MD*
_____

      Thomas D. Fowlkes, M.D.

Appendix A



# Thomas D. Fowlkes, M.D.
1207 Office Park Drive, Suite B
P.O. Box 1955
Oxford, MS 38655
Cell: 662-801-7508
Office: 662-234-7601
Fax: 662-234-8531
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with more than 18 years of practice in Correctional Medicine

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters

Areas of expertise include:
- Correctional Healthcare
- Deaths in Custody
- Drug Abuse and Effects of Addiction
- Drug testing interpretation and effects of substances
- Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine)- July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Addiction Medicine)- Dec. 2010 - Dec. 2020

Certified Correctional Healthcare Professional (CCHP) - Jan. 2017 - Dec. 2017

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2017

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2015- Present | Director of Professional and Medical Relations for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 1998-Present | Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015 |
| 2011- Present | Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judge Andrew Howorth |
| 2007- Present | Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi |

Updated 04/18/2017     Page 1 of 4

# Thomas D. Fowlkes, M.D.

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice. |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2011-2014 | Medical Director for Detox Services at Tupelo CSU for Region IV Community Mental Health Center (Part-time) |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center. |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company. |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN. |

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of Public Safety
Served as flight physician for STAT Med-evac helicopter program

**Thomas D. Fowlkes, M.D.**

## EDUCATION (cont.)

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS

American Society of Addiction Medicine

Mississippi Society of Addiction Medicine

American College of Correctional Physicians

North Mississippi Medical Society

Mississippi State Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight.* 3rd ed. Ed. Kuehl A. Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command.* 1st ed. Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services.* Vol. 23 (1990): 20-27. Print.

## PRESENTATIONS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation Prescribers' Summit* March 31, 2017, Oxford, MS

"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

" Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

**Thomas D. Fowlkes, M.D.**

## PRESENTATIONS (cont.)

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit* June 24, 2016, Gulfport, MS

" Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit* April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit*, November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit*, October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference*, August 22, 2013, Pickwick, TN

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS**

Angela Anderson et al vs. Marshall County MS & BMH-DeSoto Hospital
Cause # 3:12-CV-92
US Federal District Court-No. Miss

State of Mississippi v. Shawn Hunt
Cause # CR2013-167SMD
DeSoto County (MS) Circuit Court

Cary v. Cary
Cause # 14-1149-41-MM
Lee County (MS) Chancery Court

Gallion v. Hinds County et al.
Case # 3:12-CV-736
US District Court, Southern District MS

State of Mississippi v. Kimberly Dobbs
Third Judicial Circuit (MS) Court

State of Mississippi v. Brian Adams
Cause # LK11-40
Third Judicial Circuit (MS) Court

State of Mississippi v. Mark Tutor
Cause # Rankin 24,819
Third Judicial Circuit (MS) Court

State of Mississippi v. Cileste Donald
Cause # LK12-196
Third Judicial Circuit (MS) Court

State of MS v. Joshua Blunt
Cause # 2016-060-CR
Grenada County (MS) Circuit Court

MS Board of Medical Licensure v. Ikechukwe Okorie, MD
Hinds County, MS

MS Board of Nursing v. Justin Robbins
MS Board of Nursing v. Jennifer Robbins
Hinds County, MS

Lee v. Jackson County MS et al.
Case # 1:13-CV-441
US District Court, Southern District MS

Appendix C

Thomas D. Fowlkes, M.D.

**FEE SCHEDULE**

I am being paid $500 per hour for review, study & testimony in this case plus travel expenses.